UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

---------------------------------------------------------------X
BETTY, INC.,
           Plaintiff,

v.

PEPSICO, INC.,
           Defendant.
---------------------------------------------------------------X

Civil Action No. 7:16-cv-04215

COMPLAINT

Plaintiff Betty, Inc. dba Betty Advertising ("Betty"), by its attorneys, Martin LLP, as and for its Complaint against defendant PepsiCo, Inc. ("PepsiCo"), alleges as follows:

Parties and Jurisdiction

1. Betty is a corporation organized and existing under the laws of the State of Connecticut that has its principal place of business in Connecticut.

2. PepsiCo is, upon information and belief, a corporation organized and existing under the laws of the State of North Carolina that has its principal place of business in New York.

3. Subject matter jurisdiction exists in this Court pursuant to the provisions of 28 U.S.C. §§1331, 1332(a) and 1338 inasmuch as it states a claim of copyright infringement and is between citizens of different states that involves a sum of more than $75,000.

1

4. Venue is proper in this District pursuant to 28 U.S.C. §1391(a)(1) and (2) inasmuch as PepsiCo resides in this District and a substantial part of the events giving rise to the claim occurred in this District.

COUNT ONE (Copyright Infringement)

5. Betty is a premium boutique advertising agency engaged in the business of, among other things, developing innovative and high quality creative and advertising concepts and storylines. Betty's work is known to be unique and compelling.

6. PepsiCo is a well-known global food and beverage company that markets and sells products with respected household names throughout the world.

7. The Super Bowl is considered the premier advertising event each year because it is perennially the highest-rated telecast. Many viewers are more interested in, and pay more attention to, the commercials than they do to the game and considerable media attention is given to evaluating the quality, creativity and impact of each commercial. For these reasons, many advertisers devote particular time, effort and attention to Super Bowl commercials and the cost to an advertiser to broadcast a commercial during the Super Bowl greatly exceeds the cost of any other commercial time.

8. In recent years, many advertisers have built campaigns centered on their Super Bowl advertising by doing such things as pre-releasing commercials, or

parts of commercials, before Super Bowl Sunday through online media like YouTube and Facebook.

9. PepsiCo has for many years embraced the value of Super Bowl advertising and it has aired a number of iconic Super Bowl commercials over the years.

10. In recent years, the Super Bowl halftime show, featuring well-known musical entertainers, has also become a significant part of the Super Bowl broadcast. Many viewers of the Super Bowl broadcast are more interested in, and pay more attention to, the halftime show than they do to the game.

11. According to industry estimates reported by the Nielsen Company, approximately 115.5 million people watched the 2016 Super Bowl halftime show. According to a CNN/Money report, the actual number of viewers exceeded the Nielsen's estimate inasmuch as that estimate does not take into account the many viewers who watch at bars and restaurants nor does it include the 67 million viewers that CBS reported watched online by streaming the broadcast. With these figures, Super Bowl 50 was the most-watched television broadcast in history.

12. Since June 2012, PepsiCo has been the title sponsor of the Super Bowl halftime show.

13. The commercial leading into the PepsiCo Super Bowl halftime show ("the Super Bowl halftime commercial") is an extremely high profile spot to

which, given its prominent placement as the direct lead, PepsiCo devotes considerable and direct focus, attention and concern.

14. Because of its importance, PepsiCo began to solicit creative concepts for the 2016 Super Bowl halftime commercial at least as early as September 2015. PepsiCo received concepts from a number of advertising agencies but it determined not to pursue the development of any of the ideas initially presented to it by these advertising agencies for the Super Bowl halftime commercial, and instead determined to solicit new creative concepts from an additional group of advertising agencies.

15. On October 29, 2015, PepsiCo sent an invitation to Betty, with whom certain of its brands had previously worked, as well as other agencies, to join a telephone briefing at which PepsiCo would provide direction and a general outline or "brief" of what it wanted for the Super Bowl halftime commercial. Betty participated in the telephone briefing on October 30, 2015 and it was given until November 6, 2015 to prepare proposed advertising storylines and its presentation.

16. The agreement PepsiCo and Betty made, based on past practices between them and industry custom, was that a Statement of Work would be negotiated, prepared and executed if PepsiCo liked a presented advertising storyline and wanted to move forward into production with it.

17. Unless a Statement of Work is negotiated, prepared and executed with respect to an advertising concept, that is, it is specifically referenced as a deliverable in an executed Statement of Work, Betty retains all rights, title and interest to each concept and advertising storyline it develops.

18. Betty representatives met with the PepsiCo team (which consisted of employees and non-employee agents) during the morning of November 6, 2015 at PepsiCo's offices. At all relevant times, each member of the PepsiCo team acted within the scope of the actual or apparent authority conferred by PepsiCo.

19. At the November 6, 2015 meeting, Betty's Chief Creative Officer presented eight (8) concepts in detail to the PepsiCo team through the use of casting technology from a computer to a television screen mounted on the conference room wall. After the conclusion of the presentation, Betty provided four of its distinctive, white Betty branded USB drives to the PepsiCo team to keep for further review at a later time.

20. Consistent with the recommendations provided in the PepsiCo-provided brief, among the concepts Betty presented to PepsiCo at the November 6, 2015 meeting were concepts that Betty titled "All Kinds/Living Jukebox", "Parallel Universe" and "Flop Joy." The PepsiCo team reacted favorably to the presentation made by Betty's Chief Creative Officer and later that night (Friday November 6, 2015) it requested that refinements be made to certain of the

presented storylines and sent to the PepsiCo team by 9:00 a.m. on Monday, November 9, 2015.

21. To meet the Monday morning, November 9, 2015 deadline that PepsiCo set, Betty rearranged schedules and worked all weekend on the requested refinements.

22. Betty presented the refined concepts to the PepsiCo team on November 9, 2015.

23. Betty's "All Kinds/Living Jukebox" storyline was prepared in accordance with the PepsiCo recommended outline and contains the following significant elements:

    a. The spot was descriptively named "All Kinds / Living Jukebox" with a proposed specific play on the Joy of Pepsi. "All Kinds" described the variety of music, dance, fashion, and overall room vibe depicted in the storyline. "Living Jukebox" described the human representation of what a jukebox could be, with seamless music changes and genre variety and with the ability to transport the viewer to imagine a scene consistent with a created joyous feeling.

    b. The spot starts with someone walking inside a room;

c. The viewer travels through various rooms with a hero character, which was presented as potentially being a single powerful performer for all music renditions, and the same principle dancers;

d. The hero character moves seamlessly from room to room throughout the set design;

e. Every time the hero character enters a new room, the genre of music and dance style immediately switches to reflect a new vibe in that room;

f. The set design stylistically changes as does the fashion/wardrobe of the cast, as the viewer moves to the next room;

g. Seamless wardrobe changes were proposed for the hero character; and

h. Clean seamless cuts / camera shots are used as the rooms and genres change.

24. During the November 6, 2015 presentation meeting, Betty's Chief Creative Officer verbally communicated and emphasized to the PepsiCo team that dancers would be performing in the background in each room and that there would be a different dance style shown. As the shot moved from room to room, the dance

7

moves would change to reflect the changes in music genre. Betty's Chief Creative Officer also verbalized and emphasized that the commercial would be done in the style of what would appear to be one consecutive shot as the hero performer in the spot moved seamlessly from one room to the next with the doorway serving as the agent of change. To illustrate the concept, Betty's Chief Creative Officer provided sample images to the PepsiCo team as reference points as how each room could change both visually and stylistically through the commercial.

25. Betty produced the initial ideation and undertook the requested refinement services on the basis of an express understanding that it would be paid $5,000 by PepsiCo for such services. The agreement Betty made with PepsiCo did <u>not</u> relate to any right to use, or any licensing or assignment of, the copyright and other intellectual property rights in the advertising storylines which Betty presented to PepsiCo (and/or any derivative versions of them). Betty reiterated its ownership rights related to such advertising storylines in a letter to PepsiCo dated December 7, 2015.

26. PepsiCo did not pay the $5,000 fee to Betty in respect of the production of the initial pitch and the refinement services when those services were requested and rendered. Months later, in April 2016, after Betty altered PepsiCo senior management of its concerns, as outlined in this Complaint, PepsiCo tendered a payment along with an unsolicited PepsiCo purchase order (there had

8

been no Statement of Work or Betty invoice) for the "Betty Super Bowl Ad Creative Concept," which, if accepted by Betty, could arguably have had the effect of transferring ownership rights in the presented advertising storylines to PepsiCo long after the Super Bowl halftime commercial first aired. Betty rejected this tendered payment, and returned the payment to PepsiCo.

27. Betty only licenses or assigns its copyright or other intellectual property rights to its clients pursuant to written agreements and only in consideration of its receipt of fair market value compensation.

28. On December 2, 2015, PepsiCo advised Betty, via an e-mail sent by Jayonthi Raja Segaran, that PepsiCo had decided to move forward with different ideas to put into testing for the Super Bowl halftime commercial.

29. Without advising Betty, entering into a Statement of Work or otherwise negotiating an agreement to acquire the rights in, or any right to use, Betty's copyright, and other intellectual property rights, PepsiCo used Betty's "All Kinds/Living Jukebox" storyline, with executional adjustments, to produce the Super Bowl halftime commercial.

30. The Super Bowl halftime commercial PepsiCo aired during the 2016 Super Bowl copies, is fundamentally based on, and is derivative of, the "All Kinds/Living Jukebox" advertising storyline Betty presented to PepsiCo.

9

31. Like the "All Kinds/Living Jukebox" storyline Betty presented to PepsiCo, without limitation, the Super Bowl halftime commercial features the following significant, critical and unique elements:

    a. As with "All Kinds/Living Jukebox", the commercial is implemented as if and so as to suggest the viewer is transported into a human jukebox, with seamless music changes and genre variety and the ability to imagine a scene consistent with a created joyous feeling;

    b. As with "All Kinds/Living Jukebox", a single powerful performer (hero character) is used to perform all music renditions, genres and fashion changes as she dances seamlessly from room to room;

    c. As with "All Kinds/Living Jukebox", the commercial follows a hero character moving from room to room through each doorway used in the complete set design;

    d. As with "All Kinds/Living Jukebox", every time the hero character enters a new room, the genre of music immediately changes to reflect a new vibe;

e. As with "All Kinds/Living Jukebox", the set design stylistically changes, along with the fashion/wardrobe of the cast, as the hero character moves from room to room;

f. As with "All Kinds/Living Jukebox", seamless wardrobe changes are used for the hero character;

g. As with "All Kinds/Living Jukebox", the dance style changes along with the music genre as the hero character enters and exits each room;

h. As with "All Kinds/Living Jukebox", the commercial uses clean, seamless cuts / camera shots, with the hero character dancing from genre to genre; and

i. Specifically reflecting one of the critical elements of the "All Kinds/Living Jukebox" name, the commercial opens on the direct focus of Betty's main theme, a jukebox.

32. Upon information and belief, an advertising agency named The Marketing Arm, which was on information and belief not one of the original group of agencies that pitched ideas to PepsiCo and was not listed as an invitee on the October 29, 2015 invitation to attend PepsiCo's October 30, 2015 telephone briefing, has publicly taken credit for the Super Bowl halftime commercial. The Marketing Arm did not present its concepts to the PepsiCo team until <u>after</u> the

11

November 6, 2015 presentation made by Betty's Chief Creative Officer. Any relevant concept The Marketing Arm may have presented to the PepsiCo team had far fewer elements in common with the Super Bowl halftime commercial than did "All Kinds/Living Jukebox".

33. On February 2, 2016, PepsiCo's Chief Marketing Officer, in a nationally televised interview with CNN/Money, stated that "with all the analysis we do, PepsiCo's Super Bowl is worth the money we are putting up because we are getting great payback across our businesses."

34. In addition to airing the Super Bowl halftime commercial during the Super Bowl broadcast, PepsiCo has used that commercial in numerous other premium spots and released it, both before and after the Super Bowl, on various social media and other distribution channels. As of May 3, 2016, PepsiCo had re-broadcast the Super Bowl halftime commercial nationally more than 7,580 times (more than 66 times per day) and it has been viewed millions of times across numerous platforms.

35. PepsiCo's unauthorized use of Betty's "All Kinds/Living Jukebox" storyline, in whole or in part, has damaged Betty in numerous ways including, but not limited to, by not receiving fair market value compensation for the use of its intellectual property, and by not receiving the public acclaim it rightfully deserves for its work.

36. Betty is the sole and exclusive author, creator and owner of all right, title and interest in the "All Kinds/Living Jukebox" advertising storyline, as well as in all derivatives thereof.

37. PepsiCo willfully infringed Betty's federally registered copyright (Registration No. TXu 1-993-773) by copying and distributing, without authorization or approval, Betty's copyrighted materials and/or making other infringing use of the copyrighted materials.

38. A finding of willfulness is supported by the evidence.

39. PepsiCo is liable to Betty for willful infringement of its copyright under 17 U.S.C. §501, *et seq*.

40. Betty has suffered and will continue to suffer great and irreparable damages as a result of PepsiCo's copyright infringement.

COUNT TWO (Breach of Contract)

41. Betty repeats and re-alleges each of its allegations contained in Paragraphs 1-40 of the Complaint as if fully set forth herein.

42. PepsiCo breached the agreement it made with Betty that it would enter into a Statement of Work with Betty as to any advertising storyline which it wanted to use or otherwise acquire rights.

43. Betty has been damaged by the PepsiCo breach of contract.

COUNT THREE (Unjust Enrichment)

44. Betty repeats and re-alleges each of its allegations contained in Paragraphs 1-43 of the Complaint as if fully set forth herein.

45. By producing and airing the Super Bowl halftime commercial based on use of Betty's "All Kinds/Living Jukebox" storyline without paying an agreed, fair market value associated with such use, PepsiCo received an unjust benefit from Betty.

46. PepsiCo's failure to pay for the benefit it obtained from Betty was to Betty's detriment.

47. PepsiCo is liable to Betty for unjust enrichment.

COUNT FOUR (Conversion)

48. Betty repeats and re-alleges each of its allegations contained in Paragraphs 1-47 of the Complaint as if fully set forth at length herein.

49. By producing and airing the Super Bowl halftime commercial based on use of Betty's "All Kinds/Living Jukebox" storyline without paying an agreed, fair market value associated with such use, PepsiCo, without authorization, assumed and exercised ownership over property belonging to Betty to the exclusion of Betty's rights.

50. PepsiCo acted with malice or reckless or willful disregard of Betty's rights.

51. PepsiCo is liable to Betty for conversion.

COUNT FIVE (Unfair Competition)

52. Betty repeats and re-alleges each of its allegations contained in Paragraphs 1-51 of the Complaint as if fully set forth at length herein.

53. PepsiCo's actions represent an unjustifiable misappropriation of Betty's property rights for PepsiCo's commercial advantage and an attempt to profit from Betty's expenditure of time, labor and talent.

54. PepsiCo acted in bad faith.

55. PepsiCo is liable to Betty for unfair competition.

WHEREFORE, Betty prays for the entry of a Judgment against PepsiCo providing for:

    a. Compensatory damages;

    b. Punitive damages;

    c. Attorneys' fees pursuant to 17 U.S.C. §505;

    d. Costs;

    e. Prejudgment interest; and

    f. Such other and further relief that the Court deems just and appropriate.

## JURY DEMAND

Plaintiff hereby demands a trial by jury.

Dated: June 7, 2016
Stamford, Connecticut

        Respectfully,

By _/s/ Mark A. Gregory_
Mark S. Gregory (MG0914)
Martin LLP
262 Harbor Drive, 3rd Floor
Stamford, Connecticut 06902
Tel: (203) 973-5210
Fax: (203) 973-5250
E-Mail: mgregory@martinllp.net

*Attorneys for Plaintiff Betty, Inc.*