UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

BETTY, INC.,

                                Plaintiff,

        -v-

PEPSICO, INC.,

                                Defendant.

No. 16-CV-4215 (KMK)

OPINION & ORDER

Appearances:

Mark S. Gregory, Esq.
Martin LLP
Stamford, CT
*Counsel for Plaintiff*

Michael S. Elkin, Esq.
Scott R. Samay, Esq.
Monique N. Bhargava, Esq.
Winston & Stawn LLP
New York, NY
Chicago, IL
*Counsel for Defendant*

KENNETH M. KARAS, District Judge:

Plaintiff Betty, Inc. ("Plaintiff") brings this Action against Defendant PepsiCo, Inc. ("Defendant"), alleging that Defendant's 2016 Super Bowl commercial infringed on its copyrighted advertisement pitch. Plaintiff additionally asserts breach of contract, unjust enrichment, conversion, and unfair competition claims arising in large part from Defendant's unauthorized use of the copyrighted material. (*See generally* Compl. (Dkt. No. 1).) Before the Court is Defendant's Motion To Dismiss the Complaint pursuant to Federal Rule of Civil

Procedure 12(b)(6) (the "Motion"). For the reasons to follow, Defendant's Motion is granted in part and denied in part.

## I. Background

### A. Factual Background

The following facts are drawn from Plaintiff's Complaint and certain documents that are integral to the Complaint, and are taken as true for the purpose of resolving the Motion.

Plaintiff is an advertising agency that creates and develops "innovative and high quality creative and advertising concepts and storylines." (Compl. ¶ 5.) Defendant is a global food and beverage company. (*Id.* ¶ 6.) Since June 2012, Defendant has been the title sponsor of the National Football League Super Bowl halftime show. (*See id.* ¶ 12.) Some 115 million people watched the 2016 Super Bowl halftime show. (*See id.* ¶ 11.)

Defendant, hoping to have a memorable halftime commercial, began soliciting ideas for its 2016 halftime commercial in September 2015. (*See id.* ¶ 14.) After reviewing an initial round of submissions, Defendant decided to solicit new ideas from advertising agencies that did not participate in the initial group. (*See id.*) On October 29, 2015, Plaintiff was invited to participate in a telephone briefing, which was held on October 30, 2015, during which Defendant explained a general outline of what it envisioned for the Super Bowl commercial. (*See id.* ¶ 15.) Plaintiff was given until November 6, 2015, to prepare a presentation outlining ideas for the commercial. (*See id.*) The Parties allegedly agreed, "based on past practices between them and industry custom," that a "Statement of Work would be negotiated, prepared and executed if [Defendant] liked a presented advertising storyline and wanted to move forward into production with it." (*Id.* ¶ 16.) Until a Statement of Work is executed, "[Plaintiff] retains all rights, title and interest to each concept and advertising storyline it develops." (*Id.* ¶ 17.)

On November 6, 2015, Betty attended a meeting at Defendant's offices, during which Plaintiff presented eight concepts for the Super Bowl commercial to Defendant. (*See id.* ¶¶ 18–19.) Among the concepts presented were concepts that Plaintiff titled "All Kinds/Living Jukebox," "Parallel Universe," and "Flop Joy." (*Id.* ¶ 20 (internal quotation marks omitted).) At the end of the meeting, Plaintiff provided Defendant four USB drives containing the concepts for the commercial. (*See id.* ¶ 19.) Defendant allegedly "reacted favorably" to Plaintiff's presentation, and requested, later that night, that certain refinements be made to certain of the concepts by 9:00 a.m. on November 9, 2015. (*Id.* ¶ 20.)

On November 9, 2015, Plaintiff presented the refined concepts to Defendant. (*See id.* ¶ 22.) The "All Kinds/Living Jukebox" storyline allegedly contained the following elements:

a. The spot was descriptively named "All Kinds/Living Jukebox" with a proposed specific play on the Joy of Pepsi. "All Kinds" described the variety of music, dance, fashion, and overall room vibe depicted in the storyline. "Living Jukebox" described the human representation of what a jukebox could be, with seamless music changes and genre variety and with the ability to transport the viewer to imagine a scene consistent with a created joyous feeling.
b. The spot starts with someone walking inside a room;
c. The viewer travels through various rooms with a hero character, which was presented as potentially being a single powerful performer for all music renditions, and the same principle dancers;
d. The hero character moves seamlessly from room to room throughout the set design;
e. Every time the hero character enters a new room, the genre of music and dance style immediately switches to reflect a new vibe in that room;
f. The set design stylistically changes as does the fashion/wardrobe of the cast, as the viewer moves to the next room;
g. Seamless wardrobe changes were proposed for the hero character; and
h. Clean seamless cuts/camera shots are used as the rooms and genres change.

(*Id.* ¶ 23.) During the presentation, Plaintiff's Chief Creative Officer emphasized that dancers would be performing in the background of each room and there would be different dance styles shown. (*See id.* ¶ 24.) "As the shot moved from room to room, the dance moves would change to reflect the changes in music genre." (*Id.*) Plaintiff's Chief Creative Officer also allegedly

emphasized that the commercial would be created to appear as one consecutive shot as the hero performer moved from one room to the next. (*See id.*) Plaintiff provided Defendant with sample images to illustrate how each room could change throughout the commercial. (*See id.*)

Plaintiff sought and obtained a copyright in the materials presented to Defendant during the presentation. (*See* Decl. of Michael S. Elkin, Esq., in Supp. of Def.'s Mot. To Dismiss Ex. B ("Copyright") (Dkt. No. 23).)[1] As relevant here, the copyrighted material includes two slides describing the "All Kinds/Living Jukebox" concept. The first slide states:

Concept: All Kinds/Living Jukebox

There is no one correct way to experience joy. It's different for everyone and that should be celebrated.

The spot starts outside a giant Brooklyn(like) warehouse. We're given the camera perspective of someone walking in. Outside the door, a man plays an acoustic guitar singing an acoustic rendition of the Joy of Pepsi. As we enter the warehouse the genres start to change and unfold while the song remains the same and continues in the spot the acoustic singer left off. We travel through various rooms where we experience the song in different genres. As each genre changes so does the fashion, clothes, and vibe of the room.

Rock•Rap•Jazz/Swing•Classical•Metal•etc

Think for reference going from a metal interpretation of the Joy of Pepsi to a lone singer with an Adele like quality with a single beam of light shining on her. Think of going from rock an [sic] upright bass plucking out the "ba ba ba ba ba"

The spot ends walking out the other side of the warehouse where a doo wop/acapella crew is standing around a fire lit in a trash can.

V/O or title: Joy takes all kinds. Pepsi.

(Copyright 3.) The second slide contains the following additional elements for consideration:

---

[1] The Court may consider this exhibit even though it was not attached to the Complaint because the Court deems it integral thereto. *See DiFolco v. MSNBC Cable L.L.C.*, 622 F.3d 104, 111 (2d Cir. 2010) ("Where a document is not incorporated by reference, the court may never[the]less consider it where the complaint relied heavily upon its terms and effect, thereby rendering the document integral to the complaint." (internal quotation marks omitted)).

Considerables:
Doesn't have to be a walkthrough of the warehouse. Can be achieved on one stage
while making clean cuts from genre to genre.
Can be a single powerful performer Celeb or Not who pulls off all renditions
Can incorporate quick changes (wardrobe the way magicians accomplish quick
changes . . . one dress comes off, another is underneath ready to go)
Crowdsource renditions of Joy of Pepsi as contests on social media

(*Id.* at 4.)  Below this text are six pictures meant to give the viewer an impression of the concept.

Plaintiff created the initial concepts and the refined concepts presented at the November

9, 2015 meeting based upon an agreement between the Parties that Plaintiff would be paid

$5,000 for such services.  (*See* Compl. ¶ 25.)  "The agreement [Plaintiff] made with [Defendant]

did not relate to any right to use, or any licensing or assignment of, the copyright and other

intellectual property rights in the advertising storylines which [Plaintiff] presented to

[Defendant] . . . ."  (*Id.* (emphasis omitted).)  Defendant did not pay Plaintiff the agreed upon

$5,000 during the November 9, 2015 meeting.  (*See id.* ¶ 26.)

On December 2, 2015, Defendant advised Plaintiff that Defendant had chosen to move

forward with different concepts.  (*Id.* ¶ 28.)  Defendant nonetheless allegedly used the "All

Kinds/Living Jukebox storyline, with executional adjustments, to produce the Super Bowl

halftime commercial."  (*Id.* ¶ 29 (internal quotation marks omitted).)  According to Plaintiff,

"[t]he Super Bowl halftime commercial [Defendant] aired during the 2016 Super Bowl copies, is

fundamentally based on, and is derivative of, the All Kinds/Living Jukebox advertising storyline

[Plaintiff] presented to [Defendant]."  (*Id.* ¶ 30 (internal quotation marks omitted).)

The halftime commercial opens on a jukebox selecting a record with a Pepsi logo at its

center.  (*See* Decl. of Kimera Rosen Ex. A ("Halftime Commercial") (Dkt. No. 22).)  The

commercial then changes focus from the jukebox to Janelle Monáe, and a room full of other

people, dancing in a red 1960s style diner to "Do you Love Me" by the Contours.  After several

seconds dancing in the diner, Monáe kicks open a door into a second, all white room filled with a second group of dancers.  While Monáe walks through the door her wardrobe changes, and so does the music and the style of the dance.  Monáe and the other dancers are shown dancing to "Express Yourself" by Madonna.  After a brief period in the white room, Monáe runs through a second door and into a blue, modern-day dance club.  As the scene transitions into the dance club, Monáe's outfit changes again.  In this room, Monáe dances to a modern rendition of the "Joy of Pepsi" jingle, while holding and sipping a bottled Pepsi.  As the commercial ends, the camera zooms out and the viewer is shown that the three rooms combine together to make an image of the Pepsi Globe.

Plaintiff has identified the following similarities between the "All Kinds/Living Jukebox" concept and Defendant's Super Bowl commercial:

a. As with "All Kinds/Living Jukebox," the commercial is implemented as if and so as to suggest the viewer is transported into a human jukebox, with seamless music changes and genre variety and the ability to imagine a scene consistent with a created joyous feeling;

b. As with "All Kinds/Living Jukebox," a single powerful performer (hero character) is used to perform all music renditions, genres and fashion changes as she dances seamlessly from room to room;

c. As with "All Kinds/Living Jukebox", the commercial follows a hero character moving from room to room through each doorway used in the complete set design;

d. As with "All Kinds/Living Jukebox," every time the hero character enters a new room, the genre of music immediately changes to reflect a new vibe;

e. As with "All Kinds/Living Jukebox," the set design stylistically changes, along with the fashion/wardrobe of the cast, as the hero character moves from room to room;

f. As with "All Kinds/Living Jukebox," seamless wardrobe changes are used for the hero character;

g. As with "All Kinds/Living Jukebox," the dance style changes along with the music genre as the hero character enters and exits each room;

h. As with "All Kinds/Living Jukebox," the commercial uses clean, seamless cuts/camera shots, with the hero character dancing from genre to genre; and

i. Specifically reflecting one of the critical elements of the "All Kinds/Living Jukebox" name, the commercial opens on the direct focus of [Plaintiff's] main theme, a jukebox.

(Compl. ¶ 31.) As of May 3, 2016, the Super Bowl halftime commercial has been aired nationally over 7,500 times. (*See id.* ¶ 34.)

Another advertising agency, The Marketing Arm, which was not part of the original group of agencies that pitched ideas to Defendant and did not participate in the October 30, 2015 telephone briefing, has allegedly taken credit for the commercial aired during the Super Bowl. (*See id.* ¶ 32.) Plaintiff alleges that even if The Marketing Arm did present concepts to Defendant, those concepts "had far fewer elements in common with the Super Bowl halftime commercial than did 'All Kinds/Living Jukebox.'" (*Id.*)

After Defendant learned that Plaintiff was contemplating filing this Action, Defendant tendered a $5,000 payment along with a purchase order for the "Betty Super Bowl Ad Creative Concept." (*Id.* ¶ 26.) Plaintiff rejected this payment on the ground that Plaintiff did not want it to appear as though it agreed to transfer any ownership rights in the concepts to Defendant. (*See id.*)[2]

Plaintiff alleges that Defendant infringed on Plaintiff's copyright to the "All Kinds/Living Jukebox" concept by airing the commercial without Plaintiff's permission. (*See id.* ¶ 37.) Plaintiff has allegedly been harmed by Defendant's actions because Defendant has not compensated Plaintiff for using Plaintiff's intellectual property and Plaintiff has not received the public recognition it believes it is owed. (*See id.* ¶ 35.)

Plaintiff additionally asserts four state-law causes of action: breach of contract, unjust enrichment, conversion, and unfair competition. All of these causes of action stem largely from

---

[2] Defendant does not dispute that Plaintiff is entitled to the $5,000 payment. (*See* Def.'s Mem. of Law in Supp. of Mot. To Dismiss 4 n.2 (Dkt. No. 21).)

the same conduct described above—Defendant's use of Plaintiff's concept and ideas without permission or executing a Statement of Work.  (*See id.* ¶¶ 42, 45, 49, 53.)

B.  Procedural Background

Plaintiff initiated this Action by filing the Complaint on June 7, 2016.  (*See* Dkt. No. 1.) Pursuant to a memo endorsement, Defendant filed its Motion and supporting papers on November 22, 2016.  (*See* Dkt. Nos. 20–23.)  Following a series of scheduling modifications, (*see* Dkt. Nos. 25, 27), Plaintiff filed opposition papers on January 20, 2017, (*see* Dkt. No. 28), and Defendant filed a reply on February 24, 2017, (*see* Dkt. No. 29).

## II.  Discussion

Plaintiff's claims can be divided into two separate categories: state-law claims and a copyright infringement claim.  Defendant attacks the state-law claims—breach of contract, unjust enrichment, conversion, and unfair competition—on the ground that they are preempted by the Copyright Act because the claims relate exclusively to Defendant's alleged reproduction and distribution of Plaintiff's copyrighted material.  With respect to the breach of contract claim specifically, Defendant argues that even if the claim is not preempted, Plaintiff has not stated a claim for breach of contract because Plaintiff has not alleged adequately the existence of a contract.  Defendant attacks Plaintiff's copyright infringement claim on the ground that the "All Kinds/Living Jukebox" concept and the 2016 Super Bowl commercial do not share substantial similarities and therefore Plaintiff cannot state a claim.  The Court will address these argument in turn below.

A.  Standard of Review

The Supreme Court has held that although a complaint "does not need detailed factual allegations" to survive a motion to dismiss, "a plaintiff's obligation to provide the grounds of his

entitlement to relief requires more than labels and conclusions, and a formulaic recitation of the elements of a cause of action will not do." *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 555 (2007) (alteration and internal quotation marks omitted). Indeed, Rule 8 of the Federal Rules of Civil Procedure "demands more than an unadorned, the-defendant-unlawfully-harmed-me accusation." *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009). "Nor does a complaint suffice if it tenders naked assertions devoid of further factual enhancement." *Id.* (alteration and internal quotation marks omitted). Rather, a complaint's "[f]actual allegations must be enough to raise a right to relief above the speculative level." *Twombly*, 550 U.S. at 555. Although "once a claim has been stated adequately, it may be supported by showing any set of facts consistent with the allegations in the complaint," *id.* at 563, and a plaintiff must allege "only enough facts to state a claim to relief that is plausible on its face," *id.* at 570, if a plaintiff has not "nudged [his] claims across the line from conceivable to plausible, the[] complaint must be dismissed," *id.*; *see also Iqbal*, 556 U.S. at 679 ("Determining whether a complaint states a plausible claim for relief will . . . be a context-specific task that requires the reviewing court to draw on its judicial experience and common sense. But where the well-pleaded facts do not permit the court to infer more than the mere possibility of misconduct, the complaint has alleged—but it has not 'show[n]'—'that the pleader is entitled to relief.'" (second alteration in original) (citation omitted) (quoting Fed. R. Civ. P. 8(a)(2))); *id.* at 678–79 ("Rule 8 marks a notable and generous departure from the hypertechnical, code-pleading regime of a prior era, but it does not unlock the doors of discovery for a plaintiff armed with nothing more than conclusions.").

"[W]hen ruling on a defendant's motion to dismiss, a judge must accept as true all of the factual allegations contained in the complaint," *Erickson v. Pardus*, 551 U.S. 89, 94 (2007), and "draw[] all reasonable inferences in favor of the plaintiff," *Daniel v. T & M Prot. Res., Inc.*, 992

F. Supp. 2d 302, 304 n.1 (S.D.N.Y. 2014) (citing *Koch v. Christie's Int'l PLC*, 699 F.3d 141, 145 (2d Cir. 2012)). Additionally, "[i]n adjudicating a Rule 12(b)(6) motion, a district court must confine its consideration to facts stated on the face of the complaint, in documents appended to the complaint or incorporated in the complaint by reference, and to matters of which judicial notice may be taken." *Leonard F. v. Isr. Disc. Bank of N.Y.*, 199 F.3d 99, 107 (2d Cir. 1999) (internal quotation marks omitted); *see also Wang v. Palmisano*, 157 F. Supp. 3d 306, 317 (S.D.N.Y. 2016) (same).

### B. Preemption under the Copyright Act

"Section 301 of the Copyright Act expressly preempts a state law claim only if (i) the work at issue 'come[s]' within the subject matter of copyright and (ii) the right being asserted is 'equivalent to any of the exclusive rights within the general scope of copyright.'" *Forest Park Pictures v. Universal Television Network, Inc.*, 683 F.3d 424, 429 (2d Cir. 2012) (alteration in original) (quoting 17 U.S.C. § 301(b)); *Ardis Health v. Nankivell*, No. 11-CV-5013, 2012 WL 5290326, at *7 (S.D.N.Y. Oct. 23, 2012) (same).

To satisfy the first prong—the "subject matter" prong—"a claim must involve a work 'within the subject matter of copyright.'" *Forest Park Pictures*, 683 F.3d at 429 (quoting 17 U.S.C. § 301(a)); *see also Briarpatch Ltd., L.P. v. Phoenix Pictures, Inc.*, 373 F.3d 296, 305 (2d Cir. 2004) ("The subject matter requirement is satisfied if the claim applies to a work of authorship fixed in a tangible medium of expression and falling within the ambit of one of the categories of copyrightable works."). "Copyright protection exists for 'original works of authorship fixed in any tangible medium of expression,' but does not extend to an 'idea, . . . regardless of the form in which it is described, explained, illustrated, or embodied." *Forest Park Pictures*, 683 F.3d at 429 (alteration in original) (quoting 17 U.S.C. § 102(a), (b)). The Second

Circuit has held, however, "that works may fall within the subject matter of copyright, and thus be subject to preemption, even if they contain material that is uncopyrightable under [§] 102." *Id.*; *see also Briarpatch*, 373 F.3d at 305 ("A work need not consist entirely of copyrightable material in order to meet the subject matter requirement, but instead need only fit into one of the copyrightable categories in a broad sense.").

The second prong of this framework—referred to as the "equivalency requirement" or the "general scope requirement"—is met when the "[c]omplaint seeks to vindicate a 'legal or equitable right that is equivalent to any of the exclusive rights within the general scope of copyright as specified by [§] 106." *Forest Park Pictures*, 683 F.3d at 430 (alteration omitted) (quoting 17 U.S.C. § 301(a)). Section 106 of the Copyright Act gives "the owner of copyright" "the exclusive rights to," among other things, reproduce and distribute the copyrighted work. 17 U.S.C. § 106. "A state law right is equivalent to one of the exclusive rights of copyright if it may be abridged by an act which, in and of itself, would infringe one of the exclusive rights." *Forest Park Pictures*, 683 F.3d at 430 (internal quotation marks omitted). "In other words, the state law claim must involve acts of reproduction, adaptation, performance, distribution[,] or display." *Briarpatch*, 373 F.3d at 305. "'But if an extra element is required instead of or in addition to the acts of reproduction, performance, distribution or display, in order to constitute a state-created cause of action,' there is no preemption." *Forest Park Pictures*, 683 F.3d at 430 (quoting *Computer Assocs. Int'l, Inc. v. Altai, Inc.*, 982 F.2d 693, 716 (2d Cir. 1992)). "To determine whether a claim meets this standard, [the Court] must determine what [the] plaintiff seeks to protect, the theories in which the matter is thought to be protected[,] and the rights sought to be enforced." *Computer Assocs. Int'l*, 982 F.2d at 716 (internal quotation marks omitted). The Second Circuit has advised that courts must "take a restrictive view of what extra elements

transform an otherwise equivalent claim into one that is qualitatively different from a copyright claim." *Briarpatch*, 37 F.3d at 306.

Both Parties agree that the "subject matter" prong has been satisfied. (*See* Def.'s Mem. of Law in Supp. of Mot. To Dismiss ("Def.'s Mem.") 10 (Dkt. No. 21) ("It is clear that [Plaintiff's] Concept satisfies the 'subject matter' prong—as [Plaintiff] registered it for copyright protection."); Pl.'s Mem. of Law in Opp'n to Def.'s Mot. To Dismiss ("Pl.'s Opp'n") 12 (Dkt. No. 28) ("Because [Plaintiff] applied for and the U.S. Copyright Office accepted, a copyright registration for the printed 'All Kinds/Living Jukebox' presentation material, there is no question that the first prong of the test is satisfied with respect to that summary expression of [Plaintiff's] creative efforts.").) Therefore, the Court's discussion focuses exclusively on whether Plaintiff's state-law claims are preempted because they satisfy the "general scope requirement."

### 1. Plaintiff's Unjust Enrichment, Conversion & Unfair Competition Claims

Defendant argues that Plaintiff's unjust enrichment, conversion, and unfair competition claims are preempted because they seek to vindicate rights that are protected by the Copyright Act. (*See* Def.'s Mem. 10.) In its papers, Plaintiff focuses almost exclusively on whether its breach of contract claim is preempted, but asserts that it has a non-copyright property interest in the ideas giving rise to the "All Kinds/Living Jukebox" concept. (*See* Pl.'s Opp'n 15–16.)

Plaintiff's unjust enrichment, conversion, and unfair competition claim all stem from Defendant's alleged distribution and reproduction of the "All Kinds/Living Jukebox" storyline. (*See* Compl. ¶ 45 ("By producing and airing the Super Bowl halftime commercial based on use of [Plaintiff's] 'All Kinds/Living Jukebox' storyline without paying an agreed, fair market value associated with such use, [Defendant] received an unjust benefit from [Plaintiff]".); *id.* ¶ 49 ("By producing and airing the Super Bowl halftime commercial based on use of [Plaintiff's] 'All

Kinds/Living Jukebox' storyline without paying an agreed, fair market value associated with such use, [Defendant], without authorization, assumed and exercised ownership over property belonging to [Plaintiff] to the exclusion of [Plaintiff's rights]."); *id.* ¶ 53 ("[Defendant's] actions represent an unjustifiable misappropriation of [Plaintiff's] property rights for [Defendant's] commercial advantage and an attempt to profit from [Plaintiff's] expenditure of time, labor and talent.").) Although brought pursuant to state law, Plaintiff's claims "assert[] rights equivalent to those protected within the general scope" of the Copyright Act, *Urbont v. Sony Music Entm't*, 831 F.3d 80, 93 (2d Cir. 2016), namely, the alleged reproduction and distribution of copyrighted material, *see* 17 U.S.C. § 106. Courts regularly hold that state-law claims based on similar allegations are preempted by the Copyright Act. *See Forest Park Pictures*, 683 F.3d at 431 (collecting cases holding that unjust enrichment, misappropriation, and conversion claims were preempted); *Briarpatch*, 373 F.3d at 306 (holding that the plaintiff's unjust enrichment claim was preempted because the claim sought to vindicate its adaptation rights); *Computer Assocs. Int'l*, 982 F.2d at 717 ("[U]nfair competition and misappropriation claims grounded solely in the copying of a plaintiff's protected expression are preempted by [§] 301."); *Member.com LLC v. Barber*, No. 12-CV-4941, 2013 WL 5348546, at *13 (E.D.N.Y. Sept. 23, 2013) (holding that the plaintiff's claim for "misappropriation and/or conversion" was preempted "to the extent that [the] [p]laintiff [sought] relief for [the] [d]efendants' distribution, publishing, and/or reproducing of the registered work"); *Atrium Grp. De Ediciones Y Publicaciones, S.L. v. Harry N. Abrams, Inc.*, 565 F. Supp. 2d 505, 508 (S.D.N.Y. 2008) (holding that the plaintiff's unjust enrichment and misappropriation of intellectual property claims were preempted by the Copyright Act because the claims "were functionally equivalent to a claim for copyright infringement"); *Weber v. Geffen Records, Inc.*, 63 F. Supp. 2d 458, 462 (S.D.N.Y. 1999) ("Courts have generally

concluded that the theory of unjust enrichment protects rights that are essentially 'equivalent' to rights protected by the Copyright Act; thus, unjust enrichment claims relating to the use of copyrighted material are generally preempted." (some internal quotation marks omitted)). Plaintiff has provided no basis to depart from this well-established precedent. Plaintiff's only argument is that its claims are not preempted because it has a property interest in the ideas giving rise to the "All Kinds/Living Jukebox" concept. (*See* Pl.'s Opp'n 15–16.) This argument, however, has been expressly foreclosed by the Second Circuit. *See Briarpatch*, 373 F.3d at 306 ("To the extent that the project includes non-copyrightable material, such as ideas, these are not sufficient to remove it from the broad ambit of the subject matter categories."). Accordingly, Plaintiff's unjust enrichment, conversion, and unfair competition claims are dismissed.

### 2. Plaintiff's Breach of Contract Claim

Defendant likewise argues that Plaintiff's breach of contract claim is preempted because Plaintiff "has failed to allege any extra element that would qualitatively make such claim different from its copyright claim." (Def.'s Mem. 12.) In the alternative, Defendant argues that even if the Court were to find that Plaintiff's breach of contract claim is not preempted, the claim must be dismissed because Plaintiff had not alleged adequately the existence of a contract. (*See id.* at 12–13.)

"[A]s a general matter, a breach of contract action is not preempted by the Copyright Act." *BanxCorp v. Costco Wholesale Corp*, 723 F. Supp. 2d 596, 617 (S.D.N.Y. 2010). "Of course, preemption cannot be avoided simply by labeling a claim 'breach of contract.' A plaintiff must actually allege the elements of an enforceable contract (whether express or implied-in-fact), including offer, acceptance, and consideration, in additional to adequately alleging the defendant's breach of the contract." *Forest Park Pictures*, 683 F.3d at 432. "As

long as the elements of a contract are properly pleaded, there is no difference for preemption purposes between an express contract and an implied-in-fact contract." *Id.* In *Forest Park Pictures*, however, the Second Circuit was careful to draw a distinction between contracts implied-in-fact and contracts implied-in-law for preemption purposes. "Theories of implied-in-law contract, quasi-contract, or unjust enrichment differ significantly from breach of contract because the plaintiff need not allege that existence of an actual agreement between the parties." *Id.* Such claims are generally preempted because they are "not materially different from a claim for copyright infringement that requires a plaintiff to prove that the defendant used, reproduced, copied, or displayed a copyrighted work." *Id.*

Plaintiff argues that it has complied with the Second Circuit's holding in *Forest Park Pictures* because the agreement at issue in this Action "required [Defendant] to not simply honor [Plaintiff's] exclusive rights under the Copyright Act, but it also required [Defendant] to pay for any use of [Plaintiff's] presented storylines and ideas." (Pl.'s Opp'n 14.) Plaintiff's argument strays slightly from the allegations in the Complaint. The breach of contract claim consists of three paragraphs. The first incorporates the first 40 paragraphs of the Complaint, (*see* Compl. ¶ 41), the second alleges that "[Defendant] breached the agreement it made with [Plaintiff] that it would enter into a Statement of Work with [Plaintiff] as to any advertising storyline which it wanted to use or otherwise acquire rights," (*id.* ¶ 42), and the third alleges that Plaintiff has been damaged by the breach, (*see id.* ¶ 43). Nowhere does Plaintiff allege that Defendant promised to pay Plaintiff for the use of any of Plaintiff's concepts. Indeed, the thrust of Plaintiff's Complaint is that Defendant reproduced and distributed copyrighted material without Plaintiff's permission. The Court is skeptical that Plaintiff has alleged more than an unjust enrichment claim, which would be preempted, but will assume that Plaintiff was attempting to allege an implied-in-fact

contract. The issue is thus whether Plaintiff has alleged adequately the existence of a contract

between the Parties. *See Forest Park Pictures*, 683 F.3d at 432 ("A plaintiff must actually allege

the elements of an enforceable contract (whether express or implied-in-fact), including offer,

acceptance, and consideration, in addition to adequately alleging the defendant's breach of the

contract.").

"Under New York law, absent a written agreement between the parties, a contract may be

implied where inferences may be drawn from the facts and circumstances of the case and the

intention of the parties as indicated by their conduct." *Bader v. Wells Fargo Home Mortg. Inc.*,

773 F. Supp. 2d 397, 413 (S.D.N.Y. 2011) (internal quotation marks omitted). "An implied-in-

fact contract is just as binding as an express contract arising from declared intention, since in the

law there is no distinction between agreements made by words and those made by contract."

*Missigman v. USI Ne., Inc.*, 131 F. Supp. 2d 495, 512 (S.D.N.Y. 2001) (internal quotation marks

omitted). A contract

> cannot be implied in fact where the facts are inconsistent with its existence, or
> against the declaration of the party to be charged, or where there is an express
> contract covering the subject-matter involved, or against the intention or
> understanding of the parties; or where an express promise would be contrary to law.
> The assent of the person to be charged is necessary, and, unless he has conducted
> himself in such a manner that his assent may fairly be inferred, he has not
> contracted.

*Miller v. Schloss*, 113 N.E. 337, 339 (N.Y. 1916). "It is settled law that before a plaintiff may

secure redress for breach of an agreement, the promise made by the defendant must be

sufficiently certain and specific so that the parties' intentions are ascertainable." *Danton Constr.*

*Corp. v. Bonner*, 571 N.Y.S.2d 299, 300 (App. Div. 1991).

Plaintiff argues that it has alleged the existence of a contact between the Parties because

the Complaint alleges that there was an "agreement between the [P]arties that a Statement of

Work would be negotiated, prepared and executed if [Defendant] liked a presented storyline (or any aspect of it) enough to move forward with it."  (Pl.'s Opp'n 17; *see also* Compl. ¶ 42 ("[Defendant] breached the agreement it made with [Plaintiff] that it would enter into a Statement of Work with [Plaintiff] as to any advertising storyline which it wanted to use or otherwise acquire rights.").)  There are two weaknesses in Plaintiff's argument.  The first is that Plaintiff has alleged what amounts to an agreement to agree, which is not actionable under New York law.  *See KJ Roberts & Co. v. MDC Partners Inc.*, No. 12-CV-5779, 2014 WL 1013828, at *9 (S.D.N.Y. Mar. 14, 2014) ("It is rightfully well settled in the common law of contracts in New York that a mere agreement to agree, in which a material term is left for future negotiations, is unenforceable." (alterations and internal quotation marks omitted)); *Wilson v. Ledger*, 949 N.Y.S.2d 515, 517 (App. Div. 2012) ("The parties, however, left these material terms for future negotiation and agreement and failed to set forth in the documents any objective method for supplying those missing terms, resulting in only an unenforceable agreement to agree."); *Danton Constr. Corp.*, 571 N.Y.S.2d at 300 ("[A]n 'agreement to agree,' which leaves material terms of a proposed contract for future negotiation, is unenforceable.").  The second weakness is that Plaintiff has not alleged any of the terms of the agreement, making it impossible to determine whether Defendant is in breach of the alleged contract.  *See Emerald Town Car of Pearl River, LLC v. Phila. Indem. Ins. Co.*, No. 16-CV-1099, 2017 WL 1383773, at *7 (S.D.N.Y. Apr. 12, 2017) ("A complaint fails to sufficiently plead the existence of a contract if it does not provide factual allegations regarding, inter alia, the formation of the contract, the date it took place, and the contract's major terms.  Conclusory allegations that a contract existed or that it was breached do not suffice." (italics, citation, and internal quotation marks omitted)); *Childers v. N.Y. & Presbyterian Hosp.*, 36 F. Supp. 3d 292, 312 (S.D.N.Y. 2014) (holding that the plaintiff failed to

allege the existence of an agreement between the parties where the complaint alleged, "in a conclusory fashion, that there was an express contractual relationship between the parties, but it d[id] not include any details regarding this alleged express contract" (internal quotation marks omitted)).  Although there is some ambiguity as to whether price is an essential element of a contract, *see Forest Park Pictures*, 683 F.3d at 434 (noting that it "is not clear" whether an implied-in-fact contract can have an open price term to be filled in by industry standards), Plaintiff has offered no information about the other terms of the alleged contract, other than the conclusory allegation that one existed.  This is insufficient to state a claim.  *See Emerald Town Car*, 2017 WL 1383773, at *7 ("A complaint fails to sufficiently plead the existence of a contract if it does not provide factual allegations regarding, inter alia, the formation of the contract, the date it took place, and the contract's major terms." (italics and internal quotation marks omitted)); *Eaves v. Designs for Finance, Inc.*, 785 F. Supp. 2d 229, 259–60 (holding that the plaintiffs' failure to "provide facts regarding any specific contract between the parties, how or when such contract was formed, or any terms of the contract(s) at issue" was "fatal" to the claims); *Berman v. Sugo LLC*, 580 F. Supp. 2d 191, 202 (S.D.N.Y. 2008) ("Although it is not necessary for each element to be pleaded individually, a claim that fails to allege facts sufficient to show that an enforceable contract existed between the parties is subject to dismissal." (internal quotation marks omitted)).  Accordingly, Plaintiff's breach of contract claim is dismissed on the ground that Plaintiff has failed to state a claim.

    C.  Copyright Infringement

    "The owner of a copyright has the exclusive right to—or to license others to—reproduce, perform publicly, display publicly, prepare derivative works of, and distribute copies of, his copyrighted work."  *Arista Records, LLC v. Doe 3*, 604 F.3d 110, 117 (2d Cir. 2010).  "A party

who violates the exclusive rights of the copyright owner is an infringer, liable for damages pursuant to 17 U.S.C. § 504." *Warren v. John Wiley & Sons, Inc.*, 952 F. Supp. 2d 610, 616 (S.D.N.Y. 2013).

"In order to establish a claim of copyright infringement, a plaintiff with a valid copyright must demonstrate that: (1) the defendant has actually copied the plaintiff's work; and (2) the copying is illegal because a substantial similarity exists between the defendant's work and the protect[a]ble elements of [the] plaintiff's." *Peter F. Gaito Architecture, LLC v. Simone Dev. Corp.*, 602 F.3d 57, 63 (2d Cir. 2010) (internal quotation marks omitted). Defendant does not contest the first element. Accordingly, the Court focuses exclusively on whether a substantial similarity exists between Defendant's Super Bowl commercial and the protectable elements of the "All Kinds/Living Jukebox" concept.

"[I]t is entirely appropriate for [a] district court to consider the similarity between th[e] works in connection with a motion to dismiss." *Id.* at 64. When called upon to consider whether two works are substantially similar, "no discovery or fact-finding is typically necessary, because what is required is only a visual comparison of the works," and "the works themselves supersede and control contrary descriptions of them, including any contrary allegations, conclusions or descriptions contained in the pleadings." *Id.* (citation and internal quotation marks omitted). The Court recognizes, however, "that the question of substantial similarity is generally a factual inquiry reserved to the trier of fact." *Blakeman v. The Walt Disney Co.*, 613 F. Supp. 2d 288, 305 n.4 (E.D.N.Y. 2009).

"The standard test for substantial similarity between two items is whether an ordinary observer, unless he set out to detect the disparities, would be disposed to overlook them, and regard the aesthetic appeal as the same." *Yurman Design, Inc. v. PAJ, Inc.*, 262 F.3d 101, 111

(2d Cir. 2001) (alteration and internal quotation marks omitted).  In applying this test, the Court asks "whether an average lay observer would recognize the alleged copy as having been appropriated from the copyrighted work." *Peter F. Gaito Architecture*, 602 F.3d at 66 (internal quotation marks omitted).  Under circumstances where the works at issue contain both protectable and unprotectable elements, the Court's analysis must be "more discerning," *Fisher-Price, Inc. v. Well-Made Toy Mfg. Corp.*, 25 F.3d 119, 123 (2d Cir. 1994) (internal quotation marks omitted), and the Court "must attempt to extract the unprotect[a]ble elements from . . . consideration and ask whether the protect[a]ble elements, standing alone, are substantially similar," *Knitwaves, Inc. v. Lollytogs Ltd. (Inc.)*, 71 F.3d 996, 1002 (2d Cir. 1995) (emphasis omitted).  The Second Circuit has clarified, however, that the Court is not "required to dissect the works into their separate components, and compare only those elements which are in themselves copyrightable." *Peter F. Gaito Architecture*, 602 F.3d at 66 (alteration and internal quotation marks omitted).  Instead, the Court's inquiry is "guided by comparing the contested design's total concept and overall feel with that of the allegedly infringed work, as instructed by [its] good eyes and common sense." *Id.* (citations and internal quotation marks omitted).  This is the appropriate frame of reference because a "defendant may infringe on the plaintiff's work not only through literal copying of a portion of it, but also by parroting properties that are apparent only when numerous aesthetic decisions embodied in the plaintiff's work of art . . . are considered in relation to one another." *Tufenkian Imp./Exp. Ventures, Inc. v. Einstein Moomjy, Inc.*, 338 F.3d 127, 134 (2d Cir. 2003).  In short, the Court's "inquiry necessarily focuses on whether the alleged infringer has misappropriated the original way in which the author has selected, coordinated, and arranged the elements of his or her work." *Peter F. Gaito Architecture*, 602 F.3d at 66 (internal quotation marks omitted).

Defendant argues that the "All Kinds/Living Jukebox" concept and the Super Bowl commercial are not substantially similar because the setting, characters, and theme of the two works are different. (*See* Def.'s Mem. 18–19.) Although there are differences between the two works—and Plaintiff concedes as much, (*see* Pl.'s Opp'n 21)—the Court cannot conclude as a matter of law that the works are not substantially similar; an "average lay observer [c]ould recognize the alleged copy as having been appropriated from the copyrighted work." *Peter F. Gaito Architecture*, 602 F.3d at 66 (internal quotation marks omitted). The "All Kinds/Living Jukebox" concept specifically anticipates that a hero character will move from room to room in a "Brooklyn(like)" warehouse, where the genre of the rendition of the "Joy of Pepsi" song changes in each room, along with the "fashion, clothes, and vibe of the room." (Copyright 3.) Under the heading "Considerables," the copyrighted work explains that the commercial does not have to be set in a warehouse, and that the commercial can incorporate quick changes, such that the hero character is depicted rapidly changing outfits. (*Id.* at 4.) Defendant's Super Bowl ad shares many of these same features. A hero character is shown dancing to different genres of music as she moves through three different rooms, and each time the room changes, the hero character's wardrobe changes seamlessly. "Scattershot" allegations of "several highly generalized similarities" are insufficient to state a copyright infringement claim, *Mallery v. NBC Universal, Inc.*, No. 07-CV-2250, 2007 WL 4258196, at *8 (S.D.N.Y. Dec. 3, 2007) (internal quotation marks omitted), but a reasonable juror could conclude that the Super Bowl commercial's "total concept and overall feel" is substantially similar to Plaintiff's copyrighted work, *Peter F. Gaito Architecture*, 602 F.3d at 66. Defendant highlights the differences between "All Kinds/Living Jukebox" concept and the Super Bowl commercial—such as the fact that three different songs play in the Super Bowl commercial and Plaintiff's concept suggested using only varied

renditions of the "Joy of Pepsi" song ("Rock•Rap•Jazz/Swing•Classical•Metal•etc") and the fact that the main character dances in the Super Bowl commercial rather than sings, (*see* Def.'s Mem. 18–19)—but a "defendant may infringe on [a] plaintiff's work not only through literal copying of a portion of it." *Tufenkian Imp./Exp. Ventures*, 338 F.3d at 134. In short, there are sufficient similarities between the works such that resolution of this issue at the motion to dismiss stage is inappropriate.[3]

Defendant argues that even if there are substantial similarities between the two works, the similarities between the two works relate solely to unprotectable elements of the "All Kinds/Living Jukebox" concept. (*See* Def.'s Mem. 23.) "It is a principle fundamental to copyright law that a copyright does not protect an idea, but only the expression of an idea." *Williams v. Crichton*, 84 F.3d 581, 587 (2d Cir. 1996) (internal quotation marks omitted). "For example, it is well established that scènes à faire, which involve incidents, characters or settings which are as a practicable matter indispensable, or at least standard, in the treatment of a given topic are not copyrightable as a matter of law." *Horizon Comics Prods., Inc. v. Marvel Entm't, LLC*, — F. Supp. 3d —, 2017 WL 1157160, at *2 (S.D.N.Y. Mar. 27, 2017) (internal quotation marks omitted). But, an "author's original contributions" to a work that are entirely composed of unprotectable elements are protectable. *See Knitwaves*, 71 F.3d at 1004 (internal quotation marks omitted).

---

[3] The Complaint alleges that Plaintiff's Chief Creative Officer explained certain ways in which the "All Kinds/Living Jukebox" concept could be tailored to meet Defendant's needs and expectations. (*See* Compl. ¶ 24.) The Court cannot consider these allegations in determining whether the two works at issue are substantially similar because "the works themselves supersede and control contrary descriptions of them, including any contrary allegations, conclusions or descriptions contained in the pleadings." *Peter F. Gaito Architecture*, 602 F.3d at 64 (citation and internal quotation marks omitted).

Defendant's primary contention is that the similarities Plaintiff alleges between the two

works "are broad and inchoate ideas" not subject to copyright protection. (*See* Def.'s Mem. 23.)

Of course, certain aspects of the "All Kinds/Living Jukebox design" are not protectable, such as

the use of quick changes, but Plaintiff's unique combination of the elements comprising the "All

Kinds/Living Jukebox" concept is protectable. *See Knitwaves*, 71 F.3d at 1004. In any event,

the Court is not required at this stage to parse Plaintiff's claim with this level of detail. *See Peter*

*F. Gaito Architecture*, 602 F.3d at 66 ("[W]e have disavowed any notion that we are required to

dissect the works into their separate components, and compare only those elements which are in

themselves copyrightable." (alteration and internal quotation marks omitted)); *see also Horizon*

*Comics Prods.*, 2017 WL 1157160, at *5 ("The [c]ourt must look beyond the works as dissected

into their separate components, and must compare the contested work's total concept and overall

feel with that of the allegedly infringed work, as instructed by our good eyes and common

sense." (alterations and internal quotation marks omitted)). For now, it is sufficient that

Plaintiff's concept contains protectable elements and that the works "share a similarity of

expression." *Hogan v. DC Comics*, 48 F. Supp. 2d 298, 309 (S.D.N.Y. 1999). Accordingly,

Defendant's Motion To Dismiss Plaintiff's claim of copyright infringement is denied.

### D.  Leave to Amend

In a footnote at the end of its papers, Plaintiff requests permission to file an amended

pleading in the event that the Court finds that Plaintiff has failed to state a claim. (*See* Pl.'s

Opp'n 26 n.9.) Plaintiff specifically notes that it has "additional information about the contract

relationship between the [P]arties." (*Id.*) Given this representation, the Court will give Plaintiff

one final opportunity to state a claim. Plaintiff may file an amended pleading within 30 days of

the date of this Opinion remedying the deficiencies identified about with respect to its failure to

state a claim for breach of contract. The other state-law claims are dismissed with prejudice because better pleading cannot cure the fact that they are preempted by the Copyright Act. If Plaintiff does not file an amended pleading, Defendant shall file an Answer within 45 days from the date of this Opinion.

## III. Conclusion

For the foregoing reasons, Defendant's Motion is granted in part and denied in part. The Clerk of Court is directed to terminate the pending Motion. (Dkt. No. 20.)

SO ORDERED.

DATED: September 26 2017
White Plains, New York

KENNETH M. KARAS
UNITED STATES DISTRICT JUDGE

24