UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
--------------------------------------------------------------x
BETTY, INC.,  :
              Plaintiff,  :
                                                                                             **OPINION AND ORDER**
v.  :
                                                                                             16 CV 4215 (VB)
PEPSICO, INC.,  :
              Defendant.  :
--------------------------------------------------------------x

Briccetti, J.:

      Plaintiff Betty, Inc. ("Betty"), brings this action asserting copyright infringement and breach of contract claims against defendant PepsiCo, Inc. ("PepsiCo").

      Now pending is PepsiCo's motion to dismiss Betty's breach of contract claim pursuant to Rule 12(b)(6). (Doc. #49).

      For the following reasons, the motion is DENIED.

      The Court has subject matter jurisdiction under 28 U.S.C. §§ 1331, 1367(a).

## BACKGROUND

      For the purpose of deciding the pending motion, the Court accepts as true all well-pleaded allegations in the amended complaint, and draws all reasonable inferences in Betty's favor, as set forth below.

I.     Factual Background

      Betty is an advertising agency based in Connecticut.

      PepsiCo is a global food and beverage company headquartered in New York that markets and sells products world-wide.

      On November 11, 2014, Betty and Pepsi-Cola Advertising & Marketing, Inc. ("PCAM"), entered into a "Creative Agency Services Agreement" (the "2014 Agreement") with a three-year

1

term. (Elkin Decl. Ex. A: 2014 Agreement). PCAM was acting on PepsiCo's behalf when it entered into the 2014 Agreement.

Pursuant to the 2014 Agreement, PCAM engaged Betty "on a non-exclusive basis to perform . . . marketing communication services" as provided in the "Schedule" or "Scope of Work" attached as "Exhibit A." (2014 Agreement ¶ 1). The attached Scope of Work sought "concept boards / creative briefs" for PepsiCo's Mountain Dew brand. (2014 Agreement Ex. A).

On October 29, 2015, PepsiCo invited advertising agencies, including Betty, to participate in a telephone briefing regarding a PepsiCo commercial scheduled to air before the 2016 Super Bowl halftime show (the "halftime commercial").

Following the briefing, Betty prepared eight concept proposals for the halftime commercial, and presented them to the PepsiCo team on November 6, 2015. One of the concepts, titled "All Kinds/Living Jukebox," opened with the image of a jukebox and envisioned a hero character moving between multiple rooms. (Am. Compl. ¶ 24). As the character transitioned from room to room, the background music would change, as would the character's wardrobe and dance style.

PepsiCo responded favorably to Betty's presentation and gave Betty three days to prepare "refinements" for a follow-up presentation. (Am. Compl. ¶ 20). Betty made a second presentation to PepsiCo on November 9, 2015.

On December 2, 2015, PepsiCo advised Betty by email that it planned to test a different concept for the halftime commercial.

According to Betty, PepsiCo's 2016 halftime commercial was in fact "derivative of" and "fundamentally based on" Betty's All Kinds/Living Jukebox concept. (Am. Compl. ¶ 30). Betty alleges the commercial opened with the image of a jukebox, and followed a character as she

2

moved between rooms. Each time the character entered a new room, the genre of music changed, as did the character's wardrobe and dance style.

In addition to its placement during the 2016 Super Bowl, PepsiCo's halftime commercial aired on numerous other premium advertising spots and was released to social media and other distribution channels. Betty alleges the halftime commercial has been broadcast more than 7,580 times as of May 3, 2016, and has received millions of views.

II.     Procedural Background

Betty's original complaint, filed June 7, 2016, asserted claims for copyright infringement, breach of contract, unjust enrichment, conversion, and unfair competition.

Thereafter, PepsiCo moved to dismiss pursuant to Rule 12(b)(6). (Doc. #20).

On September 26, 2017, Judge Karas issued an Opinion & Order which (i) granted PepsiCo's motion as to Betty's breach of contract, unjust enrichment, conversion, and unfair competition claims; (ii) denied the motion as to Betty's copyright infringement claim; and (iii) granted Betty leave to amend its breach of contract claim, in view of Betty's representation that it had "'additional information about the contract relationship between'" the parties. (Doc. #30 at 23).

Betty filed an amended complaint on October 26, 2017 (Doc. #32), and PepsiCo filed the instant motion on December 21, 2017, (Doc. #49).

**DISCUSSION**

I.     Standard of Review

In deciding a Rule 12(b)(6) motion, the Court evaluates the sufficiency of the operative complaint under the "two-pronged approach" articulated by the Supreme Court in Ashcroft v. Iqbal, 556 U.S. 662, 679 (2009). First, plaintiff's legal conclusions and "[t]hreadbare recitals

3

of the elements of a cause of action, supported by mere conclusory statements," are not entitled to the assumption of truth and are thus not sufficient to withstand a motion to dismiss.  Id. at 678; Hayden v. Paterson, 594 F.3d 150, 161 (2d Cir. 2010).  Second, "[w]hen there are well-pleaded factual allegations, a court should assume their veracity and then determine whether they plausibly give rise to an entitlement to relief."  Ashcroft v. Iqbal, 556 U.S. at 679.

To survive a Rule 12(b)(6) motion, the allegations in the complaint must meet a standard of "plausibility."  Id. at 678; Bell Atl. Corp. v. Twombly, 550 U.S. 544, 564 (2007).  A claim is facially plausible "when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged."  Ashcroft v. Iqbal, 556 U.S. at 678.  "The plausibility standard is not akin to a 'probability requirement,' but it asks for more than a sheer possibility that a defendant has acted unlawfully."  Id.

In considering a motion to dismiss, "a district court may consider the facts alleged in the complaint, documents attached to the complaint as exhibits, and documents incorporated by reference in the complaint."  DiFolco v. MSNBC Cable L.L.C., 622 F.3d 104, 111 (2d Cir. 2010).  The court may nevertheless consider a document not incorporated by reference if the complaint "'relies heavily upon its terms and effect,' thereby rendering the document 'integral' to the complaint."  Id. (quoting Mangiafico v. Blumenthal, 471 F.3d 391, 398 (2d Cir. 2006)).  However, "it must be clear on the record that no dispute exists regarding the authenticity or accuracy of the document."  DiFolco v. MSNBC Cable L.L.C., 622 F.3d at 111 (quoting Faulkner v. Beer, 463 F.3d 130, 134 (2d Cir. 2006)).  "It must also be clear that there exist no material disputed issues of fact regarding the relevance of the document."  DiFolco v. MSNBC Cable L.L.C., 622 F.3d at 111 (quoting Faulkner v. Beer, 463 F.3d at 134).

II.     Breach of Contract

PepsiCo argues Betty fails to state a claim for breach of contract because the 2014 Agreement is an unenforceable agreement to agree.

The Court disagrees.

A.      Legal Standard

"Under New York law, a breach of contract claim requires proof of (1) an agreement, (2) adequate performance by the plaintiff, (3) breach by the defendant, and (4) damages."  Fischer & Mandell LLP v. Citibank, N.A., 632 F.3d 793, 799 (2d Cir. 2011).

In addition, the Second Circuit recognizes two types of preliminary agreements that can create binding obligations under New York law.  See Brown v. Cara, 420 F.3d 148, 153 (2d Cir. 2005).  A "Type I" preliminary agreement is "complete, reflecting a meeting of the minds on all the issues perceived to require negotiation.  Because it is complete, a Type I preliminary agreement binds both sides to their ultimate contractual objective."  Id. at 153 (internal quotations and citation omitted).  A "Type II" preliminary agreement is "binding only to a certain degree, reflecting agreement on certain major terms, but leav[ing] other terms open for further negotiation."  Id. (internal quotations omitted).  Type II agreements do not "not commit the parties to their ultimate contractual objective," but instead create an "obligation to negotiate the open issues in good faith in an attempt to reach the . . . objective within the agreed framework."  Id.  (internal quotations omitted).

Two important, competing concerns are inherent in considering whether an agreement is a binding preliminary agreement.  The first is "protecting negotiating parties from involuntary judicially imposed contract."  Teachers Ins. & Annuity Ass'n of Am. v. Tribune Co., 670 F. Supp. 491, 498 (S.D.N.Y. 1987).  The second is "enforce[ing] and preserv[ing]

5

agreements that were intended as binding, despite a need for further documentation or further negotiation." Id.

1. Binding Obligation to Negotiate in Good Faith

Betty plausibly alleges the 2014 Agreement is a Type II preliminary agreement that obligated the parties to negotiate in good faith.

Determining whether an agreement is a Type II agreement requires consideration of five factors: (i) "whether the intent to be bound is revealed by the language of the agreement;" (ii) "the context of the negotiations;" (iii) "the existence of open terms;" (iv) "partial performance;" and (v) "the necessity of putting the agreement in final form, as indicated by the customary form of such transactions." Brown v. Cara, 420 F.3d at 157. In short, "the question posed is whether the parties have agreed to proceed within an open framework toward a contractual goal, leaving necessary terms for later negotiation." Id.

The first factor, whether the language of the agreement evidences an intent to be bound, is the most important. See Arcadian Phosphates, Inc. v. Arcadian Corp., 884 F.2d 69, 72 (2d Cir. 1989). Here, except for the project outlined in the Mountain Dew Scope of Work, the 2014 Agreement does not bind the parties to work together on any specific marketing communications project. In fact, it clearly states in Paragraph 1: "PCAM retains the right, in its sole discretion, to place . . . orders" for Betty's marketing communication services. (2014 Agreement ¶ 1).

Importantly, however, the 2014 Agreement also contemplates that Scope of Work agreements or Schedules (the terms are used interchangeably) will be negotiated for future projects. For example, Paragraph 2 states: "The term of this Agreement shall be three (3) years ("Term"). The term of each Schedule shall be as set forth in the applicable Schedule. . . . PCAM its parent or any of its parent's subsidiaries and affiliated companies may enter into

Schedules under this Agreement." (2014 Agreement ¶ 2). Significantly, subsequent to the Mountain Dew Scope of Work, the parties negotiated additional Scope of Work agreements "governed" by the 2014 Agreement. (Reply Br. at 6 n.3).

In addition, the 2014 Agreement imposed clear obligations on Betty, including an obligation that Betty personnel agree in writing to "adhere to non-disclosure restrictions" (2014 Agreement ¶ 10), and that Betty "not solicit or accept any assignment anywhere in the world for any product or service that directly competes with or is a substitute for any PepsiCo Product Category" for which Betty performed services. (2014 Agreement ¶ 3).

As such, it is plausible the parties intended the 2014 Agreement to operate as a "general framework" within which they would "proceed in good faith toward the goal of developing" Scope of Work agreements for Betty's marketing communication services, while "preserving for later negotiation the specific details" relevant to each project. Brown v. Cara, 420 F.3d at 158. Thus, the first factor does not favor PepsiCo as strongly as Paragraph 1 of the 2014 Agreement might otherwise suggest.

The second factor, the "context of the negotiations," favors the finding of a Type II agreement "when the parties' history of past business relationships and extended business discussions prior to [the preliminary agreement] implies that future discussions to reach the ultimate contractual goals were contemplated." EQT Infrastructure Ltd. v. Smith, 861 F. Supp. 2d 220, 229 (S.D.N.Y. 2012) (internal quotation omitted). Betty makes no allegation with regard to the context of the parties' negotiations; thus, the second factor favors PepsiCo.

With regard to the third factor, the "existence of open terms creates a presumption against finding a binding contract as to the ultimate goal." Brown v. Cara, 420 F.3d at 158 (internal citation omitted). The 2014 Agreement leaves open critical terms for future Scope of Work

7

agreements, such as the engagement date, required deliverables, and the fee for Betty's work. Thus, the third factor favors PepsiCo.

However, the fourth factor, "partial performance," cuts in Betty's favor. Paragraph 4 of the 2014 Agreement states that Betty "agrees to use its best efforts, skill, and ability to further PCAM's interests and to provide its best work to make PCAM's marketing communications and advertising successful." (2014 Agreement ¶ 4). Betty alleges it presented several concepts for the halftime commercial, prepared "refinements" at PepsiCo's request, and gave a follow up presentation. (Am. Compl. ¶ 20).

Finally, as to the fifth factor, "Type II agreements, by definition, comprehend the necessity of future negotiations and contracts." Brown v. Cara, 420 F.3d at 158. Here, Betty alleges it anticipated such contracts would be negotiated any time it submitted a proposal PepsiCo used. The 2014 Agreement contemplates the creation of future agreements, and Betty alleges past practice and industry custom dictated that "if PepsiCo liked a concept, wanted to move forward with refinement and production, and wanted to either license or acquire rights to it," then it would enter a Scope of Work. (Am. Compl. ¶ 16). Thus, the final factor favors Betty.

Accordingly, drawing all reasonable inferences in Betty's favor, Betty has plausibly alleged the 2014 Agreement is a Type II preliminary agreement. The question is close however, and may be addressed again on summary judgment.

        2.       <u>Breach of Obligation to Negotiate in Good Faith</u>

"To state a claim for breach of contract for failure to negotiate in good faith, a plaintiff must allege the specific instances or acts that amounted to the breach; generalized allegations and grievances will not suffice." L-7 Designs, Inc. v. Old Navy, LLC, 647 F.3d 419, 431 (2d Cir. 2011) (internal quotations omitted). Although courts occasionally resolve questions of bad faith

at the pleading stage, "the question of whether a party acted in good faith typically is not suitable for resolution on a motion to dismiss." Gas Natural, Inc. v. Iberdrola, S.A., 33 F. Supp. 3d 373, 383 (S.D.N.Y. 2014).

Here, Betty specifically alleges it presented marketing communication concepts to PepsiCo for the halftime commercial and prepared refinements at PepsiCo's request. Then, on December 2, 2015, PepsiCo advised Betty it "had decided to move forward with different ideas." (Am. Compl. ¶ 28). However, rather than proceeding with a different idea, Betty alleges PepsiCo used "Betty's work product in connection with the" halftime commercial. (Am. Compl. ¶ 54). In sum, Betty alleges PepsiCo failed to negotiate at all for the use of Betty's marketing communication services.

At this stage, Betty's allegations are sufficient to state a claim for breach of contract to negotiate in good faith.

## CONCLUSION

The motion to dismiss is DENIED.

Defendant shall file an answer by June 18, 2018.

The Clerk is instructed to terminate the motion. (Doc. #49).

Dated: June 4, 2018
White Plains, NY

SO ORDERED:

_____
Vincent L. Briccetti
United States District Judge