**Document Filed Electronically**

**UNITED STATES DISTRICT COURT**
**FOR THE SOUTHERN DISTRICT OF NEW YORK**

| | | |
|---|---|---|
| BETTY, INC., | : | |
| | : | |
| Plaintiff, | : | |
| v. | : | No. 16-cv-4215-VB |
| | : | |
| PEPSICO, INC., | : | |
| | : | |
| Defendant. | : | |
| | x | |

## MEMORANDUM OF LAW IN SUPPORT OF
## PEPSICO'S MOTION FOR SUMMARY JUDGMENT

LERNER, DAVID, LITTENBERG,
KRUMHOLZ & MENTLIK, LLP
600 South Avenue West
Westfield, NJ 07090

WINSTON & STRAWN LLP
200 Park Avenue
New York, New York 10166

*Attorneys for Defendant PepsiCo, Inc.*

## <u>TABLE OF CONTENTS</u>

Page

TABLE OF AUTHORITIES ................................................................................. ii

INTRODUCTION .............................................................................................1

I.  THE MARKETING ARM INDEPENDENTLY CREATED THE
    COMMERCIAL .........................................................................................7

II. THE PEPSI COMMERCIAL IS NOT SUBSTANTIALLY
    SIMILAR TO THE COPYRIGHTED MATERIAL ......................................10

    A.  There is little, if anything, protectable in the Copyrighted
        Work that is claimed to be copied..................................................11

        1.  An idea is not protectable ........................................................12

        2.  Scene-a-faire is not protectable................................................14

        3.  Prior concepts used by Pepsi cannot form basis of
            infringement........................................................................17

    B.  Nothing Protectable is Substantially Similar ..............................17

III. THERE IS NO BREACH OF CONTRACT ................................................19

    A.  There is No Breach of the Provisions of the Written Service
        Agreement....................................................................................20

    B.  There is No Enforceable Preliminary Agreement.........................20

        1.  Under New York State Law, there is No
            Preliminary Agreement, only an Unenforceable
            Agreement to Agree................................................................20

        2.  Any Preliminary Agreement is Not Enforceable. .....................22

    C.  Betty is Precluded from Proving Damages....................................24

    D.  Betty's contract claim cannot survive a finding of no
        infringement..............................................................................25

CONCLUSION.................................................................................................25

# TABLE OF AUTHORITIES

Page(s)

**Cases**

*Arcadian Phosphates, Inc. v. Arcadian Corp.*,
884 F.2d 69 (2d Cir. 1989)..............................................................21, 23

*Arden v. Columbia Pictures Indus., Inc.*,
908 F. Supp 1248 (S.D.N.Y. 1995) ........................................................14, 16

*Bill Diodato Photography, LLC v. Kate Spade, LLC*,
388 F. Supp. 2d 382 (S.D.N.Y. 2005)............................................... *passim*

*Canal+ Image UK Ltd. v Lutvak*,
773 F Supp. 2d 419 (S.D.N.Y. 2011)......................................................16

*Computer Assoc. Int'l, Inc. v. Altai, Inc.*
982 F2d 693 (2d Cir. 1992).....................................................................11

*Croack v. Saatchi & Saatchi*,
174 F. Supp. 3d 829 (S.D.N.Y. 2016)........................................................11

*Danton Constr. Corp. v. Bonner*,
571 N.Y.S.2d 299 (2d Dep't 1991)........................................................21

*Durham Indus. v. Tomy, Inc.*
630 F.2d 905, 913 (2d Cir. 1980)..........................................................19

*Feist Publ'ns, Inc. v. Rural Tel. Serv. Co.*,
499 US 340 (1991).................................................................................10

*Foros Advisors, LLC v. Digital Globe, Inc.*,
333 F. Supp. 3d 354 (S.D.N.Y. 2018).....................................................22

*Fulks v. Knowles-Carter*,
207 F. Supp. 3d 274 (S.D.N.Y. 2016)...............................................14, 15, 18, 19

*Gould Paper Corp. v. Madisen Corp.*,
614 F. Supp. 2d 485 (S.D.N.Y. 2009).....................................................24

*Hoehling v. Universal City Studios, Inc.*,
618 F.2d 972 (2d Cir. 1980)...................................................................15

*Intersong-USA v. CBS, Inc.*,
757 F. Supp. 274 (S.D.N.Y. 1991) ..........................................................8

*Joseph Martin Jr. Delicatessen, Inc. v. Schumacher*,
  52 N.Y.2d 105 (1981) .................................................................................................21

*Kaplan v. Stock Market Photo Agency, Inc.*,
  133 F. Supp. 2d 317 (S.D.N.Y. 2001) ............................................................ *passim*

*KJ Roberts & Co. v. MDC Partners Inc.*,
  No. 12-CV-5779, 2014 WL 1013828 (S.D.N.Y. Mar. 14, 2014) ...........................21

*Knitwaves, Inc. v. Lollytogs Ltd.*,
  71 F.3d 996 (2d Cir. 1995).....................................................................................11

*Mark Andrew of the Palm Beaches, Ltd. v. GMAC Commer. Mortg. Corp.*,
  265 F. Supp. 2d 366 (S.D.N.Y. July 3, 2003) .........................................................20

*Muller v. Twentieth Century Fox Film Corp.*,
  794 F. Supp.2d 429 (S.D.N.Y. 2011), *aff'd sub nom.*
  *Muller v. Anderson*, 501 Fed. Appx. 81 (2d Cir. 2012) ....................................2, 17

*Novak v. NBC*,
  752 F. Supp. 164 (S.D.N.Y. 1990) ...........................................................................8

*Offit v. Herman*,
  16 N.Y.S.3d 737 (1st Dep't 2015) ...........................................................................22

*Peter F. Gaito Architecture v. Simone Dev. Corp.*,
  602 F.3d 67 (2d Cir. 2010)......................................................................................11

*Teachers Ins. v. Tribune Co.*,
  670 F. Supp. 491 (S.D.N.Y. 1987) ...........................................................................21

*Total Telecom Grp. v. Kendal of Hudson*,
  68 N.Y.S.3d 491 (2d Dep't 2018).............................................................................21

*Tractebel Energy Mktg., Inc. v. AEP Power Mktg., Inc.*,
  487 F.3d 89 (2d Cir. 2007)......................................................................................21

*Walker v. Time Life Films, Inc.*,
  784 F.2d 44 (2d Cir. 1985)...........................................................................12, 14, 16

*Williams v. Crichton*,
  84 F. 3d 581 (2d Cir. 1996)..........................................................................11, 14, 16

**Statutes, Rules & Other Authorities**

Rule 26(a)(1)(A)(3)....................................................................................................24

## INTRODUCTION

After hearing more than a dozen pitches, Pepsi selected a commercial for the 2016 Super Bowl.  That commercial was created and pitched by an advertising agency known as "The Marketing Arm."  Betty had nothing to do with it.  The commercial was a classic Pepsi spot with a clever twist.  Like Pepsi's Britney Spears commercial over a decade earlier, the commercial followed a powerful performer dancing through different eras (or Pepsi generations) where the music, wardrobe, set, vibe and dance all changed to fit each era.  Also like the prior commercial, the first scene is in a diner with an era-appropriate jukebox.  The twist, which appealed to Pepsi, was that the commercial took place in red, white and blue rooms within Pepsi's trademarked globe logo.  The evidence of record confirms that The Marketing Arm created the commercial without access to Betty's pitch.  Betty has presented no evidence to contradict that fact.  Because there is no dispute that The Marketing Arm "independently created" the commercial, Betty's claim that the commercial infringes Betty's copyrighted pitch must be rejected.

Even if The Marketing Arm had not independently created Pepsi's commercial, there can be no copyright infringement.  Betty's copyrighted pitch deck consists of a page and a half of text.  That text provides little detail or creative expression.  Once the protectable portions of the text are separated from the unprotectable ideas and "scene-a-faire" (as required by law), there can be no doubt that Pepsi's commercial is not substantially similar to Betty's pitch.

Betty has admitted that anything arguably expressive in the text of the pitch is ***not*** contained in Pepsi's commercial.  The commercial has no warehouse, no man with an acoustic guitar, no metal interpretation of Pepsi's jingle, no Adele-like character, no doo/wop acapella crew and no gathering around a fire lit in a trash can.  What remains of the text is the basic idea of using a performer in a commercial where the scenes (music, wardrobe, etc.) change.  That idea is not protectable.  Only original and creative expression is protectable.  For example, Monet's

"Waterlilies" (right) would not infringe text suggesting the ***idea*** of painting pretty scenes of lilies in pastel colors (left).  Copying Monet's ***expression*** of that concept, on the other hand, would.

    

Here, because only unprotectable ideas are alleged to be used, there cannot be infringement.

Ironically, the ideas that Betty suggests were copied by Pepsi are ideas that Pepsi used decades before the 2016 Pepsi commercial or Betty's pitch.  As it must, Betty admits that Pepsi's 2001 Britney Spears commercial previously combined the allegedly infringing elements.  Betty's allegations fail as a matter of law because "where an element occurs both in the defendant's prior work and the plaintiff's prior work, no inference of copying can be drawn."  *Muller v. Twentieth Century Fox Film Corp.*, 794 F. Supp.2d 429, 444 (S.D.N.Y. 2011), *aff'd sub nom. Muller v. Anderson*, 501 Fed. Appx. 81 (2d Cir. 2012).

Nor does Betty allege a viable contract claim.  It claims that Pepsi breached a Services Agreement because it did not negotiate with Betty for the rights to its Super Bowl pitch.  But, as discussed above, Pepsi did not use Betty's work.  And, even if it had, Betty's remedy would be a claim for copyright infringement – not breach of contract.  Betty admits that there is ***no provision*** in the written agreement that requires Pepsi to negotiate with Betty for any new work.  More than that, Betty admits that the decision to engage Betty for any future work was left to Pepsi's "sole discretion."  Because there is no obligation to negotiate, the failure to negotiate cannot be a breach.  In addition, any attempt to claim that an enforceable "preliminary" agreement can save Betty's claim must fail.  There is no evidence that any material term related to the use of Betty's Super Bowl concept was ever discussed, much less agreed.  Absent the

negotiation of at least some of the material terms, any purported agreement is an unenforceable agreement to agree under established New York law.  Moreover, after failing to proffer a damages calculation in its Rule 26 disclosures, in response to Pepsi's interrogatories, or in expert discovery, Betty is precluded from proving damages – a necessary element of its contract claim.

Betty's copyright and contract claims should both be dismissed.

## STATEMENT OF FACTS

Music and dance are big parts of Pepsi's brand identity and are key building blocks in Pepsi's historical advertising campaigns.  SF ¶¶ 10, 12, 21.[1]  Creative advertising agencies know that.  The Marketing Arm – the agency that created and produced the Super Bowl commercial at issue in this case – recognized that "[d]ancing is in the DNA of the brand from Michael Jackson to Britney Spears to Beyonce."  SF ¶21.  The creative director for Betty – the plaintiff in this case – acknowledged the importance of music to Pepsi:  "Music was a big thing for them.  They made it very clear that, you know, music was part of Pepsi's DNA."  SF ¶12.  In addition to using music and dance in its commercials, Pepsi has often catalogued the historical significance of changing music and dance styles across each "Pepsi generation."  For example, in 2001 Pepsi aired a commercial featuring Britney Spears (known as "Now and Then") in which she danced through several scenes. SF ¶¶10, 36, 55-57.  Each scene focused on a different time period and each scene highlighted era-appropriate music, wardrobe, dance and vibe.  *Id.*:



---

[1] SF ¶___ indicates a reference to the Statement of Undisputed Material Facts filed herewith.

On November 6, 2015, Pepsi hosted a full day of pitches from a variety of creative agencies.  SF ¶12.  Betty and The Marketing Arm both presented ideas during their allotted slots.  SF ¶¶16, 25, 61.  The Marketing Arm pitched a concept entitled "The Joy of Dance."  ("The Marketing Arm's Pitch").  SF ¶¶18-20.  That pitch started with a recognition that "Pepsi has a rich connection to the art of dance" and specifically referenced previous commercials with Britney Spears.  SF ¶21.  The creator of The Marketing Arm's Pitch explained that he used the Now and Then commercial with Britney Spears as the foundation for the concept.  SF ¶21.  The pitch thus proposed to use an "incredible dancer" (first envisioned as Christopher Walken) to "walk us through a dance timeline of over 50 years" starting in a 1950s diner.  SF ¶21-24.  The pitch also promised to "show off the brand heritage from the cursive logo to the modern Pepsi globe, all the while set against the changing historical backdrop of each era."  It proposed using a "continuous set with art direction that transforms to reflect each era."  It suggested using era-influenced variations of the Joy of Pepsi jingle, or licensed music "from each era" to create a "mash-up."  The Marketing Arm also proposed that the commercial would end by revealing that each scene had occurred within the three sections of the Pepsi Globe – with "each setting w/ art direction and wardrobe in red, white or blue such that the colors of the globe match the logo."

Pepsi reacted favorably to The Marketing Arm's Pitch.  Louis Arbetter, who led advertising of the Pepsi brand, liked the ending and thought that the concept of dancing through the Pepsi Globe "was a really clever and important device" that "popped."  SF ¶36.  Others in the room agreed.  SF ¶36.  Jayanthi Segaran, director of the Pepsi trademarked brand and point person for the Super Bowl project, liked the idea of dance.  SF ¶36.  Team member, Jen Danzi, agreed and "felt strongly" that Pepsi should "take the 'Joy of Dance' and just make a classic Pepsi dance spot in the vein of Brittany Spears."  SF ¶36.  The Friday evening the pitch was

delivered, Ms. Segaran emailed The Marketing Arm and asked them to refine "The Joy of Dance" pitch by simplifying it (it covered too many eras) and proposing a more "contemporary" dancer SF ¶37.  By the next morning, The Marketing Arm had refined their work. SF ¶38.  On Monday, a revised deck was sent to Pepsi. ("The Marketing Arm's Revised Pitch") SF ¶39.  That deck suggested using pop-star Pharrell and reduced the number of era-based scenes to three.  SF ¶38-39.  It also suggested using a jukebox in the opening diner scene.  *Id.*  The Marketing Arm's Pitch and Revised Pitch were conceived without access to any Betty's work. SF ¶¶39, 62, 67, 69.

Within hours of The Marketing Arm delivering its pitch, Betty pitched eight ideas of its own.  SF ¶25.  One of those concepts was referred to as "All Kinds/Living Jukebox."  SF ¶25.  The text describing that concept is the copyrighted material at issue in this case.  ("Betty's Pitch")  SF ¶43.  It never once mentions the word "dance."  SF ¶27.  The text explains that Betty's commercial "starts outside a giant Brooklyn(like) warehouse" with "the camera perspective of someone walking in" while "[o]utside the door, a man plays an acoustic guitar singing an acoustic rendition of the Joy of Pepsi."  The spot includes changing from "a metal interpretation of the Joy of Pepsi" to "a lone singer with an Adele like quality."  Throughout the pitched commercial "the song remains the same."  "The spot ends walking out the other side of the warehouse where a doo wop/acapella crew is standing around a fire lit in a trash can."  Betty admits that none of the above material appears in the Pepsi commercial.  SF ¶¶26-31, 43.

When Pepsi saw Betty's Pitch, it was simply not interested.  SF ¶34.  Lou Arbetter thought that the fire in a trash can scene could be associated with homelessness and that the concept was "very dark" and "not on brand".  SF ¶34.  Jayanthi Segaran was not "interested in changing the Joy of Pepsi to make it heavy metal" and "didn't like the way people were standing

around a fire lit in a trash can." SF ¶34.  Betty was not asked to do additional work on the "All Kinds/Living Jukebox" concept and that concept never advanced into testing.  SF ¶35.

In February of 2016, Pepsi aired its commercial during the Super Bowl (the "Pepsi Commercial" or "Commercial").  SF ¶¶41, 76.  The Commercial, like The Marketing Arm's Pitch, was entitled "The Joy of Dance."  *Id.*  After the Commercial aired, the industry instantly recognized it as an homage to the Britney Spears' commercial.  SF ¶41-42.  In an article entitled "Time traveler Janelle Monae gets her Britney Spears on for Pepsi's Super Bowl ad," Screenertv commented that the Commercial "remind[ed] audiences of the brand's 2001 Super Bowl commercial featuring Britney Spears."  SF ¶42. The Washington Post called the Commercial "a classic, archetypal Pepsi commercial" and "a direct reference to Spears' 2001 'Pepsi Generation' ad, another romp-through-the-ages with a bright young star."  *Id.*  Ms. Segaran confirmed that the Spears commercial was the principal inspiration for the Commercial.  SF ¶¶36, 73.

On May 18, 2016, months after the 2016 Super Bowl, Betty applied for a copyright for its November 2015 pitch deck and sued Pepsi days later. SF ¶¶43, 78; D.I.1.  Betty's complaint pleaded four state law claims, including a breach of contract claim, all of which were dismissed. SF ¶48.  The dismissed breach of contract claim was based on a supposed verbal agreement and custom.  SF ¶48.  Betty amended its complaint and re-pleaded its contract claim, this time alleging breach of a written agreement. SF ¶48.  Betty alleged that "PepsiCo breached the Services Agreement it made with Betty by not working in good faith with Betty to enter into a Scope of Work with Betty once it decided to use Betty's work product."  SF ¶48.  Betty's CEO and 30(b)(6) witness testified that there is not "any provision in the contract that requires Pepsi to negotiate with Betty" toward any new Scope of Work. SF ¶¶49-50.  To the contrary, "it was up to Pepsi's sole discretion whether they were to do business with Betty in the future." SF ¶50.  No

material terms for any new Scope of Work concerning use of Betty's Pitch was ever discussed, much less agreed.  SF ¶¶ 50, 53.

Betty's Rule 26(1) disclosure failed to provide a calculation of damages for either of Betty's claims.  SF ¶ 54.  In its answer to Pepsi's interrogatory seeking a calculation of copyright damages, Betty stated that "Betty has not completed its computations of damages; this response will be supplemented when such computation has been completed."  SF ¶ 54.  In its response to Pepsi's interrogatory seeking a calculation of contract damages, Betty responded that "Betty has not yet completed its computations of damages but expects that such computation will form part of its expert disclosures."  SF ¶ 54.  Neither interrogatory response was supplemented.  SF ¶ 54.  Fact discovery closed on November 9, 2018 and expert discovery closed on December 21, 2018. SF ¶ 54.  Betty did not serve an expert report or otherwise make an expert disclosure.  SF ¶¶ 54, 81.

## **ARGUMENT**

Betty's claims cannot survive summary judgment.  At this stage of the litigation, actual evidence is required and Betty can no longer rely on conclusory allegations.  *Kaplan v. Stock Market Photo Agency, Inc.*, 133 F. Supp. 2d 317 (S.D.N.Y. 2001) ("conclusory allegations, speculation or conjecture will not avail a party resisting summary judgment.").  Here, however, there simply is no evidence to support Betty's claim of copyright infringement.

Section I details how The Marketing Arm independently created the Pepsi Commercial. Section II explains that there is little protectable in Betty's Pitch and that anything arguably protectable is undisputedly ***not*** used in the Commercial – thus there can be no substantial similarity.  Finally, Section III demonstrates the infirmity of Betty's contract claim.

## I.    **THE MARKETING ARM INDEPENDENTLY CREATED THE COMMERCIAL**

Summary judgment should be granted because the evidence adduced in this case proves that The Marketing Arm "independently created the accused work . . . without reference to the

plaintiff's work."  *Novak v. NBC*, 752 F. Supp. 164, 168 (S.D.N.Y. 1990); *Intersong-USA v. CBS, Inc.*, 757 F. Supp. 274, 282 (S.D.N.Y. 1991) (song independently created).

The Marketing Arm had no access to Betty's Pitch.  Both Tom Meyer (The Marketing Arm's representative) and Marc Gilbar (the creator of the "Joy of Dance"), testified that nothing from Betty was shared.  Mr. Meyer said that he had "never seen any Betty materials in [his] life." SF ¶39.  And Mr. Gilbar indicated that he "had no access whatsoever to any Betty material or information."  SF ¶39.  Betty has not produced a shred of evidence to dispute that.  Having never seen what Betty was pitching, The Marketing Arm had no opportunity to copy any aspect of it.

Instead, the evidence conclusively establishes that The Marketing Arm created, pitched, refined, and ultimately produced its commercial independently of anything Betty had done.  In The Marketing Arm's words, they created the "spot from soup to nuts" and it was "100 percent" their spot.  SF ¶39.  The concept's originator "conceived of" and "documented" all of the items that Betty claims Pepsi took from Betty's Pitch.  SF ¶¶17-19, 38-39.  In addition to the sworn and unrefuted testimony of all the witnesses with relevant knowledge, the documentary evidence confirms that The Marketing Arm independently created the allegedly infringed material.

The timing of events compels a finding of independent creation.  Betty and The Marketing Arm presented their pitch decks to Pepsi ***on the same day*** – within a few hours of one another.  The Marketing Arm's Pitch contains everything arguably common between Betty's Pitch and the Pepsi Commercial.  In particular, following "a hero character from room to room" is found in The Marketing Arm's Pitch which proposes having "an incredible dancer. . . walk us through a dance timeline of over 50 years" where "we'll move through one continuous set" which "forms the shape of the PEPSI GLOBE".  The pitch document also provides a link to an NFL Calendar video as an example of how scenes can change from room to room.  SF ¶23.

Changing music, set design, wardrobe and dance is also found in The Marketing Arm's Pitch.  The pitch proposes traveling through five eras "set against the changing historical backdrop of each era."  It suggests changing from Doo-wop style music to Motown to disco to Michael Jackson to modern dance music.  The set design stylistically changes from a 1950s diner to 1960s Detroit, to a 1970s disco, to a 1980s alley scene, to a modern house party.  Between each scene, the pitch notes that "the set rotates to reveal a new back drop."  Wardrobe changes from American Graffiti-era, to sequin dresses, to bellbottoms, to criminal outfits, to present day millennial garb.  Moreover, the color of "art direction and wardrobe" changes from red, to white to blue.  And the dance styles change from the jitterbug, to the twist, to Saturday Night Fever disco, to Michael Jackson moves, to pop-and-lock.

The unremarkable concept of using a powerful entertainer is found in The Marketing Arm's Pitch which proposes using "Christopher Walken, legendary actor and incredible dancer." The Marketing Arm's Pitch even details using standard film techniques to result in clean cuts by suggesting the use of "a continuous set" or "a circular set that rotates" with the camera "locked off."  The exemplary NFL Calendar video displays clean transitions between rooms.

By the next morning, The Marketing Arm had updated its script.  SF ¶ 38.  It had added a jukebox as a prop in the diner and as a mechanism to display the Pepsi-branded globe on the surface of a record and start the music.  Pharrell Williams was recast as the more contemporary pop star.  The script reduced the eras to three -- starting in a 1950s white-colored diner with folks dancing in the "twists and jive of the era" to Elvis Presley's Jailhouse Rock.  It shows Pharrell exiting a diner door and moving into a red 1980s alley scene where Michael Jackson's Billie Jean rings out and his iconic spin and thrust moves are performed.  Pharrell then kicks open a door to enter a modern-day nightclub bathed in blue light where he dances to "Happy."  The

Marketing Arm's Revised Pitch, sent to Pepsi after the weekend, contains all of these elements. SF ¶39.  All this work was done without any access to Betty or Betty's Pitch.  SF ¶39, 62, 67, 69.

Moreover, The Marketing Arm explained that Pepsi's prior work – not Betty's Pitch – was the "foundation" for its commercial concept.  The Marketing Arm's contemporaneous pitch materials explicitly credit Pepsi's "rich connection to the art of dance," specifically calling out prior commercials with iconic performers from "Michael Jackson to Britney Spears."  The Marketing Arm's era-traversing spot was aimed at "showcasing 50 years of Pepsi inspiring people to dance." Pepsi's project lead noted that the "2016 commercial was a homage to PepsiCo's history, and it was inspired not just by [the Britney Spears'] commercial," but by other previous Pepsi commercials as well.  SF ¶36. When the Pepsi Commercial launched, the industry immediately recognized it as "a classic, archetypal Pepsi commercial" and "a direct reference to Spears' 2001 'Pepsi Generation' ad."  SF ¶¶42, 75.  Even Betty was forced to acknowledge that the earlier "Now and Then" commercial featured Britney Spears (a powerful lead performer) dancing through different eras, on sets with different scenery, wearing different clothes, to music changing to fit the time period, and that the commercial used clean or seamless cuts. SF ¶¶10, 74, 76.  And like Pepsi's Super Bowl Commercial, it starts in a diner scene with a jukebox.

In view of the undisputed facts regarding The Marketing Arm's independent creation of the ad spot, the 2016 Super Bowl Commercial cannot infringe Betty's alleged copyright.

## II.  THE PEPSI COMMERCIAL IS NOT SUBSTANTIALLY SIMILAR TO THE COPYRIGHTED MATERIAL

Copyright infringement occurs when there is "copying" of elements of a copyrighted work that "are original."  *Feist Publications, Inc. v. Rural Tel. Serv. Co.*, 499 US 340, 361 (1991).  When, as here, there is no direct evidence of copying, a plaintiff may prove infringement

by demonstrating that "defendant's work is substantially similar to the plaintiff's copyrightable material." *Computer Assoc. Int'l, Inc. v. Altai, Inc.* 982 F2d 693, 701 (2d Cir. 1992).

"Before embarking on the substantial similarity analysis, it is critical to bear in mind what <u>does not</u> amount to infringement under the Copyright Act." *Croack v. Saatchi & Saatchi*, 174 F. Supp.3d 829, 835 (S.D.N.Y. 2016). Significantly, "'the similarity between two works must concern the expression of ideas, not the ideas themselves'" because "ideas are not protectable under the Copyright Act." *Id.* (quoting *Peter F. Gaito Architecture v. Simone Dev. Corp.*, 602 F.3d 57, 67 (2d Cir. 2010)). "Similarly, scenes a faire, sequences of events that 'necessarily result from the choice of a setting or situation,' do not enjoy copyright protection." *Williams v. Crichton*, 84 F. 3d 581, 587 (2d Cir. 1996). These unprotectable elements must be removed from the analysis. When comparing works with "both protectible and unprotectible elements," the Court must be "more discerning" and "must attempt to extract the unprotectible elements from…consideration and ask whether the ***protectable elements, standing alone***, are substantially similar." *Knitwaves, Inc. v. Lollytogs Ltd.*, 71 F.3d 996, 1002 (2d Cir. 1995).

"The Second Circuit has repeatedly recognized that, in certain circumstances, it is entirely appropriate for a district court to resolve [substantial similarity] as a matter of law, either because the similarity between two works concerns only non-copyrightable elements of the plaintiff's work, or because no reasonable jury, properly instructed, could find that the two works are substantially similar." *Peter F. Gaito Architecture*, 602 F.3d at 63. This is such a case.

### A. There is little, if anything, protectable in the Copyrighted Work that is claimed to be copied

Betty's claims are based on unprotected, generalized ideas, scene-a-faire, and elements contained in Pepsi's own prior works. In alleging similarity between Betty's Pitch and the Commercial, Betty relies on rough abstractions of what is contained in its pitch, rather than its

artistic expression.  Betty claims that its slides and the Commercial are similar because the "genre of music," "set design," "fashion/wardrobe", and "dance style and vibe" change when the lead or "hero" character (a single powerful performer) enters a new room.  D.I. 32 at ¶31 (a)–(e).  Betty also alleges that the use of "clean cuts" between scenes and the use of a prop jukebox infringe upon its copyright.  *Id.* at ¶31 (f)–(g).  None of these things are protectable.  Each is either an idea, an element that necessarily or naturally flows from an idea (referred to as "scene-a-faire") and/or part of Pepsi's own prior work.

### 1.    An idea is not protectable

Copyrights do not protect ideas.  Rather, copyrights protect only the ***expression*** of an idea.  In assessing claims of substantial similarity, it must therefore be decided "whether the similarities shared by the works are something more than mere generalized ideas or themes." *Walker v. Time Life Films, Inc.*, 784 F.2d 44 (2d Cir. 1985).  And, because copyright law does not protect ideas, any similarity between the ***ideas*** in the two works should be ignored. *See, e.g., Bill Diodato Photography, LLC v. Kate Spade, LLC,* 388 F. Supp.2d 382, 390 (S.D.N.Y. 2005); *see also Kaplan*, 133 F. Supp.2d at 322.

In this case, the alleged similarities are merely unprotectable ideas -- nothing more. In *Kaplan*, the claim for copyright infringement concerned the following two images:

 

Both images depict a business person standing on the ledge of a tall building, with shoes partially extended over the edge.  In both images, the person is wearing a pin-stripe suit and wing-tip

shoes.  Both images are taken from a similar angle and from the perspective of a businessperson looking down at the street below.  However, none of these elements were protectable.  First, the concept of taking a picture of "a businessperson contemplating a leap from a tall building onto the city street below" is the "central idea" (and not expression) and is "unprotectible in and of itself."  *Kaplan*, 133 F. Supp.2d at 323.  Second, as discussed in more detail below in subsection 2, common elements (looking down at street, shoes at edge of building and business attire) were all things that might reasonably be expected to appear in any expression of the idea, and were thus also unprotectable.  *Kaplan*, 133 F. Supp.2d at 324-25.  Accordingly, after filtering out the idea and the unprotectable elements that predictably flowed from the idea, the Court found that the unique expressive elements were distinct and dismissed the copyright infringement claim.

In *Diodato Photography*, the infringement claim concerned the following images:

 

The images depict the "idea" of "a woman's feet as she sits on the toilet, used as a striking device to highlight fashion accessories." *Id.* at 392.  That idea is not protectable. *Id.*  And, just as in *Kaplan*, the Court held that the similarities, including the dominant shapes of the woman's legs and the toilet base, fashionable shoes, the bathroom walls, the position of the woman's feet, and the handbag next to the woman's left foot, were unprotectable ideas or predictably flowed from the idea.  *Id.* at 392-393.  Accordingly, the court granted summary judgment.

Just as in the cases above, the unprotectable ideas must also be extracted from Betty's work in this case.  A performer's appearance in a commercial where he/she performs a song in different musical genres as the scenes change is nothing more than an "idea."  And there is no dispute that the concept is simply a generalized idea.  Al Pascarelli – Betty's creative director – testified that the "idea" was a character walking through rooms with the genre of music, the style, dance, and the performance from the main character all changing the vibe of the scene:

> I wouldn't say the idea was you're walking through a warehouse. I would say the idea is a hero character is walking through various rooms, and the genre of music, the style, the dancing, the performance from the main character are all changing the vibe of the -- of the genre of music.

SF ¶31(a).  He then confirmed that his description was the "idea broadly" and that "absolutely," you "could have different implementations of that idea."  *Id.*

Such broad ideas are simply not protectable.  *Williams*, 84 F3d 581, 587 (idea of a "dinosaur zoo" not protectable and no infringement of *Jurassic Park*); *Walker*, 784 F2d 44, 48-49 (dramatizing 41st precinct not protectable and "Fort Apache: The Bronx" movie did not infringe "Fort Apache" book); *Fulks v. Knowles-Carter*, 207 F. Supp.3d 274, 279-80 (S.D.N.Y. 2016) (similarities in pose, orientation, and camera angle so general that they are unprotected ideas); *Diodato Photography,* 388 F. Supp.2d at 392 (see above); *Kaplan*, 133 F. Supp.2d at 323 (see above); *Arden v. Columbia Pictures Indus., Inc.*, 908 F. Supp 1248, 1264 (S.D.N.Y. 1995) (man trapped in repeating day, as depicted in the movie *Groundhog Day* not protectable).[2]

### 2.    Scene-a-faire is not protectable

Under the doctrine of "scene-a-faire," scenes that necessarily result from a choice of a setting or situation are not protectable.  *See Walker,* 784 F.2d at 50.   Scene-a-faire include

---

[2] The idea is no more protectable because Betty titled its pitch "All Kinds/Living Jukebox."  It is still only the idea of using multiple music types in one place (commercial with different scenes.)

"incidents, characters or settings which are as a practical matter indispensable, or at least standard, in the treatment of a given topic." *Hoehling v. Universal City Studios, Inc.,* 618 F.2d 972, 979 (2d Cir. 1980).

In *Kaplan,* discussed above, the Court found that the fundamental details in the accused picture (attire, positioning, camera angle) were not protectable because they "naturally flowed" from the idea of picturing a businessperson contemplating suicide at the top of a building.  *See Kaplan*, 133 F. Supp.2d at 323.  In *Diodato Photography*, also discussed above, the framing of the woman's legs and handbag by the floor and bathroom wall was unprotectable scene-a-faire, because shooting the photograph "of the bottom part of a woman's legs in a bathroom stall" required the inclusion of standard bathroom stall items.  *Diodato,* 388 F. Supp.2d at 392.  In addition, the use of standard photography for the shot (low camera angle, the floor out of focus and a head on view) was unprotectable scene-a-faire.  *Id.*

The settings described in Betty's Pitch are, at best, unprotectable scene-a-faire.[3] Wardrobe/fashion/vibe changes "might reasonably be expected to" occur in any expression of the idea of having a performer in a commercial where different music genre scenes are depicted. *Kaplan*, 133 F. Supp.2d at 324.  Moreover, using clean cuts (i.e., smooth or seamless transitions between scenes) is standard filmography and is not protectable.   No specific transitions are identified in Betty's pitch (by scene, equipment, technique or otherwise) and Betty cannot claim to own the exclusive right to using basic film-making in commercials.  *See, e.g.*, *Fulks v.*

---

[3] The broad concept of changing of scenery, music, vibe and wardrobe are more aptly categorized as unprotectable ideas that are vague and generalized without any true expression. There is no specific wardrobe or scenery described in Betty's Pitch.  No song is mentioned other than Pepsi's own jingle (which Pepsi's pitch brief suggested Betty could use).   Dance is not mentioned at all and certainly no dance styles are suggested by Betty.  Other than a warehouse (which is admittedly not used in Pepsi's Commercial), no location is identified.  No set design is even cursorily described.  And, Mr. Pascarelli admitted that all of this was his "idea broadly."

*Knowles-Carter*, 207 F. Supp.3d at 282 (finding a film technique that did not originate with plaintiff not protectable).   Pepsi's own previous commercials are powerful evidence that changing scenery, wardrobe, dance, vibe and seamless transitions could reasonably be expected in such commercials.   Betty's creative director, Mr. Pascarelli, candidly admitted that Pepsi's previous Britney Spears commercial combined all these elements. SF ¶¶10, 76.

Pepsi has also submitted unrebutted expert testimony that the elements in Betty's Pitch were classic scene-a-faire.   Zachary Phillips, a writer, director, editor and producer in commercial film production for over a decade submitted an expert report explaining that Betty's concepts were not original and were, in fact, standard devices that would naturally flow from the idea in the Commercial.   SF ¶44.   Betty did not submit a responsive expert report or depose him.

All of the evidence thus indicates that the allegedly infringed elements of Betty's Pitch are not protectable.   Betty cannot claim the original creation of changing scenery, wardrobe, music or vibe, or using clean cuts between takes – these are classic scene-a-faire.   *Williams*, 84 F3d 581, 589 ("electrified fences, automated tours, dinosaur nurseries, and uniformed workers, these settings are classic *scenes a faire* that flow from the uncopyrightable concept of a dinosaur zoo."); *Walker*, 784 F2d 44, 50 (drunks, prostitutes, vermin and derelict cars would appear in any realistic work about the police work in the South Bronx); *Canal+ Image UK Ltd. v Lutvak*, 773 F Supp. 2d 419 (S.D.N.Y. 2011) ("device of using one actor to play multiple roles in the same production is not protectible. . . it is no more original than using . . . 'celebrities appearing as themselves'"); *Kaplan*, 133 F. Supp.2d at 323 (positioning business person at the ledge of a building, attire, and camera angle were unprotectible "scene a faire"); *Diodato Photography,* 388 F. Supp.2d at 392 (camera angle and bathroom scene "necessarily flow from [the] idea"); *Arden*, 908 F. Supp. at 1248 (beginning of each day with the main character awakening to the sound of

16

his alarm clock; repetition of actions, conversations, and events; and the reliving of experiences, are necessary aspects of the situation of a repeating day and, therefore, constitute unprotected scene-a-faire).[4]

### 3. Prior concepts used by Pepsi cannot form basis of infringement

It is ironic that Betty accuses Pepsi of infringement considering that it was Pepsi which popularized the music-through-the-ages commercial with its highly successful and memorable "Now and Then" Super Bowl commercial.  Betty's creative director testified that he saw the commercial *before* he crafted his pitch to Pepsi. SF ¶45.  The commercial starred a powerful performer – Britney Spears – as she danced through various eras changing wardrobe, dance style, music, and genre.  Betty's creative director admitted Pepsi had used "that whole combination of things" in the Britney Spears commercial, as well as "seamless" or "clean cuts" between scenes. SF ¶¶10, 45, 76.[5]  It is uncontested that a jukebox was used in the opening diner scene of the Britney Spears commercial, and other Pepsi commercial diner scenes.  SF ¶¶46, 57, 60.

Betty cannot use Pepsi's previously aired concepts against it in this case.  If anybody borrowed concepts, it was Betty – not Pepsi.  The law is clear that "where an element occurs both in the defendant's prior work and the plaintiff's prior work, no inference of copying can be drawn." *Muller v. Twentieth Century Fox Film Corp.*, 794 F. Supp.2d 429, 444 (S.D.N.Y. 2011), *aff'd sub nom. Muller v. Anderson*, 501 Fed. Appx 81 (2d Cir. 2012)).

### B. Nothing Protectable is Substantially Similar

Once the unprotectable ideas, scene-a-faire, and unoriginal concepts are extracted, there is nothing left of Betty's copyrighted work except material that it undisputedly ***not*** in the Pepsi

---

[4] If Betty had described the use of a jukebox in its pitch (which it did not), it would likewise be unprotected scene-a-faire.  Use of a jukebox in a 1950s/1960s diner scene flows naturally from the setting itself.  SF at ¶38.  Pepsi has used that device numerous times before. SF ¶46.

[5] The only expert to opine in this case agrees.  SF ¶45.

Commercial.  As a result, Pepsi cannot infringe Plaintiff's copyright.  *Kaplan*, 133 F. Supp.2d at 328; *Diodato Photography,* 388 F. Supp.2d at 394-95.

It is undisputed that the most descriptive parts of the pitch (the only parts arguably rising to the level of artistic expression) are not present in Pepsi's Commercial.  Unlike Betty's Pitch, the Pepsi Commercial does not start "outside a giant Brooklyn(like) warehouse" with "the camera perspective of somebody walking in."  It doesn't show that "[o]utside the door, a man plays an acoustic guitar singing an acoustic rendition of the Joy of Pepsi."  Unlike Betty's warehouse scenes, "the song" does not "remain the same."  It also does not feature "going from a metal interpretation of the Joy of Pepsi to a lone singer with an Adele like quality" or "going from rock [to] an upright bass plucking out the 'ba ba ba ba ba.'"  Nor does the Pepsi Commercial end with (or even include) "walking out . . . of the warehouse where a doo wop/acapella crew is standing around a fire lit in a trash can."  Betty admits that ***none*** of this arguable expression is in the Pepsi Commercial. SF ¶¶43, 77.

Here, like in *Diodato Photography*, the elements that are "unique to [Betty's] expression of the idea . . . distinguish it from the allegedly infringing" Pepsi Commercial.  388 F. Supp.2d at 393.  This case is a perfect example of where "dissimilarity in realization or expression can make clear" that any alleged "similarity extends only to unprotectible concepts or ideas."  *Kaplan*, 133 F. Supp.2d at 322.  Betty's "heavy reliance on unprotected ideas, scenes a faire, vague and amorphous descriptions, and technical similarities undermines its claim that the works share substantial similarity in protected expression."  *Fulks*, 207 F. Supp.3d at 290.

Because here, "any similarities between the protected elements . . . are of small import quantitatively and qualitatively," a rational trier of fact would not be able to find they are substantially similar.  *Kaplan*, 133 F. Supp.2d at 328.  Where, as here, the dissimilarities in the

works exceed those that are similar, a finding of non-infringement is appropriate.  *Id.* at 322

(citing to *Durham Indus. v. Tomy, Inc.* 630 F.2d 905, 913 (2d Cir. 1980) ("numerous differences

tend to undercut substantial similarity").)[6]

## III.   THERE IS NO BREACH OF CONTRACT

Knowing that there was nothing in the parties' Services Agreement that required

negotiation of new contracts, Betty did not claim that there was any breach of the Services

Agreement when it filed its original complaint.  Instead, it alleged a phantom verbal agreement

to negotiate for future work based on custom.  Because that claim was dismissed, Betty was

forced to switch directions and now claims a breach of the parties' written Services Agreement.

The unambiguous terms of that written agreement – and Betty's own testimony during discovery

– make clear that ***no actual provision*** of the parties' Services Agreement was breached.  Nor is

there anything in the Services Agreement (or anywhere else) that creates any kind of enforceable

"preliminary agreement" that could save Betty's claim here.

On top of Betty's attempt to enforce a non-agreement, Betty seeks to get to trial without a

damages case.  Betty has ignored its Rule 26(a) obligations to present damages calculations,

refused to provide substantive answers to interrogatories, and failed to make any expert

---

[6] Even if the Court looks to the broad ideas and scene-a-faire that Betty relies on (which would
be improper), those elements are not substantially similar to Pepsi's Commercial.  This Court no
longer must credit allegations made in the complaint and should examine the registered work
which "supersede[s] and control[s] contrary descriptions of them."  *See, Fulks*, 207 F. Supp.3d at
277.  Betty's Pitch never mentions "dance" and never describes a "stylistically changing set
design" as Betty alleges.  Likewise, the use of a prop jukebox or records with Pepsi's logo
cannot infringe text in the title of Betty's Pitch about a metaphorical "living jukebox."  The Pepsi
Commercial does not use the title and Betty never suggested using a physical jukebox.
Conflating these two things would be akin to finding that every shark movie infringed "Jaws"
because sharks have teeth in their mouths.  Moreover, switching musical "genres" (types of
music) for one song–*i.e*, from metal to classical, is very different from Pepsi's selection of
different songs from varying time periods.

disclosures. Betty has knowingly refused to provide damages calculations in fact or expert discovery, and should be precluded from proving damages – a necessary element of its claim.

### A.      There is No Breach of the Provisions of the Written Service Agreement

Betty admits that there is not "any provision" in the Services Agreement "that requires Pepsi to negotiate with Betty" concerning a new Scope of Work. SF ¶50.  That admission should end all dispute about the alleged breach of contract.  After all, Betty's allegation is that "PepsiCo breached the Services Agreement . . . by not working in good faith with Betty to enter into a Scope of Work."   Because there is no obligation to negotiate, failing to negotiate cannot constitute a breach.  *Mark Andrew of the Palm Beaches, Ltd. v. GMAC Commer. Mortg. Corp.*, 265 F. Supp.2d 366, (S.D.N.Y. 2003) (defendant "was under no obligation to negotiate in good faith . . . [a]bsent such a duty, the defendant's motion for summary judgment is granted").  It is no more complicated than that.

### B.      There is No Enforceable Preliminary Agreement

Betty cannot salvage its contract claim by asserting that the Services Agreement is a preliminary agreement with respect to Betty's 2016 Super Bowl work product.  It is not.  Pepsi has ***not found a single case*** that finds an enforceable preliminary agreement in a case where ***none*** of the material terms have been agreed.  The agreement here was executed a year before anybody knew that Betty would present a pitch for the Commercial.  The Services Agreement addressed an entirely different transaction and was never intended to bind anybody – particularly Pepsi – to negotiate anything else.  Applying New York law here, there can be no question that no enforceable preliminary agreement exists.

#### 1.      Under New York State Law, there is No Preliminary Agreement, only an Unenforceable Agreement to Agree.

New York law is straightforward.  Here, there is no "preliminary agreement" at all – much less an enforceable one.  It "is rightfully well settled . . . that a mere agreement to agree, in

which a material term is left for future negotiation, is unenforceable." *Joseph Martin Jr.*

*Delicatessen, Inc. v. Schumacher*, 52 N.Y.2d 105, 110 (1981).  Under New York law, an

agreement is simply not enforceable where there are open **material** terms.  *Id.*   The test is easy

to apply – if there is any material term not agreed, the contract is not an enforceable one.  *Total*

*Telecom Group v. Kendal of Hudson*, 68 N.Y.S.3d 491, 493 (2d Dep't 2018) ("contract lacked

material term regarding the price or fees to be paid"); *Danton Constr. Corp. v. Bonner*, 571

N.Y.S.2d 299, 300 (2d Dep't 1991) ("'agreement to agree,' which leaves material terms of a

proposed contract for future negotiation, is unenforceable.").

The Second Circuit has recognized New York's concrete test that requires that there "be a

manifestation of mutual assent sufficiently definite to assure that the parties are truly in

agreement with respect to **all material terms**"  *Tractebel Energy Marketing, Inc. v. AEP Power*

*Marketing, Inc.,* 487 F.3d 89, 95 (2d Cir. 2007) (internal quotations omitted and emphasis added)

(enforcing contract because "all material terms" agreed); *see also KJ Roberts & Co. v. MDC*

*Partners Inc.*, No. 12-CV-5779, 2014 WL 1013828, at *9 (S.D.N.Y. Mar. 14, 2014) ("a mere

agreement to agree, in which a material term is left for future negotiations, is unenforceable.")

In this Court's opinion on Pepsi's Second Motion to Dismiss, this Court looked to a

"Type I/Type II" analysis, but the "agreement" here is neither Type I, nor Type II.  It is simply

not a preliminary agreement at all.  "Type I" agreements are limited to those agreements where

the "parties have reached complete agreement on **all the issues** that require negotiation" and the

written agreement is only "preliminary in form."  *Arcadian Phosphates, Inc. v. Arcadian Corp.,*

884 F.2d 69, 72 (2d Cir. 1989) (emphasis added); *Teachers Ins. v. Tribune Co.*, 670 F. Supp.

491, 498 (S.D.N.Y. 1987).  Type II agreements are ones where the parties have committed

themselves to "**major terms**." *Arcadian,* 884 F.2d at 72 (emphasis added)*; see also Teachers*

*Ins.*, 670 F. Supp. at 498 ("mutual commitment to a contract on agreed major terms").   There is simply no third category of preliminary agreements for cases like the one here where ***no material terms*** were agreed and all the major terms remain unaddressed.

Here, the parties never negotiated a single material term relating to Betty's Super Bowl work.  SF ¶53.  Betty has specifically admitted that the parties never negotiated about "price" or even "what the deliverable would look like."  SF ¶53.  Given that admission, the recent case of *Foros Advisors, LLC v. Digital Globe, Inc.* is dispositive.  333 F.Supp.3d 354 (S.D.N.Y. 2018). In *Foros,* defendant specifically agreed to negotiate in good faith.  *Id.* at 360-361.  Despite that agreement (not present here), the contract was unenforceable because without "such critical terms as" the "scope of services and the compensation, there can be no binding agreement because the Offer Clause is merely an agreement to agree on these material terms."  *Id.* at 361. And the Court explained that enforceability depends on "the materiality of terms remaining to be negotiated" and that if "an agreement leaves a material term open for future negotiation . . . it is a mere 'agreement to agree,' which is too indefinite to be enforced."  *Id.* at 362.

## 2.  Any Preliminary Agreement is Not Enforceable.

Even if an analysis of Type II enforceability was at all appropriate,[7] the first factor, the language of the agreement, resolves this case.  A defendant can prevail by showing "only" that the other party "should have known" that the defendant "did not intend to be bound before the

---

[7] A common articulation of New York courts' analysis of enforceability of a preliminary agreement, asks "whether the agreement contemplated the negotiation of later agreements and if the consummation of those agreements was a precondition to a party's performance." *Offit v. Herman,* 16 N.Y.S.3d 737 (1st Dep't 2015).  If so, the "contract" is an unenforceable agreement to agree.  The provisions discussed above in section III.B.2 demonstrate the parties anticipated "the negotiation of later agreements" that would be necessary before parties were bound.

final contract was signed." *Arcadian,* 884 F.2d at 73.  Here, not only should Betty have known

that the parties would not be bound without a Scope of Work, it ***did know***:

> Q. Was it the parties' intentions that Pepsi would own all of any deliverable
> that Betty provided to it and that Pepsi paid for?
>
> A. It would under a scope of work agreed to by Betty and agreed to by Pepsi
> and fair compensation being paid by Pepsi. That is the only time that that
> would take place.
>
> Q. What about outside of a scope of work?
>
> A. No

SF ¶ 53.  When asked "why is it necessary" to execute a statement of work, Betty's CEO said:

"That's in their document.  That was Pepsi's – that was their rule in the contract."   SF ¶ 53.

Section 1 of the Services Agreement explicitly limits any engagement to the services "as

provided in Exhibit A ("Schedule" or "Scope of Work")." Section 2 makes clear that only after a

Scope of Work is "signed by both parties" will it form part of the Services Agreement.  And the

Agreement makes plain that Pepsi's entry into a Scope of Work is permissive – not required.

Section 2 states that Pepsi "may enter" into Scopes of Work and section 1 recites that Pepsi

"retains the right, in its sole discretion" to place future orders for work.  Betty agrees.  SF ¶ 50.

Lastly, section 1 provides that Pepsi will not have "any obligation or liability of any nature

whatsoever to the Agency, except as expressly set forth."  The language – and Betty's testimony

– make clear that the parties did not intend to be bound without an executed Scope of Work.

To the extent a review of the remaining four factors is needed, they all favor Pepsi.  The

second factor, the context of the negotiations, is largely irrelevant – as there were no negotiations

concerning the Super Bowl project.  The third factor, the existence of open terms, again cuts

decidedly in Pepsi's favor.  All the material terms remain open.  The fourth factor, partial

performance, cannot favor Betty as it relates to the Super Bowl project.  There is nothing that

Betty can point to as partial performance with respect to a contract for its concept.  Betty cannot

partially perform on a project where no definition of the project or deliverable even exists.

The last factor, the necessity to put the agreement in final form, is also largely irrelevant. There is no agreement whatsoever to put in "final form."  That is what makes this case very different.  We are not dealing with putting in "final form" an 80% negotiated agreement. Instead, to get to a final agreement, the parties would have to negotiate an entire agreement – from scratch.  The absence of any discussions regarding the subject matter of a Super Bowl agreement cannot help Betty create an agreement where none exists.

Because the evidence in the record demonstrates that not a single factor favors Betty, the court should find that the Services Agreement is an unenforceable agreement to agree.

### C.      Betty is Precluded from Proving Damages

Betty has intentionally and consistently avoided providing a damages calculation.  Rule 26(a)(1)(A)(3) requires each party to provide a calculation of the damages it seeks.  Betty never provided that calculation.  Pepsi issued an interrogatory asking for a damages calculation.  Betty responded that it had "not yet completed its computations of damages but expects that such computation will form part of its expert disclosures."  Fact discovery closed on November 9, 2018 without Betty ever amending.  Expert discovery closed on December 21, 2018 without Betty making an expert disclosure.  SF ¶81  Betty also never deposed Pepsi's experts.  Betty should not be permitted to pursue a damages case.  Without damages, its contract claim should be dismissed.

This case is almost identical to the *Gould Paper Corp. v Madisen Corp.* case.  614 F.Supp.2d 485 (S.D.N.Y. 2009).  In that case, defendants failed to provide the calculation required by Rule 26 and, like here, suggested that the calculation should be done by an expert. *Id.* at 490.  Also like here, they failed to put forth an expert disclosure.  The case proceeded

exactly as this one has and the result should be the same – Betty should be "precluded from proving damages:"

> All discovery – fact and expert – closed in this case on December 18, 2008. The motions for summary judgment followed.  Defendants may not use an expert at some point in the future to prove damages because they did not provide a damages calculation or disclose an expert witness during discovery, as required.  Defendants, therefore, are precluded from proving damages.

*Id.*  Any other result would be unfair and would reward Betty's tactics.[8]

### D.      Betty's contract claim cannot survive a finding of no infringement.

Finally, even if Betty had a viable theory for alleging a breach of some obligation, Betty's claim would fail.  Betty's contract claim is predicated on a finding that Pepsi infringed Betty's copyright, and, as demonstrated in section I, no claim of infringement exists.  Betty's claim for breach of contract hinges on Pepsi making "use of Betty's work."  D.I. 32, ¶¶53-54.  It says that Pepsi needed a contract "if it wanted to acquire 'all right, title and interest" in Betty's work.  D.I. 52 at 17.  But, if it is found that Pepsi did not use any protectable work of Betty, then there would be nothing to negotiate.  Moreover, if Pepsi did not use Betty's copyright, then there would be no damage whatsoever to remedy.  Because Pepsi did not use "All Kinds/Living Jukebox," Betty's contract claim must fail.[9]

## <u>CONCLUSION</u>

For the reasons stated above, Pepsi should be awarded judgment on Betty's claims.

---

[8] Nominal damages are not available here because Betty cannot prove that Pepsi "decided to use Betty's work product" as it alleged.  The only evidence is to the contrary.  SF ¶53

[9] Betty's copyright claim should also fail for lack of damages as Betty also refused to provide any disclosure about its proposed calculation of copyright damages.

Dated:  April 1, 2019

LERNER, DAVID, LITTENBERG,
 KRUMHOLZ & MENTLIK, LLP

By: */s/ Scott R. Samay*
Scott R. Samay
ssamay@lernerdavid.com
Natalie S. Richer (*pro hac pending*)
nricher@lernerdavid.com
Elizabeth Lafferty (*pro hac pending*)
elafferty@lernerdavid.com
600 South Avenue West
Westfield, NJ 07090-1497
(908) 654-5000

WINSTON & STRAWN LLP

Michael S. Elkin
melkin@winston.com
Emily Ellis
eellis@winston.com
200 Park Avenue
New York, New York 10166-4193
(212) 294-6700

*Attorneys for Defendant, PepsiCo, Inc.*