UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

```
------------------------------------------------X
                                   :
BETTY, INC.,                       :
               Plaintiff,          :
                                   :
v.                                 :          Case No. 16-CV-4215 (VB)
                                   :
PEPSICO, INC.,                     :
               Defendant.          :
                                   :
------------------------------------------------X
```

**PLAINTIFF BETTY, INC.'S MEMORANDUM OF LAW IN OPPOSITION TO
DEFENDANT PEPSICO'S MOTION FOR SUMMARY JUDGMENT**

MARTIN LLP
262 Harbor Drive
Stamford, Connecticut 06902
Tel: (203) 973-5210
Fax: (203) 973-5250

*Attorneys for Plaintiff Betty, Inc.*

# TABLE OF CONTENTS

TABLE OF AUTHORITIES ..................................................................................................... ii

PRELIMINARY STATEMENT ................................................................................................ 1

STATEMENT OF FACTS ........................................................................................................ 3

A.   Betty is a Boutique Connecticut Advertising Agency that Formed a Working and Contractual Relationship With PepsiCo. ........................................................................ 3

B.   PepsiCo Stole and Produced Betty's Script for a LIPTON Sparkling Iced Tea Spot ........... 4

C.   Betty Continued to Work with Other PepsiCo Brands. ...................................................... 5

D.   In Late October 2015, PepsiCo Invited Betty to Pitch Creative Concepts for the PEPSI 2016 Super Bowl Commercial. ......................................................................................... 6

E.   Betty Presented Its "All Kinds/Living Jukebox" Creative to PepsiCo Employees and Agents During the Morning of November 6, 2015. ............................................................ 7

F.   The Authenticity of TMA's Pitch Deck is Suspicious and in any Event Distinct from the Super Bowl Commercial; PepsiCo Shared Inside Information With TMA to Improve TMA's Work and The Changes Made to the "Original Concept" Made the Commercial Substantially Similar to Betty's Creative ....................................................................... 10

G.   The Super Bowl Commercial Copies and is Substantially Similar to Betty's "All Kinds/Living Jukebox" Storyline ...................................................................................... 14

H.   Betty Complained to PepsiCo About Its Use of Betty's Creative Work and PepsiCo Reacted By Trying to Cover Its Tracks, Including By Creating a Phony Betty Invoice. .... 15

ARGUMENT ......................................................................................................................... 17

A.   "All Kinds / Living Jukebox" Qualifies For Copyright Protection. .................................... 17

1.   It is Improper for PepsiCo to Dissect Betty's Work Into Individual Components to Argue that Such Components Are Not Protectable. ....................................................................... 17

2.   The Other Commercials PepsiCo Describes Are Easily Distinguishable From Betty's Creative Work. ................................................................................................................... 19

B.   The Super Bowl Commercial Infringed "All Kinds / Living Jukebox" By Creating A Substantially Similar Copy Of It ......................................................................................... 19

A.   PepsiCo's Characterization of the Agreement as an Unenforceable "Agreement to Agree" is Misplaced. ...................................................................................................................... 22

B.   The Agreement Indicates the Material Obligation Imposed on PepsiCo to Enter Into a Scope of Work with Betty Before Making Use of Betty's Creative Work Product. ......... 23

C.   Betty Sustained Damages as a Result of the PepsiCo Breach of Contract. ........................ 24

CONCLUSION ...................................................................................................................... 25

## TABLE OF AUTHORITIES

Adjustrite Sys., Inc. v. GAB Servs., Inc., 145 F.3d 543 (2d Cir. 1998)......................................22

Albanese v. Consolidated Rail Corp., 666 N.Y.S.2d 680, 245 A.D.2d 475 (App. Div. 2d Dep't 1997) ....................................................................................................................................................24

Am. Auto. Ins. Co. v. Rest Assured Alarm Sys., 786 F.Supp.2d 798, 804-05 (S.D.N.Y. 2011)...........24

Boisson v. Banian, Ltd., 273 F.3d 262 (2d Cir. 2001) ..............................................................19

Brown v. Cara, 420 F.3d 148 (2d Cir. 2005)............................................................................22

Cacace v. Meyer Mktg. (Macau Commer. Offshore) Co., Ltd., 589 F.Supp.2d 314 (S.D.N.Y. 2008) 24

Castorina v. Spike Cable Networks, Inc., 784 F.Supp.2d 107 (E.D.N.Y. 2011).....................................21

Danton Constr. Corp. v. Bonner, 571 N.Y.S.2d 299, 173 A.D.2d 759 (App. Div. 2d Dep't 1991) ...22

Feist Publications, Inc. v. Rural Telephone Service Co., 499 U.S. 340, 111 S.Ct. 1282 (1987) ..........17

Fisher-Price, Inc. v. Well-Made Toy Mfg., Corp., 25 F.3d 119 (2d Cir. 1994)......................................20

God's Battalion of Prayer Pentecostal Church, Inc. v. Miele Assocs. LLP, 6 N.Y.3d 371, 812 N.Y.S.2d 435, 437 (2006) ..............................................................................................24

Hamil Am. Inc. v. GFI, 193 F.3d 92 (2d Cir. 1999)......................................................................17

Hayuk v. Starbucks Corp., 157 F.Supp.2d 285 (S.D.N.Y. 2016)......................................................20

Hogan v. DC Comics, 48 F.Supp.2d 298 (S.D.N.Y. 1999).......................................................19

Horizon Comics Prods., Inc. v. Marvel Entm't, LLC, 246 F. Supp. 3d 937 (S.D.N.Y. 2017).............18

Innophos, Inc. v. Rhodia, S.A., 10 N.Y.3d 25, 852 N.Y.S. 820 (2008) ....................................22

Jorgensen v. Epic/Sony Records, 351 F.3d 46 (2d Cir. 2003)(citing 17 U.S.C. §410c)) ......................17

Joseph Martin, Jr. Delicatessen, Inc., v. Schumacher, 52 N.Y.2d 105, 436 N.Y.S.2d 247 (1981) .......23

Kaitwaves, Inc. v. Lollytogs Ltd., 71 F.3d 996 (2d Cir. 1995) ....................................................18

KJ Roberts & Co. v. MDC Partners Inc., 2014 U.S. Dist. LEXIS 34740 (S.D.N.Y. March 14, 2014) ....................................................................................................................................................22

Knitwaves, Inc. v. Well-Made Toy Mtg. Corp., 25 F.3d 119 (2d Cir. 1994)......................................18

Law Debenture Trust Co. of N.Y. v. Maverick Tube Corp., 595 F.3d 458 (2d Cir. 2010) .................22

Lewinson v. Henry Holt and Company, LLC, 659 F.Supp.2d 547 (S.D.N.Y. 2009) ...........................19

Nihon Keizai Shimbun, Inc. v. Comline Bus. Data, Inc., 166 F.3d 65 (2d Cir. 1999)...........................20

Peter F. Gaito Architecture, LLC v. Simone Dev. Corp., 602 F.3d 57 (2d Cir. 2010)....................18, 20

Teachers Ins. & Annuity Ass'n of Am. v. Tribune Co., 670 F.Supp. 498 (S.D.N.Y. 1997).................22

Terwilliger v. Terwilliger, 206 F.3d 240 (2d Cir. 2000) ..........................................................24

Tractebel Energy Marketing, Inc., v. AEP Power Marketing, Inc., 487 F.3d 89 (2d Cir. 2007)..........23

Tufenkian Import/Export Ventures, Inc. v. Eisnstein Moomjy, Inc., 338 F.3d 127 (2d Cir. 2003)..20

Walker v. Time Life Films, Inc., 784 F.2d 44 (2d Cir. 1986).....................................................20

Williams v. A&E Television Networks, 122 F.Supp.2d 157 (S.D.N.Y. 2015) ....................................... 23

Yurman Design, Inc. v. PAJ, Inc., 262 F.3d 101 (2d Cir. 2001) ............................................................... 23

## PRELIMINARY STATEMENT

Defendant PepsiCo., Inc.'s ("PepsiCo")[1] motion for summary judgment rests on the same legal propositions the Court rejected with the motions to dismiss. While the standard of review is, of course, different now, discovery has revealed a level of evidentiary support for the copyright infringement and breach of contract claims even greater than what Betty originally suspected.

PepsiCo has spent many millions of dollars to foster and shroud the public image of its PEPSI brand as the manifestation of joy. However, behind the brown carbonated bubbles, the employees and agents working on PepsiCo's brand teams routinely operate with the attitude and approach of a bully seeking to use the enormous financial and other resources at its ready disposal to take unfair advantage of its potential vendors. What is certain from the evidence elicited in this case is that PepsiCo has not lived up to industry convention and legal responsibilities, let alone to "the highest standards of ethics and integrity" proclaimed by its Global Code of Conduct (www.pepsico.com/about/global-code-of-conduct). Betty's causes of action are the product of (a) the negative consequences resulting from the way PepsiCo fell short of its expressed values and (b) Betty's decision to finally take a stand against PepsiCo's way of treating its advertising agency vendors, because the misappropriation here was not the first time it had been victimized by PepsiCo infringement of its rights.

This case stems from the chance of a lifetime PepsiCo gave to Betty, a boutique Connecticut advertising agency. Betty seized that chance by creating an innovative, fun, joyful and ownable advertising concept. To be clear, PepsiCo had no obligation to react favorably to Betty's concept nor was it obliged to pursue the making of a commercial based on and specifically incorporating

---

[1] Plaintiff Betty, Inc. ("Betty") will respect the name convention PepsiCo witnesses preferred, which is to call the company "PepsiCo" in order to distinguish it from the name of its PEPSI brand product. It is unclear why PepsiCo did not follow that convention in its own moving papers. For the convenience of the Court, Betty will use the citation to evidence practice PepsiCo adopted by citing to the Betty Response to Statement of Undisputed Facts ("BRSF") and, whenever possible, to the exhibits already in the record.

Betty's creative work product. The decision about what spot to air during the 2016 Super Bowl was exclusively reserved for PepsiCo to make according to its discretion and what it believed would best resonate with its targeted consumers. But, PepsiCo was not at liberty to use Betty's creative work without first negotiating the terms for its use with Betty, and paying Betty for the rights desired; yet, this is exactly what happened. It is natural and understandable for witnesses to suffer from imperfect memories about minor details of their activities and observations, but that excuse cannot explain PepsiCo's inability to provide a coherent and supportable narrative regarding the creation of the subject commercial and of its interactions with Betty. The logical conclusion is that, at minimum, PepsiCo realizes it used Betty's creative work to drastically change, or to use the word in the record, "elevate" the work of The Marketing Arm ("TMA") by making it substantial similar to what Betty had already presented -- and that it did so without first taking the legal steps required by the Copyright Act and by the parties' contract to gain permission and rights for such use.

The primary value advertising agencies bring to their clients lies in the ability to conjure interesting storylines and unique and imaginative ways for portraying a product, communicating a message, and using and assembling such things as music, dance, costumes, talent, visual images, shot angles and props to establish a memorable, impactful flow of scene in a 60, 30 or 15 second spot. Determining there is nothing protectable or of compensable value in creative work simply because it includes basic elements like music, dance and wardrobe changes that can be isolated into separate components would be tantamount to undermining an entire industry as PepsiCo urges is, as Judge Karas previously acknowledged, not supported by law.

Substantial evidence undercuts any notion that the competition to win this assignment took place on an even playing field. While there is nothing legally improper about PepsiCo favoring one or more agencies, it precludes summary judgment because there is sufficient proof to conclude that PepsiCo allowed TMA to benefit from having various details of Betty's creative work shared with it.

It may be that TMA did not know that the feedback and suggestions it received from PepsiCo had been derived from Betty's work; therefore, the mere fact that TMA professes that it created the work and was unaware of Betty's does not provide a basis for discounting a finding of copying. TMA was provided with inputs and refinements throughout the entire development process that had the effect of evolving its "originally presented" story line to a point of substantial similarity with Betty's presented creative work. There were far more than what TMA calls "standard executional adjustments" from the initial concept to the final product; the final commercial was not at all a natural extension of the original concept TMA developed and pitched. The significant inputs and refinements were not made in a vacuum but instead resulted from the specific direction provided by PepsiCo employees and agents who received Betty's in-person and written presentation.

## STATEMENT OF FACTS

### A. Betty is a Boutique Connecticut Advertising Agency that Formed a Working and Contractual Relationship With PepsiCo.

Betty became introduced to PepsiCo because Barry Rosen, the principal of an agency named Direct Focus, Inc., saw work Al Pascarelli, III, Betty's Chief Creative Officer ("Al")[2], did for another Betty client. BRSF ¶88. Rosen has had a decades long relationship with PepsiCo and he has been intimately involved in numerous substantial campaigns for its brands (including PEPSI). BRSF ¶89. The role Rosen plays with PepsiCo commercials spans from managing the creative presentation process to providing input to concept selection decisions to working with PepsiCo in creating and refining story boards to directing the technical production of a commercial. Rosen reached out to Al to invite him to work on a project for PepsiCo's MOUNTAIN DEW brand in 2014. BRSF ¶91.

PepsiCo requires advertising agencies wanting to do business with it to enter into a Creative Agency Services Agreement with its affiliate Pepsi-Cola Advertising & Marketing, Inc. ("PCAM").

---

[2] Because Betty is a family business with its key employees sharing the same last name, they will be defined and referenced by their first names.

BRSF ¶92. Therefore, Betty and PCAM made such an agreement dated as of November 11, 2014 ("the Agreement"). BRSF ¶93. The Agreement serves as a master or umbrella agreement providing the framework for specific projects the parties undertake. As one would expect, the contract is very one-sided with the respective obligations it sets. The Agreement did not require PepsiCo to work with Betty as the relationship was non-exclusive and PepsiCo maintained the right, in its sole discretion, to enter into engagements or to decide not to enter into engagements with Betty. BRSF ¶96. The consideration Betty received in return was significant – the opportunity to secure a Scope of Work ("SOW") commitment if and whenever PepsiCo wanted to use Betty's creative efforts on a project. BRSF ¶100. With a SOW and payment of the negotiated fee, PCAM would then own all rights to the produced creatives. The corollary is that no transfer of rights would occur in the absence of the SOW that the Agreement contemplated and mandated. BRSF ¶101.

The parties first used the Agreement for a MOUNTAIN DEW brand project. BRSF ¶102. As it mandated, PepsiCo and Betty made a SOW to define the scope and fee for the assignment. By making the SOW related to the two commercials Betty created and paying the negotiated fee, PepsiCo acquired all rights, title and interest (including copyright rights) to Betty's work in connection with the project. Betty then worked on a project for the PEPSI MAX brand and once again, in May 2015, the parties made SOWs. BRSF ¶102. With Betty's creative efforts, two commercial spots were made and aired; PepsiCo owns all rights to Betty's work product for those projects because it paid the negotiated fee.

## B. PepsiCo Stole and Produced Betty's Script for a LIPTON Sparkling Iced Tea Spot.

Not all of Betty's interactions with PepsiCo were pleasant. In retrospect, one represented a harbinger of things to come as PepsiCo simply took, produced and used Betty's work product without making a SOW, without permission and without the payment of any compensation. At

PepsiCo's request, Al pitched a script for a commercial for the LIPTON Sparkling Iced Tea brand. The pitch was very well received yet the brand team suddenly stopped all contact and discussion with Betty. Several months later, by happenstance based on an Internet search, Betty discovered that PepsiCo had taken and used the script to produce an online commercial. BRSF¶104.

When confronted about the theft, Rosen expressed disgust and agreed Al had every right to be upset. BRSF ¶105. Through Rosen, PepsiCo offered a fee which Betty felt it had no choice but to accept (As Rosen put it, Betty could either accept the proposed fee or sue and never work for PepsiCo again). Worse still, Rosen claimed he wanted Betty to create new material for the LIPTON brand, but the brand manager, Melanie Watts, had after the incident become hostile to Betty because she had been caught red-handed using the prior script without paying for it. Allegedly as a result of Watts' attitude, Rosen "suggested" Betty team up with Rosen's daughter and ghostwrite creative concepts, which then would be submitted to the LIPTON brand team under her name. The fees received relating to these projects would be shared (not equally but in favor of Rosen's daughter). This "suggestion" by Rosen was actually presented by Rosen as a threat that if Betty did not follow his "suggested" path, he would use his considerable influence and authority to ensure that Betty would never again have the opportunity to work on PepsiCo matters. BRSF ¶106. Despite this stated consequence, ultimately, Betty declined Rosen's "suggested" offer. BRSF¶107.

**C.    Betty Continued to Work with Other PepsiCo Brands.**

In February 2016, PepsiCo's AMP brand managers advised Betty that it had won a multiagency pitch to be the agency of record for a multi-million dollar campaign. BRSF ¶108. Unfortunately for Betty, those managers changed their minds (or were instructed to do so) and decided to "go in a different direction" after Betty raised its issues with the PEPSI 2016 Super Bowl commercial. Notwithstanding the change of direction, PepsiCo still attempted to purchase Betty's

presented work product for the AMP project, but for an abnormally low fee that Betty declined. BRSF ¶108.

D. **In Late October 2015, PepsiCo Invited Betty to Pitch Creative Concepts for the PEPSI 2016 Super Bowl Commercial.**

The importance of the Super Bowl to advertisers given the widescale attention it garners from football fans and non-football fans alike cannot be questioned. PepsiCo has long recognized the advertising reach of the Super Bowl telecast and has worked hard to ensure it is regularly associated with the event because it is believed to represent the center of a pop culture moment. BRSF ¶110. To that end, PepsiCo has been the title sponsor of the extremely high-profile Super Bowl halftime show, which features well-known musical entertainers, every year since June 2012. BRSF ¶111.

Commercials are the product of a combination of inspiration and perspiration, that is, creative expression and hard work. The process often starts with the client preparing for the advertising agencies a short writing, known as a Brief, to provide high-level guidance of what it wants to achieve with the spot or campaign and any particular project specifications or requirements. PepsiCo initially solicited proposals for the Super Bowl spot in two different rounds of pitches from the agencies it regularly used, but because the initial storylines or spot concepts did not test well, PepsiCo prepared a Brief to solicit new creatives from other agencies. BRSF ¶112.

On October 29, 2015, Arbetter instructed Jayanthi Reja Segaran ("Segaran") to invite Betty and some other agencies to join a telephone briefing the next day for the 2016 Super Bowl spot. BRSF ¶114. Segaran was a director of NFL-related creative communications and marketing for the PEPSI brand and the point person for developing the commercial PepsiCo would air leading into the halftime show of the 2016 Super Bowl. BRSF ¶115. During the briefing of this group of agencies, Segaran provided direction and a general outline of what PepsiCo wanted from the creative presentations. Notably, TMA did not receive the same e-mail invitation that was provided to Betty

and TMA did not participate in Segaran's telephone briefing for the participating agencies. BRSF ¶116. Working under the tight deadline PepsiCo needed to impose because it was behind schedule, Betty devoted its efforts to developing creative storylines for PepsiCo's consideration. Betty undertook those efforts based on the fact that the Agreement was in place to require that a SOW would be negotiated, and entered into if PepsiCo ultimately wanted to move forward with producing and acquiring rights to a Betty presented advertising storyline

### E. Betty Presented Its "All Kinds/Living Jukebox" Creative to PepsiCo Employees and Agents During the Morning of November 6, 2015.

Betty met with the PepsiCo team (employees and agents) during the morning of Friday November 6, 2015 at PepsiCo's offices. BRSF ¶119. Al and his brother Justin attended the meeting for Betty. Al presented eight (8) separate storyline concepts in detail *and distributed Betty-branded USB drives containing summary printed material so that it could be easily accessed by PepsiCo's representatives for later review.* BRSF ¶121. Hence, the work product Betty presented consisted of both the written presentation material Betty later registered with the U.S. Copyright Office[3] and a detailed verbal description and articulation of the proposed storylines, including the "All Kinds / Living Jukebox" creative and numerous potential variations of it. BRSF¶122.

Because he believed it to be his strongest storyline proposal, Al started his presentation by pitching the "All Kinds/Living Jukebox" concept, and he spent the most time on it. BRSF ¶123. As he described it, consistent with the fact that this concept had two names, "All Kinds/Living Jukebox" set forth two related but distinct concepts that shared the same execution mechanic. BRSF ¶124. In a nutshell, the commercial would feature a single "hero character" (performer) moving from room to room; as the character passed into each new room, the doorway would be used to act as the precipice or agent of change for a completely new vibe (which included music

---

[3] Betty obtained a copyright registration effective May 18, 2016 issued by the U.S. Copyrights Office (Registration No. TXu 1-993-773). BRSF ¶43.

genre changes, wardrobe changes of both the hero and the background characters, dance style changes, prop changes and set design changes – which would all be reflective and consistent with the new music). The overarching thematic is that the ad would be stitched together to appear as one continuous seamless shot. As an example, the hero character walks through the door of one room wearing one outfit and emerges into the adjoining room in an entirely new outfit reflective of a different music genre. The secondary characters from the previous room would now be depicted in the new room also with new wardrobe, along with new action and props reflective of the new music. BRSF ¶124. With the All Kinds interpretation, a single song, PepsiCo's Joy of Cola, would be used throughout but with different musical genre/style mixes to it, one new genre/style per new room, picking up exactly where the last version left off. BRSF¶125. With the Living Jukebox interpretation, multiple songs would be used rather than just the Joy of Cola, thereby reflecting the notion of a jukebox springing to life as the hero and background performers perform to a different song (as a jukebox plays different songs) in each room. BRSF ¶126. Significantly, PepsiCo ended up producing both a Joy of Cola genre mashup only version as well as the Super Bowl aired multiple song version - - thus, PepsiCo actually produced both versions of Betty's presented All Kinds / Living Jukebox creative. BRSF ¶127, 165.

PepsiCo's witnesses were unable to testify about the contents of Betty's presentation. BRSF ¶129. Therefore, the descriptions Al and Justin gave of the presentation meeting and the Betty presentation itself cannot be credibly challenged. The Betty concept specifically contemplated flexibility, labelled "Considerables" in the deck, because experience taught Al that changes and concept refinement typically occur during the production process.[4] Al's approach to concepting is

---

[4] As much as PepsiCo tries in its motion to hinge the Betty concept to the specific examples cited in the pitch deck, Al emphasized during his presentation that his creative did not depend on the specific types of music listed (rock, rap, jazz/swing, classical) or on the initial scene taking place outside a warehouse facility ("Doesn't have to be a walkthrough of the warehouse."). BRSF ¶130.

that it is more beneficial to, and appreciated by, the client, to present storylines that are not pigeonholed at the outset to require a particular celebrity, song, or style. BRSF ¶130.

Client representatives are typically instructed to remain poker-faced during competitive agency presentations. Notwithstanding that mindset, the PepsiCo team reacted favorably to Betty's work during Al's presentation. BRSF ¶131. Indeed, after Betty completed its November 6, 2015 presentation, Rosen promptly came out of the conference room and followed the Pascarellis down the hallway to congratulate them on the pitch and to suggest that they soon meet with him for dinner. BRSF ¶131. It is fair to surmise that Rosen wanted to clear the air from the "ghostwrite for my daughter" episode because he realized there was a strong likelihood of PepsiCo awarding the project to Betty and that he might have to work with Betty on production of the Super Bowl spot.[5]

Segaran contacted Al that evening to request that refinements be made to two of the presented storylines and that the refinements be submitted by 9:00 a.m. on Monday November 9, 2015. BRSF ¶134. Al devoted the weekend to making the refinements (pursuant to a separate understanding that Betty would be paid $5000 solely for the refinement services and not for any ownership rights) in time to meet PepsiCo's Monday morning deadline. BRSF ¶135.

Nearly one month later, PepsiCo thanked Betty for its efforts but advised that it had decided on a different approach for the Super Bowl commercial and, therefore, would not be using any of Betty's storylines. BRSF ¶136. Based on that representation, there was no reason for an SOW to be entered into which would license or assign Betty's Super Bowl work product to PepsiCo in consideration for fair market value compensation. Thus, all rights associated with Betty's creations, including the presented All Kinds / Living Jukebox storyline, remained Betty's property.

---

[5] When Rosen did meet the Pascarellis for dinner, he apologized for the ghost-writing threat and he acknowledged that Betty was right to have considered it to be a form of blackmail. BRSF ¶132-33.

### F. The Authenticity of TMA's Pitch Deck is Suspicious and in any Event Distinct from the Super Bowl Commercial; PepsiCo Shared Inside Information With TMA to Improve TMA's Work and The Changes Made to the "Original Concept" Made the Commercial Substantially Similar to Betty's Creative.

PepsiCo claims that the Super Bowl commercial it aired originated with and was developed by TMA. The relationship between PepsiCo and TMA is a long and close one; in fact, TMA originated within PepsiCo before being spun out as a separate entity years ago. BRSF ¶138. Brad Groves of TMA often works out of the PepsiCo offices, where he tends to the PepsiCo - TMA relationship. BRSF ¶139. The disingenuous spin PepsiCo weaves about the creation of the Super Bowl commercial is evident from the start of its litigation narrative and the misleading statement that Betty pitched its creative ideas to the PepsiCo team "within hours of The Marketing Arm delivering its pitch." That phraseology is plainly designed to imply that the TMA presentation preceded Betty's when there is no question that, in fact, the opposite was true. BRSF ¶140. What is telling (and disturbing) about the PepsiCo approach is that nowhere in its voluminous moving papers is the acknowledgement that Betty delivered its "All Kind/Living Jukebox" pitch presentation orally and in writing <u>before</u> TMA presented its "Joy of Dance" idea.

With the "Joy of Dance" slide deck produced by PepsiCo in discovery, TMA proposed to have Christopher Walken dancing in different eras in a manner reminiscent of his "Fatboy Slim" video -- https://www.youtube.com/watch?v=XQ7z57qrZU8 -- with the mechanical execution of the commercial being that the camera will be "locked off and [as a] giant circulate set rotates left to right as if on a giant 'LAZY SUSAN.'" BRSF ¶142. With that execution, the hero character could not change his appearance (same as the Fatboy Slim video), and could not navigate anywhere. Any scene changes would occur behind him as the set rotated -- there would be no doorways used. The TMA slide deck repeatedly used the words "backdrop" and "rotated" to indicate that the hero character was intended to be stationary and to never himself navigate anywhere. BRSF ¶142. This

is reinforced by the example TMA cited of Wes Anderson's AT&T commercial, where a stage is rotating behind the main character, whose wardrobe does not change and who does not navigate anywhere -- https://www.youtube.com/watch?v=f0AtZbgmAr4. This approach is very different from Betty's proposal and very different from the actual Super Bowl spot. In the pitch, TMA proposed several time era pieces and backdrops as the set rotated, stating that Walken would "crack open an ice-cold Pepsi in a vintage glass bottle", grab a "1960s-era Pepsi", be handed a "1970s era Pepsi bottle", have a "1980s Pepsi machine" in the background and in the final scene take a long refreshing drink from a "modern-day Pepsi." BRSF ¶143.

PepsiCo professes to take precautionary steps to safeguard against the possibility of one agency learning about the presentations and creative expressions of others. The idea of appropriate protective measures is laudable and consistent with industry norms inasmuch as the creative output of advertising agencies is their *sine qua non* and if an agency's creative work is shared with other agencies, it can be misappropriated or otherwise taken without compensation resulting in no profitable business model for the agency's (or the advertising industry's) survival. Unfortunately, it is apparent that any such PepsiCo guidelines exist as a matter of aspiration only and over the past several years at least, have been routinely ignored in practice.

Some of the PepsiCo breaches of protective measures indicate a level of sloppiness, while others are more suggestive of a deliberate and sinister motive. For example, Jennifer Danzi, one of the PepsiCo employees who attended the November 6, 2015 pitch presentations, testified that PepsiCo employees are "trained to respect every agency's materials" and that it is "standard practice to turn a new page and write notes fresh so nobody can peek over and see what you've written about a previous presentation." BRSF ¶144. In discovery, notwithstanding that several PepsiCo employees and agents had attended the agency presentations, PepsiCo produced very few documents indicating notes contemporaneously taken during the meetings. The notes specifically

taken by Segaran of each presentation were not made on separate pages as Danzi had stated. BRSF ¶145. Segaran's notes about "All Kinds/Living Jukebox" recite as highlights that there would be a "musical mash up of Joy of Pepsi", "all sorts of musical genres" and that it would be "continuous" (her notes reinforce that Al did not just read off the pitch deck when he presented).

PepsiCo's witnesses testified that representatives of one agency are not allowed to hear or see the presentation of another. BRSF ¶147. However, TMA was so concerned about PepsiCo's practices that Tom Meyer of TMA specifically asked one of his November 2015 pitch meeting attendees to let him know who was in the room because he knew an agency previously had been allowed by PepsiCo representatives to hear and evaluate the creative efforts of other agencies (including TMA): "Motive both pitched ideas and got to sit in on everyone's presentations. Totally f***ed up. Also Matti Leshem was sitting next to Lou. Terrible." BRSF ¶148.

After the PepsiCo group met to compare notes from the November, 2015 presentations, Segaran e-mailed TMA that the Joy of Dance concept was a "cool idea" but that it was "too long and complicated" so TMA should work on refining it. On Monday morning (November 9), Segaran expressed the hope that TMA's creative director (Marc Gilbar) had been able to connect with Arbetter over the weekend regarding revisions to the spot. BRSF ¶150. TMA submitted a revised slide (BRSF ¶151) indicating the use of a jukebox (consistent with Betty's "Living Jukebox" concept) and, for the first time, the use of doorways to bring the hero character (now proposed to be Pharrell) from room to room (also like Betty's presented concept). At this point, the TMA Joy of Dance concept still did not utilize a continuous shot, still used different background performers in each scene and still venued one scene in a dark, wet alley (hardly conveying joy). BRSF ¶151.

Later that same day, Segaran e-mailed that PepsiCo wanted "[i]n each section, we would show the Pepsi Bottle and logo during its time." BRSF ¶152. For TMA, Gilbar responded "love that idea, we gotta do this." BRSF ¶152. These e-mails on November 9, 2015 raises substantial

questions about the authenticity of the produced TMA deck that PepsiCo asserts is, and relies upon as being, in its originally presented form. If the idea of using different era-specific props were already supposedly a part of TMA's Joy of Dance concept proposal on November 6, 2015, there would have been no need or reason for Segaran to introduce that concept by email days later and have Gilbar treat it like a new idea. BRSF¶153.

Even more dramatic proof of what appears to be the time-travelling TMA pitch deck is an e-mail Arbetter sent to Segaran on November 15, 2015 in which he complained that the Joy of Dance concept as existing as of that date lacked an active role for the brand and did not have some kind of twist or clever wink at the end. BRSF ¶153. The ending of the spot (which Segaran did not note in her notes (BRSF¶153)) had supposedly been the factor of the Joy of Dance storyline TMA originally presented on November 6, 2015 that PepsiCo loved – Arbetter described it as a "really clever and important device" that "popped." BRSF ¶153. If that ending had been a part of the originally presented TMA concept, there would have been no basis for the Arbetter emails relating to the need for a clever wink at the end, an entire week later. The only logical conclusion one can reach based on these emails is that the TMA pitch deck produced by PepsiCo was not the pitch deck as it was presented on November 6, 2015. To the degree that PepsiCo representatives have expressed that the elements that were outlined in PepsiCo's later emails were the basis for selecting the Joy of Dance storyline in the first place, a legitimate competitive bid process is totally undermined and PepsiCo's misconduct in the context of the 2016 Super Bowl pitch process is confirmed.

Since PepsiCo needed to embark on the new round of collecting creatives, there was anxiety from its senior marketing management about the status of the commercial development. As Seth Kaufman, the PepsiCo executive who needed to give sign-off for the spot, stated before the presentations, the Super Bowl commercial represented his "highest level of anxiety." BRSF ¶154. That anxiety naturally caused the need for the concept selection, refinements and development to

run at an accelerated pace. The e-mails between PepsiCo and TMA and internally within TMA indicate that TMA was having off-line "inside scoop" conversations with Rosen and that Rosen was giving "great" feedback that would "really elevate the spot." BRSF ¶155. While he tried to discount his own role, the PepsiCo witnesses credited Rosen (and his partner Neil Goldberg) with being an important part of the concept selection task. BRSF ¶156. The "questionable" sharing of information with TMA by PepsiCo representatives clearly began even before the November 6, 2016 pitch date. Although during the October 30, 2015 briefing conference call, Segaran indicated that PepsiCo did not know and could not reveal the theme of the halftime show to the agencies (BRSF ¶158), an internal TMA e-mail on November 2, 2015 somehow indicated "[t]he Theme for the Halftime show is the History of Music – a celebration of the past and present in music." BRSF ¶158. The totality of the evidence is certainly sufficient to support the conclusion that PepsiCo and its agents were sharing confidential information with TMA.

G. **The Super Bowl Commercial Copies and is Substantially Similar to Betty's "All Kinds/Living Jukebox" Storyline**

To Betty's great surprise, the Super Bowl commercial PepsiCo aired did not reflect a different approach than the "All Kinds / Living Jukebox" storyline Betty had created and presented. Instead, Betty immediately recognized that PepsiCo had utilized the exact "All Kinds/Living Jukebox" concept and storyline: the spot uses a hero character (Janelle Monáe) in the commercial and, as she moved from room to room, the music genre, fashion, clothes and vibe of the room changed -- with the doorways acting as the agent of change to give the appearance of one continuous seamless shot. The spot opens on a jukebox and closes on a light around the logo to emulate a record spinning as if it all took place on a spinning record (*i.e.*, a living jukebox).

After airing the commercial during the Super Bowl, PepsiCo re-broadcast the Super Bowl commercial (and several variation of it) nationally on both television and on the Internet many

thousands of times. The spots have been viewed literally hundreds of millions of times across numerous platforms. As noted above, when PepsiCo produced the Super Bowl commercial, it also created a second version using exclusively the well-known "Joy of Cola" song in different musical styles. BRSF ¶162. The PepsiCo plan was to use the second version for the remainder of the year, after the expiration of the short-term music licenses it had secured from Madonna and The Contours. BRSF ¶163. The PepsiCo witnesses acknowledged the production of the second commercial, but did not provide a copy of it or any details about the number or location of airings of it.

### H.   Betty Complained to PepsiCo About Its Use of Betty's Creative Work and PepsiCo Reacted By Trying to Cover Its Tracks, Including By Creating a Phony Betty Invoice.

As soon as Betty reached out to PepsiCo after the Super Bowl to complain about the misappropriation of its creative efforts, PepsiCo hastily tried to cover its tracks given its lack of ownership of Betty's work. While some of its actions are shielded by the attorney-client privilege, the timeline of events is clear and reflects the unscrupulous behavior by PepsiCo representatives, now caught for a second time misappropriating Betty's creative work:

| | |
|---|---|
| December 28, 2015 (4:48 pm): | Betty submits formal estimate with a cover letter to Segaran stating: "We are happy to submit our estimate for the creative concept development and the requested second round of refinements related to the 2016 Super Bowl Ad. Pursuant to our phone conversation Betty will retain all rights, title and interest in its developed advertising concepts and ideas and in all variations and or derivative of them." The attached estimate bore a banner at the top of the page indicating "Work Estimate" and "Estimate #1228." Consistent with the cover letter, the Job Description stated: **"Creative concept development and second round refinements relating to the 2016 Pepsi Super Bowl Ad. Estimate includes for time only. Betty will retain all rights title and interest in its developed concepts and ideas and in all variations and derivatives of them."** (emphasis added) BRSF ¶173. |
| February 7, 2016 | Super Bowl 50 is played. PepsiCo commercial airs leading into Halftime show. BRSF ¶174. |

| | |
|---|---|
| February 10, 2016 | Betty issues demand letter to PepsiCo. BRSF ¶175. |
| March 1, 2016 (4:48 pm) | Segaran forwards Betty estimate to Danzi. BRSF ¶176. |
| March 1, 2016 | Danzi submits Betty estimate for payment). BRSF ¶177. |
| March 4, 2016 (2:01 pm) | Danzi learns that Betty is not set up as a PepsiCo vendor and is requested to provide tax documentation. BRSF ¶178. |
| March 4, 2016 (7:05 pm) | Danzi responds "Shoot" because she was told that Betty was upset, considering litigation and that she could not contact Betty. BRSF ¶179. |
| March 9, 2016 (9:37 am) | Danzi is sent a follow up request regarding the tax paperwork needed from Betty. BRSF ¶180. |
| April 21, 2016 | Segaran is included on privileged communications initiated by Arbetter regarding threatened Betty Litigation. BRSF ¶181. |
| March/April 2016 | Segaran instructs Danzi to pay Betty so Danzi creates fraudulent Betty invoice by doctoring the header banner of the actual Betty estimate. The actual PO did not issue until 3/8/16 (making it impossible for the false invoice of 12/28/15 to be accurate). The false invoice deleted the precautionary statement relating to Betty's retention of its ownership rights in its concepts and ideas, and variations of them and forges Betty's signature to suggest validity. Danzi also removes the statement at the bottom of the actual Betty estimate that "[a]bove information is not an invoice and only an estimate for the services that have been provided." BRSF ¶182. |
| April 25, 2016 | PepsiCo initiates $5000 ACH payment to Betty referencing the Dani prepared phony invoice. Arguably, the $5,000 payment was made in a deliberate effort to effect a transfer of intellectual property rights in All Kinds/Living Jukebox to PepsiCo inasmuch as it attached a purchase order titled "Betty SB Ad Creative Concept" and General Terms and Conditions which included a section providing PepsiCo with "Ownership" of all created intellectual property. The payment was made and purchase order referenced without any SOW being entered into under the Agreement. BRSF ¶183. |
| April 27, 2016 | Betty returns $5000 to PepsiCo to avoid any suggestion that it intended to transfer any intellectual property rights to "All Kinds/Living Jukebox" to PepsiCo. BRSF ¶184. |

Thus, months after payment should have been made, and without initiating any proper SOW with

Betty, what PepsiCo did was forge a Betty invoice that it then used as a way to generate a purchase

order with terms directly at odds with the Agreement (which specifically requires an SOW and a delineation of intended Deliverables) and with Betty's repeated statements that it would retain all rights to its creative efforts because no arrangement for their transfer had been made. This series of events constitutes a clumsy and disingenuous effort by PepsiCo to cover its tracks after the fact and after its unauthorized use of Betty's creative expression had been identified and brought to PepsiCo's attention by Betty's demand letter.

## ARGUMENT

## I.  SUBSTANTIAL EVIDENCE DEMONSTRATES THAT PEPSICO INFRINGED BETTY'S COPYRIGHT IN "ALL KINDS / LIVING JUKEBOX".

This motion largely mirrors the failed motion to dismiss the copyright infringement claim. Significantly, PepsiCo based the dismissal motion on not just the allegations of Betty's complaint, but also a DVD it submitted to Judge Karas containing the Super Bowl commercial as well as the other commercials PepsiCo argues preclude a finding of uniqueness to Betty's work. The Court rejected PepsiCo's reasoning.

### A.  "All Kinds / Living Jukebox" Qualifies For Copyright Protection.

#### 1.  It is Improper for PepsiCo to Dissect Betty's Work Into Individual Components to Argue that Such Components Are Not Protectable.

Copyright infringement exists when the owner of a valid copyright proves unauthorized copying. To establish infringement, a plaintiff must prove (1) ownership of a valid copyright and (2) copying of constituent elements of the work that are original. *Feist Publications, Inc. v. Rural Telephone Service Co.*, 499 U.S. 340, 361, 111 S.Ct. 1282 (1987). While Betty's work was well-received because of the creativity and punch of its expression of the idea, the law sets the requisite level of creativity sufficient to qualify for copyright protection "extremely low; even a slight amount will suffice." *Feist*, 499 U.S. at 345, 111 S.Ct. at 1287. Betty's copyright registration *constitutes prime facie* evidence of

Betty's valid ownership of the copyright. *Jorgensen v. Epic/Sony Records*, 351 F.3d 46, 51 (2d Cir. 2003)(*citing* 17 U.S.C. §410c)). *Hamil Am. Inc. v. GFI*, 193 F.3d 92, 98 (2d Cir. 1999).

PepsiCo's characterization of Betty's work as generalized "ideas" and nothing more than a compilation of generic "scènes à faire" is wrong; attaching litigation labels is insufficient to carry the burden PepsiCo bears with this motion. All creative work product for television commercials begins with an idea and a theme. That the concept uses some scene elements that have been used before does not make the expression unoriginal for copyright purposes. What is relevant is not that music, dance, and a main performer with wardrobe changes have been used before, but the way Betty selected, coordinated and arranged such elements. *Alexander v. Murdoch*, 2011 U.S. Dist. LEXIS, *18 (S.D.N.Y. May 27, 2011)("A work may be copyrightable even though it is entirely a compilation of unprotectable elements' so long as those elements are arranged in an original manner.") *quoting Knitwaves, Inc. v. Lollytogs Ltd.*, 71 F.3d 996, 1003-04 (2d Cir. 1995). There is nothing standard about the elements of a living human manifestation of a jukebox and certainly nothing so standard about it that renders the manner or way Betty expressed it unworthy of protection.

Any work of art or expression can be broken into individual pieces. Al provided an excellent example of the principle: a lily pad is not protectable; a frog is not protectable and a ribbit is not protectable. Putting those non-protectable elements together, however, and Budweiser created one of advertising's most iconic commercials. BRSF ¶167. As Judge Karas concluded, it is Betty's "unique combination of the elements comprising the "All Kinds/Living Jukebox" concept is protectable." Doc# 30 at 23 *citing Knitwaves, Inc. v. Well-Made Toy Mfg. Corp.*, 25 F.3d 119, 1004 (2d Cir. 1994). As the Second Circuit has instructed, "we have disavowed any notion that we are required to dissect the works into their separate components and compare only those elements which are in themselves copyrightable." *Peter F. Gaito Architecture, LLC v. Simone Dev. Corp.*, 602 F.3d 57, 66 (2d Cir. 2010); *Horizon Comics Prods., Inc. v. Marvel Entm't, LLC,* 246 F. Supp. 3d 937, 941

(S.D.N.Y. 2017)("The [c]ourt must look beyond the works as dissected into their separate components, and must compare the contested work's total concept and overall feel with that of the allegedly infringed work, as instructed by our good eyes and common senses." (alterations and internal quotation marks omitted)).

### 2. The Other Commercials PepsiCo Describes Are Easily Distinguishable From Betty's Creative Work.

PepsiCo's attorneys asked Al about the prior PEPSI commercials it argues make Betty's work unoriginal. His testimony, which is entitled to the same evidentiary value as the advertising affiants, demonstrated how his work differed from those commercials. The Britney Spears "Now and Then" commercial did not employ the device of one continuous shot in a changing environment, used different cast members in each scene and created a distinct feel. BRSF ¶185. As for the "Bottle Pass" spot, there was no hero character, the cast changes, it does not take place in a singular space, and there was no change of music genres or wardrobes for each era depicted. BRSF ¶186.

### B. The Super Bowl Commercial Infringed "All Kinds / Living Jukebox" By Creating A Substantially Similar Copy Of It.

Because the Super Bowl commercial (as well as the second Joy of Cola version) shares "a similarity of expression" with "All Kinds/Living Jukebox", summary judgment in favor of PepsiCo is not warranted. *Hogan v. DC Comics*, 48 F.Supp.2d 298, 309 (S.D.N.Y. 1999). The second prong of the infringement test examines if the constituent elements of the original work were copied. *Boisson v. Banian, Ltd.*, 273 F.3d 262, 267 (2d Cir. 2001). Proving that a defendant used the material created by plaintiff is rarely done with an overt admission. Instead, what is needed is an examination of circumstantial evidence and the two items of creative work. The appropriate starting point for analysis here is the original "Joy of Dance" concept. That concept was very dissimilar from the commercial PepsiCo ultimately aired. As detailed above, the concept underwent radical changes from its initial presentation and such changes all derived from what Betty had presented.

The pivotal issue is whether there is a substantial similarity of protectable material in the two works. *Lewinson v. Henry Holt and Company, LLC*, 659 F.Supp.2d 547, 562 (S.D.N.Y. 2009) *citing Fisher-Price, Inc. v. Well-Made Toy Mfg., Corp.*, 25 F.3d 119, 122-23 (2d Cir. 1994) and *Tufenkian Import/Export Ventures, Inc. v. Eisnstein Moomjy, Inc.*, 338 F.3d 127, 131 (2d Cir. 2003). A review of the works demonstrates "probative similarity" because "the works are similar enough to support an inference that the defendant copied the plaintiff's work ... [as there are similarities] that would not be expected to arise if the works had been created independently." *Lewinson*, 659 F.Supp.2d at 563.

There are, to be sure, some differences between the Betty storyline and the Super Bowl commercial (and its variations). Such differences are to be expected; as Al testified, refinements to any creative storyline are customary and usually occur throughout the production process. Indeed, Betty provided some proposed production detail during its November 6 presentation. It is not proper for the Court to dissect the works into their separate components for comparison purposes. *Peter F. Gaito Architecture, LLC v. Simone Development Corp.*, 602 F.3d 57, 66 (2d Cir. 2010). It is the total concept and feel that must be considered. *Hayuk v. Starbucks Corp.*, 157 F.Supp.2d 285, 291 (S.D.N.Y. 2016). A finding of infringement does not require the offending work to be identical to or a carbon copy of the original work in all respects. *Walker v. Time Life Films, Inc.*, 784 F.2d 44, 49 (2d Cir. 1986). In this Circuit, substantial similarity is judged on the basis of an evaluation of the spontaneous response of the ordinary lay observer. *Walker*, 784 F.2d at 51. If such an observer would overlook any dissimilarity between the works and conclude that one was copied from the other, there is infringement. *Nihon Keizai Shimbun, Inc. v. Comline Bus. Data, Inc.*, 166 F.3d 65, 70 (2d Cir. 1999). Here, as was the case with Judge Karas, an ordinary observer would be disposed to overlook the differences and regard the aesthetic appeal as the same. *Peter F. Gaito Architect*, 602 F.2d at 66 *quoting Yurman Design, Inc. v. PAJ, Inc.*, 262 F.3d 101, 111 (2d Cir. 2001).

If a work copies the original way in which the author has selected, coordinated, and arranged those unprotectable elements to such an extent that the copying work is substantially similar to the "expression of ideas" and "total concept and overall feel" of the copied work, there is infringement. *Williams v. A&E Television Networks*, 122 F.Supp.2d 157 (S.D.N.Y. 2015) *quoting Castorina v. Spike Cable Networks, Inc.*, 784 F.Supp.2d 107, 111 (E.D.N.Y. 2011). In this case, an ordinary observer's comparison of the two works shows at least the following significant similarities: (a) the viewer is transported into a human jukebox, with seamless music changes and genre variety and the ability to imagine a scene consistent with a created joyous feeling; (b) a single powerful character performs all music renditions, genres and fashion changes as she dances seamlessly from room to room; (c) every time the hero character enters a new room, the genre of music immediately changes to reflect a new vibe; (d) the set design stylistically changes, along with the fashion/wardrobe of the cast, as the hero character moves from room to room; (e) seamless wardrobe changes are used for the hero character (f) the dance style changes along with the music genre as the hero character enters and exits each room; (g) there are clean, seamless cuts / camera shots; and (h) specifically reflecting one of the critical elements of the "All Kinds/Living Jukebox" name, the Super Bowl commercial opens on the direct focus of Betty's main theme, a jukebox, and closes on a light circling the perimeter of "the Pepsi Globe" to simulate and suggest a record spinning and that it all (dancing, performing, etc.) took place on this record – a jukebox springing to life like a living jukebox. PepsiCo picks at some of the differences but such differences do not change the overall sense that the Super Bowl commercial is a copy of "All Kinds / Living Jukebox." The substantial similarity between the works, as they would be viewed by an ordinary observer (a question that is usually and appropriately reserved for the ultimate factfinder should be determined by the jury.

## II. THE AGREEMENT STATES MATERIAL TERMS AND IMPOSES A DUTY OF GOOD FAITH AND FAIR DEALING ON PEPSICO TO ENTER INTO A SOW WITH BETTY BEFORE IT USES ANY OF BETTY'S CREATIVE WORK.

### A. PepsiCo's Characterization of the Agreement as an Unenforceable "Agreement to Agree" is Misplaced.

Preliminary agreements can create binding obligations. *Adjustrite Sys., Inc. v. GAB Servs., Inc.*, 145 F.3d 543, 548 (2d Cir. 1998). To make that determination, it is necessary to consider such things as the intent revealed by the contract, the context of the negotiations and any partial performance by one of the parties. *Brown v. Cara*, 420 F.3d 148, 153 (2d Cir. 2005); *Teachers Ins. & Annuity Ass'n of Am. v. Tribune Co.*, 670 F.Supp. 498 (S.D.N.Y. 1997). The exercise of making the Service Agreement is not mandated to serve no purpose. Instead, it serves the important purpose of setting the framework for the business relationship and is a valid contract with an exchange of consideration. PepsiCo has not taken the position that the form agreement PCAM requires agencies to sign is invalid or unenforceable. If PepsiCo can enforce it, so, too, can Betty.

The "agreement to agree" label PepsiCo favors, ironically for its own form contract, seems designed to deflect attention away from the material obligations imposed on it. The parties used it on prior occasions when PepsiCo wanted ownership of Betty's work product. PepsiCo's reliance on *KJ Roberts & Co. v. MDC Partners Inc.*, 2014 U.S. Dist. LEXIS 34740 (S.D.N.Y. March 14, 2014), is misplaced because the statute of frauds barred enforcement of the claimed contract as there was no writing or group of writings encompassing all material terms of it. *Id.* at *22. By contrast, it is undeniable that an important and detailed writing exists here.

*Danton Constr. Corp. v. Bonner*, 571 N.Y.S.2d 299, 300, 173 A.D.2d 759 (App. Div. 2d Dep't 1991), is also inapplicable as it involved a situation where there was no contract obligating the parties to negotiate the remaining terms in good faith if they wanted to consummate the benefits of the deal. Instead, the subject option letter agreement expressly gave one party the right to "reformat"

the terms of the proposed contract and the parties were unable to reach agreement on the proposed reformat. The court directed defendant to return the consideration provided to him in anticipation of contract consummation. No such remedy is available here. Similarly, the lease agreement in the *Joseph Martin, Jr. Delicatessen, Inc., v. Schumacher*, 52 N.Y.2d 105, 436 N.Y.S.2d 247 (1981) case allowed plaintiff to renew the agreement but on terms to be agreed upon but did not involve a situation by which one party could unilaterally take the benefit of the renewal as if an agreement had been made.

### B. The Agreement Indicates the Material Obligation Imposed on PepsiCo to Enter Into a Scope of Work with Betty Before Making Use of Betty's Creative Work Product.

The Agreement provides a sufficient indication of "a manifestation of mutual assent sufficiently definite to assure that the parties are truly in agreement with respect to all material terms." *Tractebel Energy Marketing, Inc., v. AEP Power Marketing, Inc.*, 487 F.3d 89, 95 (2d Cir. 2007). While heavily tilted in PepsiCo's favor, there is a mutuality of consideration. What Betty received is clear: if PepsiCo wanted to use Betty's creative efforts, it was obliged to act in accord with the contract to make a SOW *before* using the work. While the price PepsiCo would pay, and the exact nature and timing of the Deliverables may have been left for future good faith discussion, the material obligation PepsiCo accepted is that it would engage in those efforts before using Betty's work. By urging the Court to find there was no contract related to Betty's work because no SOW was made, PepsiCo completely misses the fundamental point. PepsiCo breached the contract by not exercising its best (actually any) efforts to negotiate with Betty before using Betty's work product.

PepsiCo's duty to negotiate is manifest from New York's basic rules of contract interpretation, which dictate the intention of the parties, that is, what they mutually assented to do, is to be drawn from their language, interpreted in the light of their situation and the circumstances connected with the transaction. *Innophos, Inc. v. Rhodia, S.A.*, 10 N.Y.3d 25, 29, 852 N.Y.S. 820 (2008); *Law Debenture Trust Co. of N.Y. v. Maverick Tube Corp.*, 595 F.3d 458, 467 (2d Cir. 2010). "Under New York law, a

written contract is to be interpreted so as to give effect to the intention of the parties as expressed in the unequivocal language they have employed." *Terwillinger v. Terwillinger*, 206 F.3d 240, 245 (2d Cir. 2000); *Am. Auto. Ins. Co. v. Rest Assured Alarm Sys.*, 786 F.Supp.2d 798, 804-05 (S.D.N.Y. 2011).

The contract words must be accorded their common, natural, and ordinary meaning and usage where it can be sensibly applied. *Albanese v. Consolidated Rail Corp.*, 666 N.Y.S.2d 680, 682, 245 A.D.2d 475, 476 (App. Div. 2d Dep't 1997). By focusing only on what is not stated, PepsiCo fails to heed the cardinal rule that meaning is to be given to every contract term. *God's Battalion of Prayer Pentecostal Church, Inc. v. Miele Assocs. LLP*, 6 N.Y.3d 371, 374 812 N.Y.S.2d 435, 437 (2006); *Cacace v. Meyer Mktg. (Macau Commer. Offshore) Co., Ltd.*, 589 F.Supp.2d 314, 323 (S.D.N.Y. 2008)(citing cases). In particular, PepsiCo does not address the significance of Section 7:

> Ownership/Trademarks/Copyrights Subject to PCAM's payment of all amounts owed for the Deliverables pursuant to the Scope of Work, PCAM shall own all right, title, and interest in and to the Deliverables[.]

That language must have some meaning and the only plausible interpretation of it that is consistent with the four corners of the parties' agreement is that PepsiCo will meet certain obligations before it will use Betty's work. PepsiCo had freedom of contract discretion to not make a SOW with Betty but only if it likewise did not pretend to own rights to the work it received from Betty.

**C.    Betty Sustained Damages as a Result of the PepsiCo Breach of Contract.**

By being deprived of the recognition associated with being known as the creator of the PepsiCo Super Bowl commercial, Betty sustained a loss of the fee it would have earned pursuant to the SOW that should have been negotiated (which would have included a percentage of production costs) plus the opportunity losses. Evidence in the record of the SOWs Betty and PepsiCo entered into for less high-profile projects as well as the SOW between PepsiCo and TMA all indicate the fee element of Betty's damages. BRSF¶102-03. Had PepsiCo acted in accordance with the Agreement and past practices, the fee would have been set after it either awarded the project to Betty or had

confirmed to Betty that it wished to make commercial use of Betty's presented storyline. In addition, Betty would not have lost the opportunity to work with the other brands (MOUNTAIN DEW, PEPSI MAX, AMP AND LIPTON) that were familiar with, and loved Betty's work.

## CONCLUSION

No option laid out by TMA achieves what it actually produced. In the purported TMA presentation, there was only an option for Christopher Walken in front of a rotating stage; there was no option for a hero character to navigate from room to room and there was no option of using doors as the agents of change. PepsiCo's description of the TMA creative is a wishful combination of what it would have liked for TMA to have presented, but it is exactly the unique combination Betty proposed: a combination of music changes, wardrobe changes, set design changes, dance changes and vibe changes brought about by a hero character passing through the precipice of a doorway giving the appearance of one continuous shot in one continuous changing environment. PepsiCo does nothing more than chop the elements into pieces – it does not point to any example where all of these elements come together in the unique way presented with the Betty storyline.

The evidence in the record indicates: (a) PepsiCo has a recorded history of stealing from Betty; (b) TMA received the theme to the halftime show in advance, suggesting a PepsiCo intention to "farm" information to TMA; (c) the authenticity of TMA's original slide deck is doubtful, and whatever the original TMA presented Joy of Dance storyline was, it was changed over the next number of weeks to make it more reflective of Betty's creative; (d) PepsiCo tried to cover its tracks by creating a phony Betty invoice and making payment purportedly pursuant to terms other than those set forth in the Agreement; and (e) the second commercial is akin to "All Kinds" and was aired extensively. For all of the foregoing reasons, the PepsiCo motion for summary judgment should be denied in all respects.

Dated: May 1, 2019

Respectfully submitted,

By: /s/Mark S. Gregory

    Mark S. Gregory (MG0914)
    Martin LLP
    262 Harbor Drive
    Stamford, Connecticut 06902
    Tel: (203) 973-5210
    Fax: (203) 973-5250
    E-Mail: mgregory@martinllp.net

    *Attorneys for Plaintiff Betty, Inc.*

## CERTIFICATE OF SERVICE

I hereby certify that on May 1, 2019 a copy of the foregoing Plaintiff's Memorandum of Law in Opposition to Motion for Summary Judgment is being filed electronically and served by mail on anyone unable to accept electronic filing.  Notice of this filing will be sent by e-mail to all parties by operation of the court's electronic filing system or by mail to anyone unable to accept electronic filing as indicated on the Notice of Electronic filing.  Parties may access this filing through the Court's CM/ECF System.

By:/s/Mark S. Gregory
    Mark S. Gregory (MG0914)
    Martin LLP
    262 Harbor Drive
    Stamford, Connecticut 06902
    Tel:  (203) 973-5210
    Fax:  (203) 973-5250

    E-Mail:  mgregory@martinllp.net