UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

-------------------------------------------------------X
                           :

BETTY, INC.,                  :

          Plaintiff,      :     Civil Action No. 16-cv-4215-VB

                           :

v.                           :

                           :

PEPSICO, INC.,         :     **PLAINTIFF'S RESPONSES TO**

          Defendant.    :     **DEFENDANT'S STATEMENT OF**

                           :     <u>**UNDISPUTED MATERIAL FACTS**</u>

-------------------------------------------------------X

      Plaintiff Betty, Inc. ("Betty") hereby responds to the Statement of Undisputed Material Facts

filed by defendant PepsiCo, Inc. ("PepsiCo") and provides its own Statement of Additional Material

Facts in accordance with Local Rule 56.1 follows:

**I.**      **The Parties**

   **A.  Pepsi**

<u>**STATEMENT NO. 1:**</u>

      Pepsi is an international food and beverage corporation formed under the laws of the

state of North Carolina, with a headquarters in Purchase, New York. (D.I. 32 at ¶¶3, 6; D.I. 67

¶¶3, 6.)

<u>**RESPONSE TO STATEMENT NO. 1**</u>

      Betty does not dispute.

<u>**STATEMENT NO. 2:**</u>

      In November 2015, Lou Arbetter was Senior Marketing Director at Pepsi. (Samay Dec.

Ex. 60 at 12:4-20.)

<u>**RESPONSE TO STATEMENT NO. 2**</u>

      Betty does not dispute.

<u>**STATEMENT NO. 3:**</u>

In November 2015, Jayanthi Raja Segaran was Brand Director at Pepsi. (Segaran Dec. ¶1; Samay Dec. Ex. 64 at 18:17-25.)

**RESPONSE TO STATEMENT NO. 3**

Betty does not dispute.

**STATEMENT NO. 4:**

In November 2015, Jennifer Danzi was Senior Brand Manager at Pepsi. (Samay Dec. Ex. 65 at 8:16-19.)

**RESPONSE TO STATEMENT NO. 4**

Betty does not dispute.

**B. Betty, Inc.**

**STATEMENT NO. 5:**

Betty, Inc. ("Betty") is an advertising agency. (Samay Dec. at ¶ 7, Ex. 22 at ¶ 5.)

**RESPONSE TO STATEMENT NO. 5**

Betty does not dispute.

**STATEMENT NO. 6:**

Al Pascarelli, III serves as the Creative Director of Betty. (Samay Dec. Ex. 66 at 20:15-21.)

**RESPONSE TO STATEMENT NO. 6**

Betty does not dispute.

**STATEMENT NO. 7:**

Justin Pascarelli serves as the Chief Financial Officer of Betty, but also works on the account side, servicing clients. (Samay Dec. Ex. 66 at 19:12- 20:9.)

**RESPONSE TO STATEMENT NO. 7**

Betty does not dispute.

**STATEMENT NO. 8:**

Al Pascarelli, Jr. serves as the Chief Executive Officer and Chairman of Betty and was Betty's 30(b)(6) witness with respect to the parties' Services Agreement. (Samay Dec. at ¶ 1 6, Ex. 62 at 5:24-6:6.)

**RESPONSE TO STATEMENT NO. 8**

Betty does not dispute.

**STATEMENT NO. 9:**

Betty, Inc. is a corporation existing under the laws of Connecticut with its principal place of business in Stamford, Connecticut. (Samay Dec. ¶7, Ex. 22 at ¶1.**)**

**RESPONSE TO STATEMENT NO. 9**

Betty disputes in part.  Betty's principal place of business is in Trumbull, Connecticut. (Gregory Dec. Ex. 12).[1]

**STATEMENT NO. 10:**

Pepsi has been the title sponsor of the Super Bowl Halftime show for several years. (Samay Dec. Ex. 60 at 20:10-17.) Pepsi has used a "through the ages" structure in prior commercials. (Phillips Dec. Exh. A, § III.A.2.) The prior Pepsi commercial "Now and Then" featured Britney Spears singing and dancing through various eras. (Phillips Dec. Exh. A, §III.A.2; Samay Dec. ¶ 10, Ex. 34, Ex.61 at 93:4-96:2, 101:4-9, 105:24-106:23, Exs. 72-73 at Nos. 94-95, 100-110, 118-124, Exs.74-75.) Each scene focused on a different time period and highlighted era-appropriate music, wardrobe, dance and vibe. (Samay Ex. 34, Ex. 61 at 93:4- 96:2, 101:4-9,

---

[1] References to "Gregory Dec." are to the Declaration of Mark S. Gregory dated May 1, 2019.

105:24-106:23.)[2] The prior Pepsi commercial "Bottle Pass" featured various performers dancing and moving through different eras. (Phillips Dec. Exh. A, § III.A.2; Samay Decl. ¶¶ 10, Ex. 34, Ex. 61 at 110:11-13, Exs. 72, 73 at Nos. 132-138.)

## RESPONSE TO STATEMENT NO. 10

Betty disputes in part. The background performers changed in each scene and therefore did not transition through different eras. Samay Dec. Ex. 34.

## STATEMENT NO. 11:

Betty's Creative Director, Al Pascarelli, JII, testified that the Now and Then commercial included: (a) "Britney Spears as the hero character" (Samay Dec. Ex. 61 at 93:24- 94:2); (b) "genres of music changing" (Samay Dec. Ex. 61 at 94:3-5); (c) "wardrobe changed as the eras and genre changed" (Samay Dec. Ex. 61 at 101:4-9); (d) "dancing changes" (Samay Dec. Ex. 61 at 106:8-16); and (e) at least one "clean cut" (Samay Dec. Ex. 61 at 107:8-21.) Mr. Pascarelli III testified that "any commercial that takes place on two different sets... you're going to have wardrobe changes" and that wardrobe changes have "certainly been used before and been used by Pepsi before." (Samay Dec. Ex. 61 at 94:16-95:13.) He concluded that Pepsi had previously used "that whole combination of things." (Samay Dec. Ex. 61 at 106:8-21.)

## RESPONSE TO STATEMENT NO. 11

Betty disputes in part. The PepsiCo statement takes the Pascarelli testimony out of context by selectively pulling tiny excerpts from his deposition. In fact, Mr. Pascarelli did not state that the whole combination had been used before; those were the words of the examining attorney that Mr. Pascarelli did not adopt. A fair reading of the testimony reveals that Mr. Pascarelli believes the "Now and Then" commercial to be clearly distinguishable from the "All Things/Living Jukebox" concept

---

[2] Exhibit references are to Deposition Exhibit numbers. If not used as a deposition exhibit, documents are referenced by the Exhibit letter and declaration to which it is attached.

he created and presented to PepsiCo.  For example, the "Now and Then" spot did not employ the device of one continuous shot, it used different background cast members in each scene and it evoked for the viewer a different feel.  Gregory Dec. Ex. 77 [Al Pascarelli Tr] at 14:7-20:11, 54:21-56:5, 94:16-97:20, 108:16-109:3.  Mr. Pascarelli testified that it was his combination of elements that made "All Kinds/Living Jukebox" unique; what he said is that PepsiCo had used "that whole combination of things" but only "in a way."  Samay Ex. 61 at 106:15-18.

## STATEMENT NO. 12:

Pepsi invited Betty to pitch concepts for a television commercial to air during the 2016 Super Bowl commercial. (Samay Dec. Ex. 61 at 11:23-25; Segaran Dec. Ex. A.) Betty, along with other agencies, was briefed via teleconference on October 30, 2015. (Samay Dec. ¶14, Ex. 60 at 40:9-13.) As part of the briefing, agencies received a one-page briefing document ("the Pitch Brief") outlining what Pepsi was seeking for the Commercial.  (Samay Dec. ¶ 15, Ex.  61 at 34:11-14.) The Pitch Brief asked for a commercial that is "joyous," "simple," and "humorous" with a "clear role [for] the brand." (Samay Dec.¶2, Ex. 1.) The Pitch Brief further noted that "Music is part of Pepsi's DNA" and offered agencies the "option to use Joy of Pepsi if it helps." (Samay Dec. Ex. 1.) Betty acknowledged the importance of music to Pepsi and Mr. Pascarelli III testified "[m]usic was a big thing for them. They made it very clear that, you know, music was part of Pepsi's DNA." (Samay Dec. ¶ 15, Ex. 61 at 14:6-18, 36:20-37:4.)

## RESPONSE TO STATEMENT NO. 12

Betty does not dispute.

## STATEMENT NO. 13:

On or around November 2, 2015, Brad Groves of the advertising agency The Marketing Arm/Davie Brown Entertainment ("The Marketing Arm") met with Lou Arbetter while visiting Pepsi and Mr. Arbetter agreed to hear The Marketing Arm's ideas for the commercial at a November 6, 2015 pitch. (Meyer Dec. ¶ 3, Ex. A; Gilbar Dec. ¶ 3 Ex. A.) Jayanthi Segaran provided The Marketing Arm with a copy of the Pitch Brief later that day. (Meyer Dec. ¶ 4, Ex. B; Gilbar Dec.

¶ 3, Ex. B; see also Segaran Dec. ¶ 2.)

## RESPONSE TO STATEMENT NO. 13

Betty does not dispute.

## STATEMENT NO. 14:

On November 3, 2015 Jayanthi Segaran emailed the participating agencies- including both The Marketing Arm and Betty- additional details regarding the November 6, 2015 pitch meeting. (Meyer Dec. ¶ 8, Exs. B, F; Gilbar Dec. Ex. B; Segaran Dec. ¶ 2.) Ms. Segaran instructed that each agency would receive 30 minutes. *Id.*

## RESPONSE TO STATEMENT NO. 14

Betty does not dispute.

## STATEMENT NO. 15:

On November 6, 2015 the Pepsi team and additional Pepsi employees, as well as a few of Pepsi's production consultants, heard the pitches of fourteen participating agencies. (Segaran Dec. ¶ 3, Ex. A.) No other agency was allowed to sit in on the pitch meeting of another agency; only the pitching agency was allowed into the room during its allotted time. (Segaran Dec. ¶3.)

## RESPONSE TO STATEMENT NO. 15

Betty disputes in part. PepsiCo has not historically followed the "practice" cited in the supporting Segaran declaration to the effect that concepts presented to PepsiCo by one advertising agency are not shared with another agency. Because PepsiCo previously allowed one agency to sit in on the presentations of other agencies, a practice he considered "totally f***ed up" and "terrible", Tom Meyer of The Marketing Arm ("TMA") specifically asked Brad Groves of TMA to take note of the meeting attendees on November 6, 2015. Gregory Dec. Ex. 54.

### A. The Marketing Arm's Pitch

## STATEMENT NO. 16:

The Marketing Arm was one of the agencies that presented a pitch to Pepsi on November 6, 2015. (Samay Dec. ¶ 17, Ex. 63 at 48:13-15; Gilbar Dec. ¶ 9, Ex. C.)

**RESPONSE TO STATEMENT NO. 16**

Betty does not dispute; however, it notes that one of the key PepsiCo decisionmakers, Barry Rosen of Direct Focus, Inc., had no memory of TMA making a presentation that day. Gregory Dec. Ex. 81 [Rosen Tr] at 109:2-11.

**STATEMENT NO. 17:**

The Marketing Arm pitch was conceived and reduced to paper between November 2 and November 6. (Gilbar Dec. ¶¶ 3-4, Ex. C; Meyer Dec. ¶ 5; Samay Dec. Exs. 5, 35.)

**RESPONSE TO STATEMENT NO. 17**

Betty disputes. The authenticity of the TMA presentation slide dated November 6, 2015 is not free of genuine dispute inasmuch as e-mails exchanged between TMA and PepsiCo on November 9 and 10, 2015 regarding concept refinements and in particular props to be used during the commercial, as well as a November 15, 2015 e-mail between Louis Arbetter and Jayanthi Segaran regarding the absence of an active role for the brand and the need for a clever twist at the end (a point PepsiCo emphasized at page 4 of its brief as the reason for TMA's selection), are inconsistent with the proposition that the Novembers 6 slide presentation marked as an exhibit is in the form actually presented. Gregory Decl. Ex. 46, 76, 86.

**STATEMENT NO. 18:**

One of the concepts developed by The Marketing Arm, through their creative director Marc Gilbar, was a concept known as "The Joy of Dance." (Gilbar Dec. ¶¶ 2, 4, 9, Ex. C; Samay Dec. Ex.63 at 45:16-46:1.)

**RESPONSE TO STATEMENT NO. 18**

Betty does not dispute.

**STATEMENT NO. 19:**

The Marketing Arm's "The Joy of Dance" was conceived, created, and then recorded in the November 6, 2015 pitch deck without any substantive input from Pepsi or its consultants (other than the Pitch Brief). (Samay Dec. Ex. 63 at 45:2-12, 46:10-47:6; Gilbar Dec. ¶¶ 16-17.)

**RESPONSE TO STATEMENT NO. 19**

Betty disputes. The authenticity of the TMA presentation slide dated November 6, 2015 is not free of genuine dispute inasmuch as e-mails exchanged between TMA and PepsiCo on November 9 and 10, 2015 regarding concept refinements and in particular props to be used during the commercial, as well as a November 15, 2015 e-mail between Louis Arbetter and Jayanthi Segaran regarding the absence of an active role for the brand and the need for a clever twist at the end (a point PepsiCo emphasized at page 4 of its brief as the reason for TMA's selection), are inconsistent with the proposition that the Novembers 6 slide presentation marked as an exhibit is in the form actually presented. Gregory Dec. Ex. 46, 76, 86.

**STATEMENT NO. 20:**

On November 6, 2015, The Marketing Arm pitched three concepts. (Samay Dec. Ex. 63 at 47:7-9.) One of these was "The Joy of Dance." (Gilbar Dec, ¶ 9, Ex. C; Meyer Dec. ¶ 5, Ex. C; Samay Dec. Exs. 5, 35, Ex. 63 at 55:15-22.)

**RESPONSE TO STATEMENT NO. 20**

Betty does not dispute; however, it notes that one of the key PepsiCo decisionmakers, Barry Rosen of Direct Focus, had no memory of TMA making a presentation that day. Gregory Dec. Ex. 81 [Rosen Tr] at 109:2-11.

**STATEMENT NO. 21:**

The Marketing Arm Pitch indicated that "The Joy of Dance" commercial built on Pepsi's "rich connection to the art of dance" and the Marketing Arm recognized that"[d]ancing is in the DNA of the brand from Michael Jackson to Britney Spears to Beyonce," (Segaran

Decl.¶ 5, Ex.C at 141; Samay Dec. Exs. 5, 35 at 4; Samay Dec. Ex. 63 at 90:8-10.)  Creator, MarcGilbar said that he "[built] on the foundation of the Now and Then spot" and "hoped to deliver a fresh twist to a classic concept." (Gilbar Dec, at ¶ 4-6.) The concept "showcase[es] 50 years of Pepsi inspiring people to dance," using Pepsi's "brand heritage[,] from the cursive logo to the modern day Pepsi globe, all the while set against the changing historical backdrop of each era." (Samay Dec. Exs. 5, 35 at 4.)

## RESPONSE TO STATEMENT NO. 21

Subject to the authenticity issue described (and the evidence presented) in response to Statement Nos. 17 and 19, Betty does not dispute.

## STATEMENT NO. 22:

In The Marketing Arm Pitch, "Christopher Walken, legendary actor and incredible dancer, will walk us through a dance timeline of over 50 years," dancing through five eras of Pepsi history by moving through several rooms in a circular set. (Samay Dec. Exs. 5, 35 at 4-5.) It proposed using a "continuous set with art direction that transforms to reflect each era." (Samay Dec. Exs. 5, 35 at 4.) Walken dances to a doo-wop version of the Joy of Pepsi, set in a 1950s diner; a Motown version of Joy of Pepsi in a "young American graffiti-era" set; a disco version in a 1970s disco; an 80s Michael Jackson-style version in an homage to a Michael Jackson music video; and a 90s/00s version in a modern house party. *(Id.* at 5.) Another option was to "license music from each era and create a mash-up." *(Id.* at 4.) In each of these settings, the styles, set and Pepsi branding changes to reflect the era. *(Id.* at 5.)

## RESPONSE TO STATEMENT NO. 22

Betty disputes in part.  Subject to the authenticity issue described in response to Statements 19 and 20 (and the evidence presented), according to the "Joy of Dance" exhibit dated November 6, 2015, TMA proposed six era scenes.  The Statement is misleading because the written concept deck does not propose Christopher Walken moving "through" several rooms but instead it proposes that

the rooms would rotate behind him.  Further, the PepsiCo statement is misleading inasmuch as it merges two distinct proposed options (Option 1 and Option 3) as if it were one concept; also, neither option employed a hero character navigating anywhere.  Samay Dec. Exs 5, 35 at 4-5.

**STATEMENT NO. 23:**

Between every scene, The Marketing Arm pitch notes that "the set rotates to reveal a new back drop." (Samay Dec. 4, Exs. 5, 35 at 5.) Wardrobe changes from American Graffiti-era, to sequin dresses, to bellbottoms, criminal outfits, to present day millennial garb. (Samay Dec. Exs. 5, 35 at 5.) The color or "art direction and wardrobe" changes from red, to white to blue. (Samay Dec. Exs. 5, 35 at 5.) And dance styles changes from jitterbug, to the twist, to Saturday Night Fever style, to Michael Jackson moves, to pop-and-lock. (Samay Dec. Exs. 5, 35 at 5.) The pitch proposes achieving clean, seemingly seamless cuts using a rotating set, where the camera is "locked off" and the circular set rotates. (Samay Dec. Exs. 5, 35; Phillips Dec. Ex. A at III.B.3.6.) The pitch document also provides a link to a NFL Calendar video which shows an example of how scenes can change seamlessly while traveling from room to room.  (Samay Dec. Exs. 5, 35 at 4; see also Gilbar Dec. at 13.)

**RESPONSE TO STATEMENT NO. 23**

Betty disputes in part.  By proposing the camera be "locked off" and a "giant circular set [rotating] left to right as if on a giant "LAZY SUSAN," used, but the written deck does not propose "clean, seemingly seamless cuts" and it does not propose anyone navigating anywhere.  A review of the Wes Anderson commercial (https://www.youtube.com/watch?v=C2zn-8KAiro)demonstrates the dramatic difference between what TMA propose and what was actually employed in the 2016 Super Bowl Commercial.  Samay Dec. Exs. 5, 35, at 5.

**STATEMENT NO. 24:**

The Marketing Arm Pitch further detailed that at the end of the spot, the camera pans up to reveal that "the giant circular set forms the shape of the PEPSI GLOBE," where the various rooms Walken danced through were actually segments of the Pepsi Globe logo. (Samay Dec. Exs. 5, 35 at 5.) Each of the rooms was to have "art direction and wardrobe in red, white or blue such that the colors of the globe match the logo." *(Id.).* According to Tom Meyer, one of The Marketing Arm team members, "[E]verything was always about the logo." (Samay Dec. Ex. 63 at 77:17-25.)

### RESPONSE TO STATEMENT NO. 24

In addition to the authenticity issue described (and the evidence presented) in response to Statement Nos. 17 and 19, Betty disputes. In the pitch, there was not going to be a hero character dancing "through" rooms but instead the rooms would have rotated behind him. Samay Ex. 5, 35.

### B. Defendant Betty's Pitch

### STATEMENT NO. 25:

Within a few hours of The Marketing Arm delivered its original pitch, Betty pitched eight concepts. (Samay Dec. Ex. 61 at 11:23-25.) The first of these concepts was entitled "All Kinds/Living Jukebox." (Samay Dec. if3, Ex. 4; Segaran Dec. 4; Ex.B at 5-6.)

### RESPONSE TO STATEMENT NO. 25

Betty disputes in part. As written, the Statement disingenuously implies that Betty supplied its written deck and made its presentation to PepsiCo after the TMA presentation. In fact, Betty presented during the morning of November 6, 2015 and TMA did not present until the afternoon. Gregory Dec. Ex. 3, Ex. 79 [Segaran Tr] at 94:16-25; Ex. 80 [Danzi Tr] at 41:22-46:3, 55:12-15.

### STATEMENT NO. 26:

The "All Kinds/Living Jukebox" pitch "starts outside a giant Brooklyn(like) warehouse,"

following "the camera perspective of someone walking in." *(Id.* at 5.) "Outside the door, a man

plays an acoustic guitar singing an acoustic rendition of the Joy of Pepsi." *(Id.)* As the commercial

continues, "the genres start to change and unfold while the song remains the same and continues

in the spot the acoustic singer left off." *(Id.)* The commercial moves through "various rooms

where [the viewer] experience[s] the song in different gemes." *(Id.)*

**RESPONSE TO STATEMENT NO. 26**

    Betty disputes in part. The PepsiCo statement selectively quotes from the Betty written pitch

deck but does so in a way that implies the commercial would *necessarily* start outside a Brooklyn-style

warehouse with a man playing an acoustic guitar. In fact, the evidence establishes that Mr. Pscarelli

emphasized the flexibility of his concept in respect of its setting ("Doesn't have to be a walkthrough

of the warehouse" or the particular genre of music.) Betty also proposed multiple song versions

(Living Jukebox). The Betty pitch clearly indicates that all renditions would be achieved by a single

powerful performer. Samay Dec. Ex. 4, 21; Gregory Dec. Ex. 77 [Al Pascarelli Tr] at 19:18-20:25.

**STATEMENT NO. 27:**

    The pitch lists several potential genres for "The Joy of Pepsi" to be performed in,

including rock, rap, jazz/swing, classical, and metal. (Samay Dec. 113, Ex. 4.) The pitch does not

reference other songs or licensed music. (Samay Dec. Exs. 72-73 at No. 20-26.) The text of the

pitch never once mentions the word "dance." (Samay Dec. Ex. 4, Ex. 62 at 17:16-19, Ex. 61 at

55:16-57:18.)

**RESPONSE TO STATEMENT NO. 27**

    Betty disputes in part. The PepsiCo statement incorrectly implies that the pitch concept

depended on the use of particular genres of music. While the pitch deck does not use the word

"dance" such word is implied by the term "vibe" in the written deck and expounded upon during the

oral presentations and the use of a jukebox implies emplying different songs.  Gregory Dec. Ex. 77 [Al Pascarelli Tr] at 14:5-20:11, 55:16-56:24.

## STATEMENT NO. 28:

The "All Kinds/Living Jukebox" pitch provides additional references to "a lone singer with an Adele like quality" and "an upright bass plucking out the 'ba ba ba ba ba.'" (Samay Dec. Ex. 4.) The commercial ends on the far side of the warehouse where "a doo wop/acappella crew is standing around a fire lit in a trash can." *(Id.)*

## RESPONSE TO STATEMENT NO. 28

Betty disputes in part.  The PepsiCo statement selectively quotes from the Betty "All Kinds/Living Jukebox" written deck but it does so in a way that implies the commercial *necessarily* depended on the cited treatments, which the evidence makes clear was not the case.  The Betty pitch clearly indicates that all renditions would be achieved by a single powerful performer.  Samay Dec. Ex. 4, 21; Gregory Dec. Ex 77 [Al Pascarelli Tr] at 19:18-20:25.

## STATEMENT NO. 29:

The "All Kinds/Living Jukebox" pitch suggests using a title of "Joy takes all kinds." *(Id.)*

## RESPONSE TO STATEMENT NO. 29

Betty disputes.  PepsiCo quotes selectively from Betty's written pitch deck and in this instance the quote is incomplete; the full indication in the written deck is "Joy takes all kinds.  Pepsi." Samay Dec. 4, 21.

## STATEMENT NO. 30:

Betty also provided "Considerables" for the "All Kinds/Living Jukebox." *Id.* at 6. As Mr. Pascarelli III testified at his deposition, "considerable means... some other ideas that we think

could make this thing better." (Samay Dec. Ex. 61. at 58:16-59:2.)

**RESPONSE TO STATEMENT NO. 30**

Betty does not dispute.

**STATEMENT NO. 31:**

The "Considerables" ideas include:

a.      That the commercial "doesn't have to be a walkthrough of the warehouse." (Samay Dec. 3, Ex.4). Mr. Pascarelli III described in his testimony that "I wouldn't say the idea was you're walking through a warehouse. I would say the idea is a hero character is walking through various rooms, and the genre of music, the style, the dancing, the performance from the main character are all changing the vibe of the genre of music." (Samay Ex. 61 at 24:15-25:3.)  He further admitted that this description was the "idea broadly" and that "absolutely," you "could have different implementations of that idea." (Id.);

b.      That the commercial could "[make] clean cuts from genre to genre." (Samay Dec. ¶3, Ex. 4 at 6.) Mr. Pascarelli III testified that "there's been clean cuts in other commercials." (Samay Dec. Ex. 61 at 60:21-25);

c.      That the commercial could utilize "a single powerful performer Celeb or Not." (Samay Dec. 3, Ex. 4 at 6);

d.      That the commercial could utilize quick changes in "the way magicians accomplish quick changes... one dress comes off, another is underneath ready to go." (Id.); and

e.      And that Pepsi could "[c]rowdsource renditions of Joy of Pepsi as contests on social media." *(Id.).*

14

**RESPONSE TO STATEMENT NO. 31**

(a)     Betty does not dispute.

(b)     Betty disputes in part. PepsiCo quotes selectively from Betty's written pitch deck and in this instance the quote is misleading inasmuch as it implies that clean cuts from genre to genre were not a fundamental part of the combination of elements proposed by the concept. Mr. Pascarelli did not testify that the clean cuts had previously been stitched together the way he proposed. Samay Ex. 4, 21; Gregory Dec. Ex. 77 [Al Pascarelli Tr] at 106:24-107:24.

(c)     Betty disputes in part. PepsiCo quotes selectively from Betty's written pitch deck and in this instance the quote is incomplete inasmuch as it was fundamental to the Betty concept that a single powerful performer (hero character) be able to pull off all renditions so that the seamless transitions from scene to scene could be achieved. The concept provided for a single powerful performer, whether or not a celebrity. Samay Dec. Ex. 4, 21; Gregory Dec. 77 Ex. [Al Pascarelli Tr] at 19:18-20-25, 55:16-56:24.

(d)     Betty does not dispute.

(e)     Betty does not dispute.

**STATEMENT NO. 32:**

Despite all these Considerables, Betty admitted that the "All Kinds/Living Jukebox" pitch did not include many features of the Commercial:

a.      Betty's written pitch does not include any reference to the idea that the "doorway is the agent of change." (Samay Dec. Ex. 61 at 55:9-11);

b.      The "vibe" of the rooms as expressed in "All Kinds/Living Jukebox" does not necessarily include dance, and the pitch does not reference dance or even contain the word "dance." (Samay Dec. Ex. 61 at 57:14-18, Ex. 62 at 17:16-19, Exs. 71, 72 at No. 59);

c.     "All Kinds/Living Jukebox" does not reference any specific performer. (Samay Dec. Ex. 61 at 71:15-16, Exs. 71, 72 at Nos. 44-48);

d.     The "All Kinds/Living Jukebox" pitch does not reference moving through different time periods. (Samay Dec. Ex. 61 at 78:19-22, Exs. 71, 72 at Nos. 49- 50);

e.     The "All Kinds/Living Jukebox" pitch does not reference using a physical jukebox in the commercial. (Samay Dec. Ex. 61 at 79:10-12, Exs. 71, 72 at Nos 29-36);

f.     The "All Kinds/Living Jukebox" pitch does not suggest using a diner as a setting. (Samay Dec. Ex. 61 at 80:18-23);

g.     The "All Kinds/Living Jukebox" pitch does not suggest using the Pepsi Globe as a set. (Samay Dec. Ex. 61 at 82:2-4);

h.     The "All Kinds/Living Jukebox" pitch does not suggest starting the commercial with a Pepsi logo on a record, or even using a physical record at all. (Samay Dec. Ex. 61 at 82:5.

i.     The "All Kinds/Living Jukebox" pitch does not suggest using music by either The Contours or Madonna. (Samay Dec. Ex. 61 at 82:12-17); and

j.     The "All Kinds/Living Jukebox" pitch does not suggest using Pepsi logos from various time periods. (Samay Dec. Ex. 61 at 82:23-83:2.)

**RESPONSE TO STATEMENT NO. 32**

(a)     Betty disputes.  The written pitch deck for "All Kinds/Living Jukebox" indicates that the changes in music genre, fashion, clothes, and vibe will change as the viewer travels through the various rooms. Samay Ex. 4, 21. The oral presentation expounded on the concept and

emphasized the role and importance of the doorways serving as the agents of change. Gregory Dec. Ex. 77 [Al Pascarelli Tr] at 55:16-56:24.

      (b)     Betty disputes in part. While the written pitch deck for "All Kinds/Living Jukebox" does not include the word "dance" such term is implied by the word "vibe", which Mr. Pascarelli expounded on during the oral presentation. Gregory Dec. Ex. 77 [Al Pascarelli Tr] at 55:16-56:24.

      (c)     Betty does not dispute.

      (d)     Betty disputes. The element of moving through different time periods is implied with the changes of fashion and clothes. Samay Dec. Ex. 4; Gregory Dec. Ex. 77 [Al Pascarelli Tr] 28:25-29:12, 78:19-23.

      (e)     Betty disputes. From the title of the concept the physical use of a jukebox is implied. Samay Dec. Ex. 4.

      (f)     Betty does not dispute.

      (g)     Betty does not dispute.

      (h)     Betty does not dispute.

      (i)     Betty does not dispute.

      (j)     Betty does not dispute.

### III. Selection, Refinements and Testing

### STATEMENT NO. 33:

At the conclusion of the pitches on November 6, the Pepsi team members sat down to discuss which concepts "popped" and the team's "initial reactions." (Samay Dec. Ex. 60 at 71:19-24.)

### RESPONSE TO STATEMENT NO. 33

Betty does not dispute.

**STATEMENT NO. 34:**

As part of these initial reactions, Pepsi team members felt that "All Kinds/Living Jukebox" was "dark," and given that "Pepsi is a happy, joyful brand," the imagery, like the Brooklyn-like warehouse and the firelit trashcan, could be associated with homelessness and that it "seemed very dark and not on brand." (Segaran Dec. ¶4; Samay Dec. Ex. 60 at 55:19-56: 7; *see also* Ex. 64 at 109:25-110:9 ("You know, often how a spot begins and how it ends are important, I didn't like the way people were standing around a fire lit in a trash can.").) Jayanthi Segaran "wasn't really all that interested in changing the Joy of Pepsi to make it heavy metal" and "didn't like the way people were standing around a fire lit in a trash can." (Samay Dec. Ex.64 at 109:25-110:9; *see also* Segaran Dec.¶4.)

**RESPONSE TO STATEMENT NO. 34**

Betty disputes.  In general, the PepsiCo witnesses were unable to recall the discussion from the "wrap-up meeting" about the Betty presentation or about the presentations made by the other agencies, including the TMA presentation.  Ms. Segaran testified that she did not recall the pitch being reliant on particular genres.  Gregory Dec. Ex. 78 [Arbetter Tr] at 56:11-17; Ex. 79 [Segaran Tr] at 107:6-108:16.

**STATEMENT NO. 35:**

Pepsi did not request any refinements to the "All Kinds/Living Jukebox" concept, and that concept never advanced into testing. (Segaran Dec. 16.)

**RESPONSE TO STATEMENT NO. 35**

Betty does not dispute.

**STATEMENT NO. 36:**

To members of the Pepsi team, "The Joy of Dance" felt appropriate for Super Bowl 50 given the tie-in to music history. (Samay Dec. Ex. 60 at 73:25-74:19.) Jayanthi Segaran, point person for the Super Bowl project team, liked the idea of dance. (Samay Dec. Ex.64 at 120:11-23.) She noted that the "2016 commercial was a homage to PepsiCo's history and it was inspired not just by [the Britney Spears'] commercial," but by other previous Pepsi commercials as well. (Samay Dec. Ex.64 at 182:19- 184:10, 187:1-188:1.)   Team member, Jen Danzi, agreed and "felt strongly" that Pepsi should "take the 'Joy of Dance' and just make a classic Pepsi dance spot in the vain of Brittany Spears." (Samay Dec. Ex.65 at 67:15-24.) Lou Arbetter and others "really liked the ending," thinking that the reveal of the Pepsi Globe "was a really clever and important device" that "popped." (Samay Dec. Ex.64 at 123:13-124:7, Ex. 60 at 65:1- 18.)

## RESPONSE TO STATEMENT NO. 36

Betty disputes.  For the reasons indicated (and evidence presented) in response to Statement Nos. 19 and 20, there is a genuine dispute about whether the idea that the ending of the TMA concept could have been considered during the wrap-up meeting.

## STATEMENT NO. 37:

The very evening that the pitch was delivered, Ms. Segaran emailed The Marketing Arm and asked them to refine "The Joy of Dance" by Monday, November 9, 2015, with the feedback that the "idea [was] too long and complicated." (Samay ¶ 12, Ex.44, Ex.64 at 145:23-148:3; Segaran Decl. ¶¶ 7-9; Ex. D at 189; Meyer Dec. ii 6, Ex. D; Gilbar Dec. ¶ 10, Ex. D.) The Pepsi team asked that the concept be simplified, and that The Marketing Arm provide "more contemporary options for the star," referencing Pharrell's music video "Happy." (Samay ¶ 12, Ex.44; Segaran Decl. ¶ 8; Ex. D at 189.)

## RESPONSE TO STATEMENT NO. 37

Betty does not dispute.

**STATEMENT NO. 38:**

Taking the feedback and quick timeline under advisement, The Marketing Arm immediately began refining the concept. (Gilbar Dec. ¶¶ 10-11, Ex. E.) Marc Gilbar of The Marketing Arm sent an updated script internally early the following morning, on November 7, 2015. (Gilbar Dec. ¶11, Ex. E, Meyer Dec. ¶ 7, Ex. E.) The script maintained the closing of the device of revealing that the scenes occurred within Pepsi's trademarked globe logo. (Gilbar, Ex. E.) The revised script updated the performer to Pharrell, simplified from five time periods to three, added licensed music suggestions, and removed the element of the continuous shot. (Gilbar Dec. ¶¶ 11-13, Ex. F.) The script also updated the settings for each of the time periods, including a jukebox as a prop in the opening 1950s type diner scene and as a mechanism to display the Pepsi branded globe on the surface of a record and start music playing in the diner. (Gilbar Dec. at ¶ 12, Ex. F; Samay Dec. Ex. 63 at 75:2-23.) Mr. Gilbar explained that "there's only one logical way to establish music playing in a 1950s diner and that's through a jukebox." (Gilbar Dec. at if12). Expert Zachary Phillips agreed. (Phillips Dec. Ex. A at III.A.2ii.5.)

**RESPONSE TO STATEMENT NO. 38**

Betty disputes in part. For the reasons indicated (and the evidence presented) in response to Statement Nos. 17 and 19, the authenticity of the written TMA deck is uncertain. In addition, the original script set forth more than five time periods and did not contain the element of one continuous shot. Samay Ex. 5, 35. Betty also disputes the proposition that there is "only one" logical way to establish music playing in a 1950s diner and it notes that e-mails reference phone calls that the witnesses could not remember.

**STATEMENT NO. 39:**

The Marketing Arm team submitted the updated concept on Monday, November 9, 2015. (Samay Dec. ¶ 5, Ex. 9, Ex. 63 at 74:14-18; Segaran Dec. ¶ 9, Ex. D; see also Gilbar Dec. ¶¶ 11-14, Ex.

F.) The submitted revised pitch included the revisions noted above in ¶ 38. *Id.* All of the work was done without any access to Betty or its pitch deck. (Gilbar Dec. at ¶¶15-17, Ex. D; Samay Dec. Ex. 63 at 87:10-12; Segaran Dec. ¶ 8.) Mr. Meyer said that he had "never seen any Betty material in [his] life" and they created the "spot from soup to nuts" and it was "100 percent" their own spot. (Samay Dec. Ex. 63 at 17:7-12, 89:22-25.) Mr. Gilbar indicated that he "had no access whatsoever to any Betty materials or information." (Gilbar Dec. at ¶ 15.) Later that day, Ms. Segaran emailed The Marketing Arm noting that the spot would move forward into testing. (Segaran Dec. ¶ 9.)

**RESPONSE TO STATEMENT NO. 39**

Betty disputes. While there is no direct evidence of TMA receiving a copy of the Betty concept deck or an explicit description of Betty's prior oral presentation, the evidence does reveal that TMA received input from individuals who were present during, and received, the Betty November 6, 2015 presentation. Gregory Dec. Ex. 45, 46, 53, 56, 76, 86.

**STATEMENT NO. 40:**

"The Joy of Dance" tested "very well" in both qualitative and quantitative testing. (Samay Dec. Ex. 60 at. 84:16-21.) As production began, The Marketing Arm and the Pepsi team explored additional talent and music options due to availability and fees. (Samay Dec. Ex.63 at 73:2-5; Gilbar Dec. at ¶17.) Ultimately, The Marketing Arm and Pepsi settled on Janelle Monae as the celebrity performer, updating the song selection to be "Do you Love Me" by The Contours, "Express Yourself" by Madonna, and 'The Joy of Pepsi". (Samay Dec. Ex. 34; Phillips Dec. Ex. B.)

**RESPONSE TO STATEMENT NO. 40**

Betty does not dispute.

**STATEMENT NO. 41:**

"The Joy of Dance" aired on February 7, 2016, in the commercial slot immediately preceding the Super Bowl 50 Halftime Show. (Samay Dec. Ex. 60 at 24:3-22; Phillips Dec. Ex. A at III.A.1.) The Commercial was generally very well received. (Samay Dec. Ex. 60 at 84:22-85:1.) Publications noted the Commercial's similarity to previous Pepsi commercials, specifically calling out the "Now and Then" commercial featuring Britney Spears dancing through the ages. (Phillips Dec. Ex. A at III.A.2.i; Samay Dec. Exs. 74-75.)

**RESPONSE TO STATEMENT NO. 41**

Betty does not dispute.

**STATEMENT NO. 42:**

In an article entitled "'Time traveler' Janelle Monae gets her Britney Spears on for Pepsi's Super Bowl ad," Screenertv commented that the commercial "remind[ed] audiences of the brand's 2001 Super Bowl commercial featuring Britney Spears." (Samay Dec. Ex.74; Phillips Dec. at III.A.2.i.) The Washington Post recognized the 2016 commercial as "a classic, archetypal Pepsi commercial" which was "a direct reference to Spears' 2001 'Pepsi Generation' ad, another romp-through-the-ages with a bright young star." (Samay Dec. Ex.75; see also Phillips Dec. at III.A.2.i.)

**RESPONSE TO STATEMENT NO. 42**

Betty does not dispute.

**V.  The "All Kinds/Living Jukebox" Pitch Does Not Appear in the Commercial**

**STATEMENT NO. 43:**

Betty applied to register its "All Kinds/Living Jukebox" presentation deck with the U.S. Copyright Office on May 18, 2016. (Samay Dec. Ex. 33.) The registration covers the "text of storyline" and explicitly excludes "photograph(s), artwork, Pepsi name and logo." *(Id.)* The only copyrighted materials at issue are fixed in Betty's written Pitch, produced in this matter as

PEPSI0000005-19. (Samay Dec. Exs. 4, 21, 33, Ex.61 at 32:17-22, Exs. 72-73 at Nos. 7, 10.) Betty alleges that the Commercial is based on pages PEPSI0000005-6. (Samay Ex. 22 at ¶ 23, Ex. 61 at 32:17-22.) However, during discovery, Betty or its representatives admitted that:

      a.      The commercial does not begin outside a giant Brooklyn warehouse. (Samay Dec. Ex. 61 at 41:21-24, Exs. 72, 73 at No. 80);

      b.      The commercial does not start with a camera perspective of somebody walking into a warehouse. (Samay Dec. Ex. 61 at 41:25-42:4, Exs. 72, 73 at No. 81);

      c.      The commercial does not have a man outside the door playing an acoustic guitar, singing an acoustic rendition of "The Joy of Pepsi." (Samay Dec. Ex. 61 at 42:5- 8, Exs. 72, 73 at No. 82);

      d.      The commercial does not have a scene where the viewer enters the warehouse and genres start to change and unfold. (Samay Dec. Ex. 61 at 42:9-14, Exs. 72, 73 at No. 84);

      e.      The song does not remain the same throughout the Commercial. (Samay Dec. Ex. 61 at 44:8-10, Exs. 72, 73 at No. 85-88);

      f.      There is not any rap in the Commercial. (Samay Dec. Ex. 61 at 50:19-22, Exs. 72, 73 at Nos. 92-93);

      g.      There is not any jazz or swing in the Commercial. (Samay Dec. Ex. 61 at 50:23- 25, Exs. 72, 73 at RFA Nos. 94-97);

      h.      There is not any classical music in the Commercial. (Samay Dec. Ex.61 at 51:5-7, Exs. 72, 73 at Nos. 98-99);

      i.      There is not a metal interpretation of the "Joy of Pepsi" in the Commercial. (Samay Dec. Ex. 61 at 51:10-13, Exs. 72, 73 at Nos. 100-101);

      j.      There is not a "lone singer with an Adele-like quality" in the Commercial. (Samay Dec. Ex. 61 at 52:20-53:5; Exs. 72, 73 at No. 102);

k.      There was no upright bass plucking out "The Joy of Pepsi" in the Commercial. (Samay Dec. Ex. 61 at 53:6-10, Exs. 72, 73 at No. 103);

l.      The Commercial does not include anyone walking out of a warehouse. (Samay Dec. Ex. 61 at 53:20-23);

m.      There is not a doo-wop/acapella crew standing around a fire lit in a trash can in the Commercial. (Samay Dec. Ex. 61 at 53:24-54:3, Exs. 72, 73 at No. 104);

n.      The title of the Commercial is not "Joy takes all kinds." (Samay Dec. Ex. 61 at 54:4-10); and

o.      The Commercial does not use quick changes the way magicians accomplish quick changes. (Samay Dec. Ex. 61 at 71:25-72:5, Exs. 72, 73 at No. 107);

**RESPONSE TO STATEMENT NO. 43**

Betty disputes in part.

a.  Betty does not dispute.

b.  Betty does not dispute.

c.  Betty does not dispute.

d.  Betty does not dispute.

e.      PepsiCo produced a second version of the Super Bowl commercial at the same time with the only difference being that it employs the "Joy of Cola" song in different musical genres. Gregory Dec. Ex. 49; 79 [Segaran Tr] at 202:16-203:9, 204:10-205:7, 207:8-208:24; Ex. 85 [Meyer Tr] at 91:9-93:1.

f.      PepsiCo produced a second version of the Super Bowl commercial at the same time with the only difference being that it employs the "Joy of Cola" song in different musical genres. Gregory Dec. Ex. 49; 79 [Segaran Tr] at 202:16-203:9, 204:10-205:7, 207:8-208:24; Ex. 85 [Meyer Tr]

at 91:9-93:1. Because PepsiCo dd not to produce the second commercial in discovery, it is uncertain what music genres were used.

     g.     PepsiCo produced a second version of the Super Bowl commercial at the same time with the only difference being that it employs the "Joy of Cola" song in different musical genres. Gregory Dec. Ex. 79 [Segaran Tr] at 202:16-203:9, 204:10-205:7, 207:8-208:24; Ex. 85 [Meyer Tr] at 91:9-93:1. Because PepsiCo dd not to produce the second commercial in discovery, it is uncertain what music genres were used.

     h.     PepsiCo produced a second version of the Super Bowl commercial at the same time with the only difference being that it employs the "Joy of Cola" song in different musical genres. Gregory Dec. Ex. 79 [Segaran Tr] at 202:16-203:9, 204:10-205:7, 207:8-208:24; Ex. 85 [Meyer Tr] at 91:9-93:1. Because PepsiCo dd not to produce the second commercial in discovery, it is uncertain what music genres were used.

     i.     PepsiCo produced a second version of the Super Bowl commercial at the same time with the only difference being that it employs the "Joy of Cola" song in different musical genres. Gregory Dec. Ex. 79 [Segaran Tr] at 202:16-203:9, 204:10-205:7, 207:8-208:24; Ex. 85 [Meyer Tr] at 91:9-93:1. Because PepsiCo dd not to produce the second commercial in discovery, it is uncertain what music genres were used.

     j.     Betty does not dispute.

     k.     Betty does not dispute.

     l.     Betty does not dispute.

     m.     Betty does not dispute.

     n.     Betty does not dispute.

     o.     Betty does not dispute.

**VI.  The Alleged Similarities are Admittedly Common Tropes and Filming Techniques**

**STATEMENT NO. 44:**

Zach Phillips, an expert in the field of advertising and film creation and production, submitted an expert report explaining that Betty's concepts were not original and were, in fact, standard devices that would naturally flow from the idea in the commercial.  (Phillips Dec. ¶ I, Ex. A at Ill.B.2, III.A.2.ii.5.) Betty did not submit any responsive expert report of its own and elected not to depose Mr. Phillips. (Samay Dec. ¶31.)

**RESPONSE TO STATEMENT NO. 44**

Betty does not dispute; however, Mr. Pascarelli's experience and expertise in creative gives his testimony as much, if not more, credibility than Mr. Phillips.

**STATEMENT NO. 45:**

The techniques used to shoot "The Joy of Dance" are commonplace in the industry. (Phillips Decl. Ex. A at III.A.2; Samay Decl. Exs. 72-73 at Nos. 144-145.) Al Pascarelli III admitted that clean cuts are a common editing technique that did not originate with Betty. (Samay Decl. Ex. 61 at 60:15-25.) Mr. Phillips identified clean cuts in both "Now and Then" and "Bottle Pass," which Mr. Pascarelli III also identified in his deposition. (Phillips Dec. Ex. A at III.A.2.ii.4; Samay Dec. Ex. 61 at 107:18-21; 120:5-10.)  Betty's creative director further testified that he saw the "Now and Then" commercial *before* he crafted his pitch to Pepsi. (Samay Dec. Ex. 61 at 93:4-23.)  Mr. Pascarelli III also admitted that "Now and Then" commercial starred a powerful performer, Britney Spears, as she danced through various eras changing wardrobe, dance style, music, and genre. (Samay Dec. Ex. 61 at 93:24-95:24, 101:4-9, 105:24-106:22.) Thus, Pepsi had already used "that whole combination of things". (Samay Dec. Ex. 61 at 106:15-18.)

**RESPONSE TO STATEMENT NO. 45**

Betty disputes in part. The "Now and Then" and "Bottle Pass" commercials did not employ clean cuts to create a single continuous shot to navigate through one changing environment. Samay Ex. 34. As noted above, Mr. Pascarelli's did not use the phrase "that whole combination of things" testimony but pushed back on the examining attorney's use of that phrase. Samay Dec. Ex. 61 at 106:15-18. It is the unique combination of all of the proposed elements that created a uniqueness to "All Kinds/Living Jukebox." In neither commercial were doorways used as the agents of change, the background cast was not the same in each scene and there was not one continuous shot of a changing environment. Samay Ex. 34.

## STATEMENT NO. 46:

Pepsi has also used jukeboxes in prior commercials to indicate era or setting. (Phillips Dec. Ex. A at III.A.2.i.) This is part of a common industry technique called "mise en scene." (Phillips Dec. Ex. A at III.A.2.ii.5.) Pepsi used a jukebox in its prior commercial "Diner," to denote setting and to start the music. (Phillips Dec. Ex. A at III.A.2.ii.5; Samay Dec. Ex. 34.) "Now and Then" similarly features a jukebox in the opening scene. (Samay Dec. Ex. 34.) Mr. Pascarelli III admitted that the previously-aired Pepsi commercial "Diner" depicting an interaction between a Pepsi truck driver and a Coca-Cola truck driver also displayed, within the first couple of seconds of the commercial, a jukebox in a diner playing a record. (Samay Dec. 10, Ex. 61 at 121:3-9.)

## RESPONSE TO STATEMENT NO. 46

Betty disputes the proposition that the "facts" set forth in the Statement are material. The importance of the jukebox is that it was suggested by "All Kinds/Living Jukebox" and is indicative of PepsiCo employees/agents providing material elements of Betty's concept to TMA to elevate the TMA concept in a way that was very different from the original TMA concept. Samay Dec. Ex. 4, 21; Gregory Dec. Ex. 56 p3.

### VII.  The Creative Agency Services Agreement and Contract Claims

**STATEMENT NO. 47:**

In 2014, Pepsi and Betty entered into a Creative Agency Services Agreement (the "Agreement"). (Samay Dec. 8; Ex. 23.)

**RESPONSE TO STATEMENT NO. 47**

Betty does not dispute.

**STATEMENT NO. 48:**

Betty's complaint pleaded four state law claims, including a breach of contract claim, all of which were dismissed. (D.I. 1 ¶¶ 41-55, D.I. 30 at 23-24.) The dismissed breach of contract claim was based on a supposed verbal agreement and custom. (D.I. 1 at ¶16.) Betty amended its complaint and it re-pleaded its contract claim, this time alleging breach of a written agreement (the Agreement). (Samay Ex. 22 at ¶¶42, 54.) Betty alleged that "PepsiCo breached the Services Agreement it made with Betty by not working in good faith with Betty to enter into a Scope of Work with Betty once it decided to use Betty's work product." *(Id.)*

**RESPONSE TO STATEMENT NO. 48**

Betty disputes in part.  Betty disputes the proposition that the wording of its original Complaint represents a material fact; the Amended Complaint is the operative pleadings in the litigation.  Betty does not dispute the second two sentences.

**STATEMENT NO. 49:**

The Agreement contains a number of provisions that outline the obligations of Betty. (Samay Dec. ¶8; Ex. 23.) Not a single provision in the agreement expressly requires Pepsi to negotiate with Betty for new work. *(Id.)* The Agreement provides that Pepsi will not have "any obligation of liability of any nature whatsoever to the Agency, except as expressly set

forth." *(Id.)*

## RESPONSE TO STATEMENT NO. 49

Betty disputes in part. Section 7 of the Services Agreement provides that PepsiCo will not own and will not use any Betty work product in the absence of a negotiated Statement of Work and payment of the fee contemplated by such SOW. Samay Ex. 23.

## STATEMENT NO. 50:

Betty's CEO and 30(B)(6) witness testified that there is not "any provision in the contract that requires Pepsi to negotiate with Betty" toward any new Scope of Work. (Samay Dec. Ex. 62 at 127:12-128:12, Ex. 23.) To the contrary, "it was up to Pepsi's sole discretion whether they were to do business with Betty in the future." (Samay Dec. Ex.62 at 45:22-46:8, Ex. 23 at ¶I.) No material terms for any new Scope of Work concerning use of Betty work product were ever discussed, much less agreed. (Samay Dec. Ex.62 at 44:4-45:9; Segaran Dec. ¶6.) There is nothing in the contract (which was executed in 2014, a year before Betty's pitch) that specifically references the 2016 Super Bowl pitch at all. (Samay Dec. Ex. 23.)

## RESPONSE TO STATEMENT NO. 50

Betty disputes in part. The Services Agreement was an umbrella contract and Section 7 of the Services Agreement requires PepsiCo to negotiate a SOW if it wants to make use of particular Betty creative work product. Samay Dec. Ex. 23.

## STATEMENT NO. 51:

The Agreement requires a Statement of Work or "Exhibit A" to the Agreement to create an engagement. *(Id.)* A statement of work outlines the material terms of a given project, including price, nature and quantity of deliverables, team structure, and timeline, as well as identifying the Pepsi product. *(See, e.g. id)* Statements of work were preconditions to any projects completed by Betty for Pepsi. (Samay Dec. Ex. 61 at 252:11-13; 253:5-9, Ex. 66

at 29:9-20.) Section 2 states that only after a Scope of Work is "signed by both parties" will

it form part of the Services Agreement. (Samay Dec. Ex. 23)

## RESPONSE TO STATEMENT NO. 51

Betty does not dispute.

## STATEMENT NO. 52:

Betty's complaint said that Pepsi needed a contract "if it wanted to acquire 'all right, title

and interest'" in Betty's work. (D.I. 52 at 17.) Betty alleged that "PepsiCo breached the Services

Agreement it made with Betty by not working in good faith with Betty to enter into a Scope of

Work with Betty once it decided to use Betty's work product." (Samay Dec. Ex. 22.) Betty's CEO

and 30(b)(6) witness testified that there is not "any provision in the contract that requires Pepsi

to negotiate with Betty" toward any new Scope of Work. (Samay Dec. Ex. 61 at 127:12-128:12,

Ex. 23.)

## RESPONSE TO STATEMENT NO. 52

Betty disputes in part.  Section 7 of the Service Agreement does not require PepsiCo to

negotiate with Betty toward a new SOW, unless PepsiCo wanted to use particular Betty creative work

product.  Samay Dec. Ex. 23.

## STATEMENT NO. 53:

No material terms for any new Scope of Work concerning use of Betty's Super Bowl

work product were ever discussed, much less agreed. (Segaran Dec. ¶6; Samay Dec. Ex. 62 at

44:4-45:9.) Because Pepsi was "not interested in the concept and did not intend to use any of

Betty's work relating to the concept," they "did not seek to engage Betty in any way. There was

never any discussion with Betty about acquiring or using the work and we did not ever discuss

any terms for doing." (Segaran Dec. ¶6.) Betty has specifically admitted that the parties never

negotiated about "price" or even "what the deliverable would look like." (Samay Dec. Ex. 62 at

45:2-9.) Those terms were left for negotiation in a Statement of Work. (Samay Dec. Ex. 62 at 40:6-15.) Mr. Pascarelli Jr. testified that the parties would not be bound without a Scope of Work, because "that was their rule in the contract." (Samay Dec. Ex. 62 at 62:22 -63:7, 68:4- 13, 71:9-23.)

### RESPONSE TO STATEMENT NO. 53

Betty disputes in part. The evidence of feedback and suggestions made by PepsiCo employees and agents to TMA that "elevated" TMA's concept brought the TMA concept in line with Betty's "All Kinds/Living Jukebox" and evidence the fact that PepsiCo (through its employees and/or agents) was interested in the concept and did intend to make use of Betty's creative work product. Gregory Dec. Ex 56.

### STATEMENT NO. 54:

Betty failed to provide a calculation of damages for either of its claims. (Samay Dec. Ex. 67.) In its answer to Pepsi's interrogatories seeking a calculation of copyright damages, Betty stated that "Betty has not completed its computations of damages; this response will be supplemented when such computation has been completed." (Samay Dec. Ex. 69.) In its response to Pepsi's interrogatories seeking a calculation of contract damages, Betty responded that "Betty has not yet completed its computations of damages but expects that such computation will form part of its expert disclosures." (Samay Dec. Ex. 71.) Neither interrogatory response was ever supplemented. (Samay Dec. ¶¶ 23, 25.) Fact discovery closed on November 9, 2018 and expert discovery closed on December 21, 2018. (D.I. 68 at ¶¶ 5.a., 6.a.) Betty did not serve an expert report or otherwise make any expert disclosure. (Samay Dec. ¶31)

### RESPONSE TO STATEMENT NO. 54

Betty disputes in part. Betty's copyright claims implicate statutory remedies. The record evidence in the case reveals the fee PepsiCo and Betty negotiated for lower-profile project and the

fees PepsiCo and TMA negotiated for the 2016 Super Bowl commercial. By being deprived of the recognition associated with being known as the creator of the PepsiCo Super Bowl commercial, Betty sustained a loss of the fee it would have earned (which would have included a percentage of production costs). In addition, Betty would not have lost the opportunity to work with the other brands (MOUNTAIN DEW, PEPSI MAX, AMP AND LIPTON) that were familiar with and loved Betty's work. Gregory Dec. Ex. 24, 25, 26, 27, 36.

### VIII.    Summary of Timeline and Key Documents and Events

**STATEMENT NO. 55:**

Pepsi previously aired the commercial known as "Now and Then" featuring Britney Spears in or around 2001-2002 contained on Exhibit 34 to the Samay Declaration. (Phillips Dec. Exh. A, § III.A.2; Samay Dec. ¶ 10, Ex. 34, Ex.61 at 93:24- 94:5, Exs. 72-73 at Nos. 94-95, 100-110, 118-124, Exs.74-75.)

**RESPONSE TO STATEMENT NO. 55**

Betty does not dispute.

**STATEMENT NO. 56:**

"Now and Then" contained Britney Spears singing and dancing through various eras. (Phillips Dec. Exh. A,§ 111.A.2; Samay Dec. ¶ 10, Ex. 34, Ex.61 at 93:4-96:2, 101:4-9, 105:24-106:23, Exs. 72-73 at Nos. 94-95, 100-110, 118-124, Exs.74-75.) It included: "Britney Spears as the hero character"; "genres of music changing"; "wardrobe changed as the eras and genre changed"; "dancing changes"; and at least one "clean cut." (Samay Dec. Ex. 61 at 93:24- 94:5, 101:4-9, 106:8-16, 107:8-21.) Samay Ex. 34.

**RESPONSE TO STATEMENT NO. 56**

Betty disputes in part. Because the "Now and Then" spot did not employ the device of doorways of change, seamless cuts to create one continuous shot of a changing environment, used

different cast members, it created a distinct feel and therefore its existence does not represent a material fact. Samay Ex. 34.

**STATEMENT NO. 57:**

"Now and Then" started in a diner with a jukebox. (Phillips Dec. Ex. A at III.A.2.ii.5, Ex. B.)

**RESPONSE TO STATEMENT NO. 57**

Betty disputes in part. Because the "Now and Then" spot did not employ the device of doorways of change, seamless cuts to create one continuous shot of a changing environment, used different cast members, it created a distinct feel and therefore its existence does not represent a material fact.

**STATEMENT NO. 58:**

Pepsi previously aired (before 2015) the commercial known as "Pass" or "Bottle Pass" contained on Exhibit 34 to the Samay Declaration. (Phillips Dec. Exh. A, § III.A.2; Samay Decl. ¶¶ 10, Ex. 34, Exs. 72, 73 at Nos. 132-138.) Samay Ex. 34.

**RESPONSE TO STATEMENT NO. 58**

Betty disputes in part. Because the "Bottle Pass" spot does not feature a hero character, doorways, the cast changes, does not take place in a singular space and therefore its existence does not represent a material fact.

**STATEMENT NO. 59:**

Pepsi previously aired (before 2015) the commercial known as "Diner" contained on Exhibit 34 to the Samay Declaration. (Phillips Dec. Ex. A at III.A.2.ii.5; Samay Dec. Ex. 34.)

**RESPONSE TO STATEMENT NO. 59**

Betty disputes in part. Because the only element of the "Diner" spot of any relevance is the use of a jukebox, it has a feel that is entirely dissimilar to Betty's "All Kinds/Living Jukebox" and to

the commercial PepsiCo aired during the 2016 Super Bowl and therefore does not represent a material fact. Samay Ex. 34.

## STATEMENT NO. 60:

The "Diner" commercial also started in a diner with a jukebox. (Phillips Dec. Ex. A at III.A.2.ii.5; Samay Dec. Ex. 34.)

## RESPONSE TO STATEMENT NO. 60

Betty disputes in part. Because the only element of the "Diner" spot of any relevance is the use of a jukebox, it has a feel that is entirely dissimilar to Betty's "All Kinds/Living Jukebox" and to the commercial PepsiCo aired during the 2016 Super Bowl and therefore does not represent a material fact. Samay Ex. 34.

## STATEMENT NO. 61:

The Marketing Arm and Betty both presented pitches to Pepsi on November 6, 2015. (Samay Dec. Ex. 63 at 48:13-15, Ex. 61 at 11:23-25; Gilbar Dec. ¶ 9, Ex. C.)

## RESPONSE TO STATEMENT NO. 61

Betty does not dispute; however, it notes that a key PepsiCo decisionmaker, Barry Rosen, had no memory of TMA presenting on November 6, 2015. Gregory Dec. Ex. 81 [Rosen Tr] at 109:2-11.

## STATEMENT NO. 62:

The Marketing Arm's Pitch on November 6, 2015 was created without access to Betty's Pitch materials or concepts presented that same day. (Samay Dec. Ex. 63 at 45:9-12, 46:10-47:6; Gilbar Dec. ¶¶ 16-17.)

## RESPONSE TO STATEMENT NO. 62

Betty disputes. For the reasons indicated (and the evidence presented) in response to Statement Nos. 17 and 19, the authenticity of the TMA pitch deck dated November 6, 2015 is uncertain.

**STATEMENT NO. 63:**

On November 6, 2015, Pepsi asked The Marketing Arm to refine its pitch to update "The Joy of Dance" concept. (Samay ¶ 12, Ex.44, Ex.64 at 145:23-148:3; Segaran Decl. ¶¶ 7-9; Ex. D at 189; Meyer Dec. ¶ 6, Ex. D; Gilbar Dec. ¶ 10, Ex.D.)

**RESPONSE TO STATEMENT NO. 63**

Betty does not dispute.

**STATEMENT NO. 64:**

Pepsi did not ask Betty, on November 6, 2015 (or at any other time) to refine Betty's Pitch with respect to the "All Kinds/Living Jukebox" concept. (Segaran Dec. if6.)

**RESPONSE TO STATEMENT NO. 64**

This Statement is duplicative of Statement No. 35; Betty does not dispute.

**STATEMENT NO. 65:**

No material terms for any new Scope of Work concerning use of Betty's Super Bowl work product were ever discussed or agreed. (Samay Dec. Ex.62 at 44:4-45:9; Segaran Dec. if6.)

**RESPONSE TO STATEMENT NO. 65**

Betty does not dispute.

**STATEMENT NO. 66:**

By November 7, 2015, The Marketing Arm had refined the script of its pitch and Marc Gilbar circulated his changes internally on November 7, 2015 as reflected in 11 of his Declaration and Exhibit E attached thereto. (Gilbar Dec. 11, Ex. E. Meyer Dec. 7, Ex.E.)

**RESPONSE TO STATEMENT NO. 66**

Subject to the authenticity issue described (and the evidence presented) in response to Statement Nos. 17 and 19, Betty does not dispute.

**STATEMENT NO. 67:**

The refinements made by Mr. Gilbar as described in his Declaration at 11-13 and Exhibit E attached thereto were made without access to Betty's Pitch or any other information concerning Betty's All Kinds/Living Jukebox concept. (Gilbar Dec. 15-17, Ex. D; Segaran Dec. 8.)

### RESPONSE TO STATEMENT NO. 67

Betty disputes.  E-mails between PepsiCo employees and agents and TMA and internal at TMA indicate that TMA had an inside connection at PepsiCo providing it information and that TMA was getting "great" feedback from PepsiCo that would "really elevate the spot."  Gregory Dec. Ex. 56.  These facts, together with the fact that changes were made from the initial TMA pitch book caused the commercial to evolve to a point of substantial similarity to "All Kinds/Living Jukebox" support the inference that changes were made on the basis of access to Betty's creative work product from PepsiCo employees and agents who were present for, and received, Betty's concept.

### STATEMENT NO. 68:

On November 9, 2015, The Marketing Arm sent their Revised Pitch to Pepsi as reflected in Exhibit F to the Gilbar Declaration. (Samay Dec. 5, Ex. 9, Ex. 63 at 74:14-18; Segaran Dec. 9, Ex. D; see also Gilbar Dec. 11-14, Ex. F.)

### RESPONSE TO STATEMENT NO. 68

Subject to the authenticity issue described (and the evidence presented) in response to Statement Nos. 17 and 19, Betty does not dispute.

### STATEMENT NO. 69:

The Marketing Ann's Revised Pitch was created without access to Betty's Pitch or any other information concerning Betty's All Kinds/Living Jukebox concept. (Gilbar Dec. 15-17, Ex. D; Samay Dec. Ex. 63 at 17:10-12, 87:10-12, 89:22-25; Segaran Dec. if 8.)

### RESPONSE TO STATEMENT NO. 69

Betty disputes. E-mails between PepsiCo employees and agents and TMA and internal at TMA indicate that TMA had an inside connection at PepsiCo providing it information and that TMA was getting "great" feedback from PepsiCo that would "really elevate the spot." Gregory Dec. Ex. 56. These facts, together with the fact that changes were made from the initial TMA pitch book caused the commercial to evolve to a point of substantial similarity to "All Kinds/Living Jukebox" support the inference that changes were made on the basis of access to Betty's creative work product from PepsiCo employees and agents who were present for, and received, Betty's concept. Samay Dec. Ex. 4, 5, 21, 35; Gregory Dec. Ex. 45, 46, 53, 56, 76, 86.

**STATEMENT NO. 70:**

The Marketing Ann's Revised Pitch was selected to advance to testing and ultimately selected for the Super Bowl Pepsi Commercial. (Segaran Dec. 9.)

**RESPONSE TO STATEMENT NO. 70**

Betty does not dispute.

**STATEMENT NO. 71:**

The Marketing Arm produced its Revised Pitch into the Commercial. (Gilbar Dec. 15-18.)

**RESPONSE TO STATEMENT NO. 71**

Betty disputes. Considerable changes were made to the Revised Pitch to produce the aired commercial. Samay Ex. 34.

**STATEMENT NO. 72:**

In February of 2016, Pepsi aired the Commercial during the Super Bowl. (Samay Dec. Ex. 60 at 24:3-22; Phillips Dec. Ex. A at III.A.I.)

**RESPONSE TO STATEMENT NO. 72**

Betty does not dispute.

37

**STATEMENT NO. 73:**

Jayanthi Segaran confirmed that the Britney Spears commercial "Now and Then" was the principal inspiration for the Commercial. (Samay Dec. Ex.64. at 182:19 - 184:10, 187:1-188:1.)

**RESPONSE TO STATEMENT NO. 73**

Betty disputes. The cited evidence does not support the stated proposition and, as noted in response to other Statements, there are considerable differences between the two commercials. Samay Ex. 34..

**STATEMENT NO. 74:**

"Now and Then", like the Commercial, featured a female performer as the lead, different scenes, where each scene focused on a different time period, and highlighted era- appropriate music, wardrobe, dance and vibe. (Samay Ex. 34, Ex. 61 at 93:4-96:2, 101:4-9, 105:24-106:23.)

**RESPONSE TO STATEMENT NO. 74**

Betty disputes in part. The "Now and Then" commercial did not employ the device of one continuous shot or doorways being the agent for a hero to navigate one continuous environment, used different background cast members in each scene and evoked for the viewer a different feel

**STATEMENT NO. 75:**

After the Commercial aired, the industry instantly recognized it as an homage to the previous Britney Spears' "Now and Then" commercial. (Phillips Dec. Ex. A at III.A.2.i; Samay Dec. Exs. 74–75.)

**RESPONSE TO STATEMENT NO. 75**

Betty disputes. Citing two articles does not qualify as a sufficient basis for the broad statement that "the industry recognized." Nor do the articles imply copying and TMA did not believe "Joy of Dance" copied "Now and Then." Gregory Dec. 85 [Meyer Tr] Ex. at 89:16-25.

**STATEMENT NO. 76:**

Betty acknowledged that the features of a hero character, genres of music changing, wardrobe changing as the eras and genre changed, dancing changes, and clean cuts were included in the previous Britney Spears' "Now and Then" commercial. (Samay Ex. 61 at 93:24–95:24, 101:4-9, 105:24-106:22, 107:8-21.)

## RESPONSE TO STATEMENT NO. 76

Betty disputes in part. The "Now and Then" commercial did not employ the device of one continuous spot, used different cast members in each scene and created a distinct feel unlike the distinct feel of Betty's "All Kinds/Living Jukebox;" therefore, the PepsiCo statement is not material. Samay Ex. 34.

## STATEMENT NO. 77:

Betty further acknowledged that the Pepsi Commercial did not include numerous· elements from Betty's Pitch, including a giant Brooklyn warehouse, a camera perspective of somebody walking into a warehouse, a man playing acoustic guitar, the "Joy of Pepsi" song in different genres, rap, jazz, swing, classical, or heavy metal music, a "lone singer with an Adele-like quality," an upright bass, a doo-wop/acapella crew, and a fire-lit in a trash can. (Samay Dec. Ex. 61 at 41:21-42:14, 44:8-10, 50:19- 51:13, 52:20- 54:3; Exs. 72, 73 at Nos. 80-82, 84-88, 92-104.)

## RESPONSE TO STATEMENT NO. 77

This Statement is duplicative of Statement No. 43. Betty disputes in part because the Statement implies that each of the cited items were necessary elements to the Betty concept.

## STATEMENT NO. 78:

On May 18, 2016, months after the 2016 Super Bowl, Betty applied for a copyright for its November 2015 pitch deck. (Samay Dec. Ex. 33.)

## RESPONSE TO STATEMENT NO. 78

Betty does not dispute.

**STATEMENT NO. 79:**

Betty sued Pepsi days later, alleging copyright infringement of its November 2015 pitch deck and breach of contract. (D.I.I.)

**RESPONSE TO STATEMENT NO. 79**

Betty does not dispute.

**STATEMENT NO. 80:**

Betty has not provided any calculation of damages for either of its claims. (Samay Dec. ¶¶ 23, 25, Exs. 69, 71.)

**RESPONSE TO STATEMENT NO. 80**

Betty disputes.  Statutory remedies are available for the statutory claim.

**STATEMENT NO. 81:**

Betty did not serve an expert report or otherwise make any expert disclosure. (Samay Dec. ¶31.)

**RESPONSE TO STATEMENT NO. 81**

Betty does not dispute.


**ADDITIONAL MATERIAL FACTS PRECLUDING SUMMARY JUDGMENT**

82.    The primary value advertising agencies bring to their clients lies in their ability to conjure creative storylines and unique and imaginative ways for portraying a product, communicating a message, and using and assembling such things as music, dance, costumes, talent, visual images, shot angles and props to set how the flow of scene and message can occur in a 60, 30 or 15 second spot. Gregory Dec. Ex. 77 at 271:13-273:12.

83.    To determine there is nothing protectable or of compensable value in an advertising agency's creative work simply because it includes basic elements like music and dance that can be broken apart into pieces would be tantamount to undermining an entire industry.

84.    The competition to win PepsiCo's Super Bowl assignment did not take place on an even playing field.  Gregory Dec. Ex. 53 p3.

85.    PepsiCo provided inputs and refinements to TMA throughout the entire development process that had the effect of evolving its "originally presented" storyline to a point of substantial similarity to Betty's presented creative work.  Gregory Dec. 5, 34, 35.

86.    There were far more than "standard executional adjustments" from the initial TMA concept to the final product.  Gregory Dec. Ex. 5, 34, 35.

87.    The final commercial was not at all a natural extension of the first concept TMA pitched.  Samay Dec. Ex. 5, 34, 35.

88.    Betty became introduced to PepsiCo because Barry Rosen, the principal of an agency named Direct Focus, Inc., saw work Al Pascarelli, III, Betty's Chief Creative Officer, did for one of Betty's other clients.  Gregory Dec. Ex. 77 [Al Pascarelli Tr] at 185:21-24; Ex. 81 [Rosen Tr] at 54:4-55:17.

89.    Rosen has had a decades long relationship with PepsiCo and he has been intimately involved in numerous substantial campaigns for PepsiCo brands (including PEPSI) over the years.  Gregory Dec. Ex. 81 [Rosen Tr] at 43:17-19.

90.    The role Rosen plays with PepsiCo commercials spans from managing the creative presentation process to providing input to concept selection decisions to working with PepsiCo in creating and refining story boards to directing the technical production of the spots.  Gregory Dec. Ex. 79 [Segaran Tr] at 39:1-14.

91.     Rosen reached out to Al to invite him to work on a project for PepsiCo's MOUNTAIN DEW brand. Gregory Dec. Ex. 82 [Al Pascarelli Tr] at 18:3-11, 28:19–29:7, 183:21-24.

92.     PepsiCo requires advertising agencies wanting to do business with it to make a Creative Agency Services Agreement with its affiliate Pepsi-Cola Advertising & Marketing, Inc. ("PCAM"). Gregory Dec. Ex. 82 [Carr Tr] at 12:20-13:3, 13:22-14:2.

93.     Betty and PCAM made such an agreement dated as of November 11, 2014 ("the Agreement"). Samay Dec. Ex 23; Gregory Dec. Ex. 82 [Carr Tr] at 12:9-13:3, 13:18-21, 17:9-16.

94.     Al is the only Betty employee who makes client presentations. Gregory Dec. Ex. 77 [Al Pascarelli Tr] at 9:8-10.

95.     Al's brother, Justin Pascarelli ("Justin"), often attends the pitch presentations to "take the temperature of the room" and thereafter assume the role of facilitator between Al and the Betty client. Gregory Dec. Ex. 77 [Al Pascarelli Tr] at 20:12-21:7; Ex. 83 [Justin Pascarelli Tr] at 21:16-22, 23:1-18, 129:13-130:8.

96.     The Agreement serves as a master or umbrella agreement providing the framework for specific projects the parties undertake. Samay Dec. Ex. 23.

97.     The contract is very one-sided in favor of PepsiCo in respect of the respective obligations it sets for the parties. Samay Dec. Ex. 23; Gregory Dec. Ex 82 at 29:23-30:7, 33:14-19, 34:2-5.

98.     Among other things, the Agreement: (a) prohibited Betty from soliciting or accepting any assignment for a product or service that competes with a PepsiCo product or service; (b) required Betty to maintain certain books and records and allowed PCAM to conduct and audit of such books and records; (c) imposed certain broad confidentiality restrictions on Betty; (d) established an indemnification obligation on Betty; and (e) required Betty to procure and maintain substantial

insurance naming PepsiCo as a Loss Payee or Additional Insured. Samay Dec. Ex 23 §§3, 9, 10, 11, 14.

99.    The Agreement did not require PepsiCo to work with Betty as the relationship was non-exclusive (*i.e.*, PepsiCo could work with other agencies) and PepsiCo maintained the right, in its sole discretion, to place orders or to decide not to place orders with Betty. Samay Dec. Ex 23 §1.

100.    The consideration Betty got from PCAM in return was significant– the opportunity to secure a Scope of Work ("SOW") commitment if and whenever PepsiCo wanted to use the output of Betty's creative efforts on a project. Samay Dec. Ex 23 §57.

101.    With a SOW and payment of the negotiated fee, PCAM would then own all rights to the produced creatives. The corollary is that no transfer of rights would occur in the absence of the SOW that the Agreement contemplated and mandated. Samay Dec. Ex 23 §7 ("Subject to PCAM's payment of all amounts owed for the Deliverables [defined in the SOW] pursuant to the Scope of Work, PCAM shall own all right, title and interest in and to the Deliverables[.]").

102.    The parties first used the Agreement with a project for PepsiCo's MOUNTAIN DEW brand. Gregory Dec. Ex. 24. As mandated by the Agreement, PepsiCo and Betty made a SOW to define the scope of the assignment and the fee to be paid. By making the SOW related to the two commercials Betty created and paying the negotiated fee, PepsiCo acquired all rights, title and interest (including copyright rights) to Betty's work.

103.    Betty also worked on a project for the PEPSI MAX brand. Gregory Dec. Ex. 25, 26. Once again, in May 2015, the parties made SOWs for the project (Gregory Dec. Ex 25 and 26) and, with Betty's creative efforts, two commercial spots were made and aired. Pursuant to the Services Agreement and the SOWs, PepsiCo owned all rights to Betty's work product for those projects because it paid the defined fee.

104.     At PepsiCo's request, Betty pitched a script for a commercial for the LIPTON Sparkling Iced Tea brand.  The LIPTON Sparkling Iced Tea product is a joint venture of PepsiCo and Unilever; PepsiCo was the key point for brand marketing and concept selection.  Gregory Dec. Ex. 81 at 57:15-21.  The pitch was well received yet the brand team suddenly stopped all contact and discussion with Betty.  Several months later, and just by happenstance based on an Internet search, Betty discovered that PepsiCo had taken the script and produced an online commercial using it almost verbatim.  Gregory Dec. Ex. 77 [Pascarelli Tr] at 148:2-7, 290:22-297:12.

105.     When confronted with the fact of PepsiCo's theft, Rosen expressed disgust with what had been done and the view that Al had every right to be upset.  Gregory Dec. Ex. 77 [Al Pascarelli Tr] at 148:2-7, 290:22-297:12Ex. 81 [Rosen Tr] at 60:6-61:25.  Through Rosen, PepsiCo offered a fee (a fee that ended up being less than originally promised) which Betty felt it had no choice but to accept (either accept the fee or sue and never work for PepsiCo again).  Gregory Dec. Ex. 77 at 148:2-7, 290:22-297:12Ex. 81 [Rosen Tr] at 63:2-64:1.

106.     Rosen claimed he wanted Betty to create new material for the brand, but, he claimed, the brand manager, Melanie Watts, had after the incident become hostile to Betty because she had been caught red-handed using Betty's script without paying for it.  Allegedly as a result of Watt's attitude, Rosen suggested Betty team up with Rosen's daughter and ghostwrite the creative concepts, which would be submitted to the LIPTON brand team under her name.  The fees received for such projects would be shared (not equally but in favor of his daughter).  The "suggestion" by Rosen was more than a suggestion; it was a threat that if Betty did not follow his "suggested" path, he would use his considerable influence and authority to ensure that Betty would never again have the opportunity to work on PepsiCo matters for the brands he worked with.  Gregory Dec. Ex. 77 [Pascarelli Tr] at 148:2-7, 290:22-297:12, Ex. 83 [Justin Pascarelli Tr] at 31:20–33:21, 66:4–68:15, 70:5–71:2.

44

107.    Betty declined the offer.  Gregory Dec. Ex. 77 [Al Pascarelli Tr] at 148:2-7, 290:22-297:12.

108.    In October 2015, PepsiCo's AMP brand mangers advised Betty that it had won a multiagency pitch to be the agency of record for (Gregory Dec. Ex. 77 [Al Pascarelli Tr] at 198:23-200:13).  Unfortunately for Betty, those managers changed their minds (or were instructed to change their minds) and decided to "go in a different direction" after Betty raised the issues of the Super Bowl commercial raised in this case.  Interestingly, notwithstanding the change of direction, PepsiCo still attempted to purchase Betty's ideas, but for a nominal fee that Betty declined.  Gregory Dec. Ex. 77 [Al Pascarelli Tr] at 202:12-205:19; Ex. 83 [Justin Pascarelli Tr] at 35:2–37:15.

109.    The importance of the Super Bowl to advertisers given the widescale attention it garners from football fans and non-football fans alike cannot be questioned.

110.    PepsiCo has long recognized the advertising reach of the Super Bowl telecast and has worked hard to be associated with the event because it is believed to represent the center of a pop culture moment.  Gregory Dec. Ex. 80 [Danzi Tr] at 12:3-10.

111.    PepsiCo has been the title sponsor of the extremely high-profile Super Bowl halftime show, which features well-known musical entertainers, since June 2012.  Gregory Dec. Ex. 80 [Danzi Tr] 12:3-10.

112.    After initially soliciting proposals for the Super Bowl commercial in two different rounds from agencies it regularly used, because the initial ideas did not test well, PepsiCo prepared a Brief to solicit new creatives from an additional group of advertising agencies.  Gregory Dec. Ex. 79 [Segaran Tr] at 34:25-35:9, 44:21-48:3; Ex. 78 [Arbetter Tr] at 43:8-14; Ex. 1.

113.    Because it rejected the initial proposals, PepsiCo was behind schedule and at least one top executive expressed that the status of the commercial caused his "highest level of anxiety."  Gregory Dec. Ex. 42.

114.    On October 29, 2015, Arbetter instructed Jayanthi Reja Segaran ("Segaran") to invite Betty and a number of other agencies to join a telephone briefing scheduled for the next day for the Super Bowl spot. Gregory Dec. Ex. 43.

115.    Segaran was a director of NFL-related creative communications and marketing for the PEPSI brand and she was PepsiCo's point person for developing the commercial PepsiCo would air leading into the halftime show of the 2016 Super Bowl. Gregory Dec. Ex. 79 [Segaran Tr] at 18:17-25; Ex. 78 [Arbetter Tr] at 48:16-22.

116.    During the October 30, 2015 briefing, Segaran provided direction and a general outline of what PepsiCo wanted from creative presentations. TMA did not receive the e-mail invitation and did not join Segaran's telephone briefing. Gregory Dec. Ex. 11.

117.    Working under the tight deadline PepsiCo imposed, Betty devoted its efforts to developing creative storylines for PepsiCo's consideration. Gregory Dec. Ex. 84 [Al Pascarelli, Jr. Tr] at 95:6-15.

118.    Betty undertook those efforts based on the fact of the Services Agreement and the parties' prior working interactions by which a SOW would be negotiated, prepared and executed if PepsiCo liked a presented advertising storyline and wanted to move forward with producing and acquiring rights to it. Samay Ex. 23.

119.    Betty met with the PepsiCo team (employees and agents) during the morning of Friday November 6, 2015 at PepsiCo's offices. Al and Justin attended the meeting for Betty. Gregory Dec. Ex. 77 [Al Pascarelli Tr] at 8: 20-22; Ex. 83 [Justin Pascarelli Tr] at 23:22-24, 50:4–51:3.

120.    The PepsiCo attendees were Chad Stubbs, Arbetter, Rosen, Jennifer Danzi, Lon Schwear, Jessica Laponte, Diana Mitrea, Neil Goldberg, Salvadore Padron and Segaran. Gregory Dec. Ex. 83 [Justin Pascarelli Tr] at 85:21–87:16.

121.    Al presented eight (8) concepts in detail and distributed Betty-branded USB drives containing summary printed material so that it would be easily available for later review. Gregory Dec. Ex. 77 [Al Pascarelli Tr] at 7:20-23; Ex. 83 [Justin Pascarelli Tr] at 87:17-88:22.

122.    The work product Betty presented consisted of both the written presentation material Betty later registered with the U.S. Copyright Office and a detailed verbal description and articulation of the proposed storyline and presentation, including potential variations of it. Gregory Dec. Ex. 77 [Al Pascarelli Tr] at 15:3-20:11, 21:13-27:3, 54:21-57:13, 58:16-60:14, 62:3-65:5, 67:19-71:7.

123.    Because he believed it to be his strongest creative, Al started his presentation by pitching the "All Kinds/Living Jukebox" concept, and he spent the most time on it. Gregory Dec. Ex. 77[Al Pascarelli Tr] at 12:6-13:6; Ex. 83 [Justin Pascarelli Tr] at 48:9-12, 52:25-53:16.

124.    As he described it, consistent with the fact that it had two names, "All Kinds/Living Jukebox" set forth two related but distinct concepts that shared the same execution mechanic. In a nutshell, the commercial would feature a single "hero character" (performer) moving from room to room; as the character passed into each new room, the doorway would be used to act as the precipice or agent of change for a completely new vibe (which included music genre changes, wardrobe changes of both the hero and the background characters, dance style changes, prop changes and set design changes – which would all be reflective and consistent with the new music). The overarching thematic is that the ad would be stitched together to appear as one continuous seamless shot. As an example, the hero character walks through the door of one room wearing one outfit and emerges into the adjoining room in a new outfit reflective of a different music genre. The secondary characters from the previous room would now be in the new room also with new wardrobe, along with new action and props reflective of the new music. Gregory Dec. Ex. 77 [Al Pascarelli Tr] at 15:3-20:11, 21:13-27:3, 54:21-57:13, 58:16-60:14, 62:3-65:5, 67:19-71:7; Ex. 83 [Justin Pascarelli Tr] at 55:2-56:20, 57:8-58:20, 59:24-61:25; Ex 21.

125. With the All Kinds interpretation, a single song, PepsiCo's Joy of Cola, would be used throughout but with musical genre/style mixes to it, one new genre/style per new room, picking up exactly where the last version left off. Gregory Dec. Ex. 77 [Al Pascarelli Tr] at 15:3-20:11, 21:13-27:3, 54:21-57:13, 58:16-60:14, 62:3-65:5, 67:19-71:7.

126. With the Living Jukebox interpretation, multiple songs would be used rather than just the Joy of Cola thus giving the notion of a jukebox springing to life as the hero and background performers perform to a different song (as a jukebox plays different songs) in each room. Gregory Dec. Ex. 77 [Al Pascarelli Tr] at 15:3-20:11, 21:13-27:3, 54:21-57:13, 58:16-60:14, 62:3-65:5, 67:19-71:7.

127. PepsiCo ended up producing both a Joy of Cola genre mashup only version as well as the Super Bowl aired multiple song version - - thus, PepsiCo actually produced both versions of Betty's creative. Gregory Dec. Ex. 49, 79 [Segaran Tr] at 202:16-203:9, 204:10-205:7, 207:8-24; Ex. 85 [Meyer Tr] at 91:9-93:1.

128. Al emphasized during his presentation that his creative did not depend on the specific types of music listed (rock, rap, jazz/swing, classical) or on the initial scene taking place outside a warehouse facility ("Doesn't have to be a walkthrough of the warehouse."). Gregory Dec. Ex. 77 [Al Pascarelli Tr] at 13:23-20:11, 21:13-22:24, 25:11-25.

129. The PepsiCo witnesses were unable to testify about the contents of Betty's presentation even as to such basic things as the shape of the table(s) in the PepsiCo conference room and what Al and Justin were wearing. One PepsiCo witness recalled that the concept involved the use of ghosts and spirits – which it certainly did not –and that the Betty representatives were wearing blazers (they did not, and hoodies are not often confused with blazers). Gregory Dec. Ex. 77 [Al Pascarelli Tr] at 28:19-21, 39:8-11; Ex. 80 [Danzi Tr] at 51:21-53:13, 55:18-56:1.

130.    The Betty concept described flexibility, labelled "Considerables" in the deck, because experience taught Al that changes often occur during execution, so it is better to not be pigeonholed at the outset with a particular celebrity, song, or style. Samay Ex. 34; Gregory Dec. Ex. 77 [Al Pascarelli Tr] at 58:18-59:20, 67:19-68:17.

131.    Clients are instructed to remain poker-faced during agency presentations. Notwithstanding that mindset, the PepsiCo team reacted favorably to Betty's work during Al's presentation. Gregory Dec. Ex. 83 [Justin Pascarelli Tr] at 131:3-23. After Betty completed its November 6, 2015 presentation, Rosen followed the Pascarellis out of the room and down the hallway to congratulate them on the pitch and to suggest that they soon meet for dinner. Gregory Dec. Ex. 81 [Rosen Tr] at 104:6-15, 104:23-105:2; Ex. 83 [Justin Pascarelli Tr] at 87:17-88:22.

132.    It is fair to surmise that Rosen wanted to clear the air from his "ghostwrite for my daughter" effort because he realized there was a strong likelihood of PepsiCo awarding the Super Bowl project to Betty and that he might have to work with Betty on production of the spot. Gregory Dec. Ex. 83 [Justin Pascarelli Tr] at 87:17–88:22.

133.    When Rosen did meet the Pascarellis for dinner, he apologized for the ghost-writing threat and he acknowledged that Betty was right to have considered it to be a form of blackmail. Gregory Dec. Ex. 83 [Justin Pascarelli Tr] at 90:14-91:10.

134.    During the evening of November 6, 2015, Segaran contacted Al to request that refinements be made to two of the presented storylines and that the refinements be submitted by 9:00 a.m. on Monday November 9, 2015. Gregory Dec. Ex. 39.

135.    Al devoted the weekend to making the refinements (pursuant to a separate agreement that Betty would be paid $5000 solely for the refinement services and not for any ownership rights) in time to meet PepsiCo's Monday morning deadline. Gregory Dec. Ex. 84 [Al Pascarelli, Jr. Tr] at 95:6-15.

136.    Nearly one month later, PepsiCo thanked Betty for its efforts but advised that it had decided on a different approach for the Super Bowl commercial and, therefore, would not be using any of the advertising stories or work Betty created for it.  Gregory Dec. Ex. 28.

137.    Based on that representation, there was no reason for Betty to make a SOW to license or assign its Super Bowl work product to PepsiCo in consideration for fair market value compensation. All of the rights associated with Betty's creations, including the presented "All Kinds/Living Jukebox" storyline, remained Betty's property.  Samay Dec. Ex. 23.

138.    The relationship between PepsiCo and TMA is a long and close one; in fact, TMA originated within PepsiCo before being spun out years ago.  Gregory Dec. Ex. 85 [Meyer Tr] at 11:3-12.

139.    Brad Groves is a TMA employee who spends considerable time working out of the PepsiCo offices, where he tends to the client relationship.  Gregory Dec. Ex. 85 [Meyer Tr] at 19:9-24.

140.    Betty delivered its "All Kind/Living Jukebox" pitch presentation orally and in writing before TMA presented its "Joy of Dance" idea.  Gregory Dec. Ex. 79 [Segaran Tr] at 94:16-25, Ex. 80 [Danzi Tr] at 41:22-46:3, 55:12-15.

141.    With its "Joy of Dance" slide deck, TMA proposed to have Christopher Walken dancing in different eras in a manner reminiscent of his Fatboy Slim video (www.youtube.com/wat?v+wCDIYyFmgW8) with the mechanical execution of the commercial being that the camera will be "locked off and [as a] giant circulate set rotates left to right as if on a giant 'LAZY SUSAN.'"  This is reinforced by the example TMA cited of Wes Anderson's AT&T commercial, where a stage is rotating behind the main character, whose wardrobe does not change and who does not navigate anywhere – https://www.youtube.com/watch?v=f0AtZbgmAr4.  Samay Dec. Ex. 5, 35.

142.    The mechanical execution of the presented concept necessarily meant the hero character could not change his appearance (same as the Fatboy Slim video), could not navigate anywhere and that any scene changes would occur behind him as the set rotated – there would be no doorways used. The TMA slide deck repeatedly used the words "backdrop" and "rotated" to indicate that the hero character never navigated anywhere. This is reinforced by the example TMA cited of Wes Anderson's AT&T commercial, where a stage is rotating behind the main character and his wardrobe never changes and he does not navigate anywhere. Samay Dec. Ex. 5, 35.

143.    The TMA approach indicating in the initial desk is very different from the one Betty proposed and very different from the actual Super Bowl commercial. In the pitch, TMA proposed several time era pieces and backdrops as the set rotated and included that Walken would "crack open an ice-cold Pepsi in a vintage glass bottle", grab a "1960s-era Pepsi", be handed a "1970s era Pepsi bottle", have a "1980s Pepsi machine" in the background and in the final scene take a long refreshing drink from a "modern-day Pepsi." Samay Dec. Ex. 5, 35.

144.    Jennifer Danzi, one of the PepsiCo employees who attended the November 6, 2015 pitch presentations, testified that PepsiCo employees are "trained to respect every agency's materials" and that it is "standard practice to turn a new page and write notes fresh so nobody can peek over and see what you've written about a previous presentation." Gregory Dec. Ex. 80 [Danzi Tr] at 42: 4-19.

145.    Notes taken by Jayanthi Raja Segaran, the individual leading the meeting; her notes of each presentation were not made on separate pages. Gregory Dec. Ex. 6.

146.    Segaran's notes about "All Kinds/Living Jukebox" recite as highlights that there would be a "musical mash up of Joy of Pepsi", "all sorts of musical genres" and that it would be "continuous." Gregory Dec. Ex. 6.

147.    The PepsiCo witnesses testified that the Company does not allow representatives of one agency to hear or see the presentation of another. Gregory Dec. Ex. 78 [Arbetter Tr] at 50-51; Ex. 80 [Danzi Tr] at 42:4-8.

148.    TMA was so concerned about PepsiCo's practices in this regard that Tom Meyer asked one of his attendees to let him know who was in the room because he knew an agency had been allowed by Pepsi representative, to hear and evaluate the creative efforts of others: "Motive both pitched ideas and got to sit in on everyone's presentations. Totally f***ed up. Also Matti Leshem was sitting next to Lou. Terrible." Gregory Dec. Ex.54.

149.    After the PepsiCo group met to compare notes at the end of the day Segaran e-mailed TMA that the Joy of Dance concept was a "cool idea" so it was "too long and complicated" but that TMA should work on refining it. Gregory Dec. Ex. 55 at p 6. Significantly, Segaran's contemporaneous notes, taken during the presentation, made no note of the ending of the spot even though that is the element the PepsiCo witnesses claim was central to their decision. Gregory Dec. Ex. 6.

150.    On Monday morning (November 9), Segaran expressed the hope that TMA's creative director (Marc Gilbar) had been able to connect with Arbetter over the weekend regarding revisions to the Joy of Dance spot. Gregory Dec. Ex 45.

151.    TMA submitted a revised slide indicating the use of an actual jukebox (Living Jukebox) and for the first time the use of doorways to bring the hero character (now proposed to be Pharrell) from room to room (like Betty's concept) but still did not employ the device of a continuous shot, still used different background performers in each scene and still venued one scene in a dark wet alley that hardly conveys joy. Samay Dec. Ex 9.

152.    Later that day, Segaran e-mailed that PepsiCo wanted "[i]n each section, we would show the Pepsi Bottle and logo during its time." Ex 45. For TMA, Gilbar responded to the idea of

featuring Pepsi product/signage from each era by saying "love that idea, we gotta do this."  Gregory

Dec. Ex. 86.  These e-mails raises substantial questions about the authenticity of the original TMA

deck since the idea of using different era-specific props was already supposedly a part of the concept

proposal (Samay Dec. Ex 5, 35) so there would have been no need or reason for Segaran to introduce

it days later and have Gilbar treat it like a new idea.

153.    Even more dramatic proof of what appears to be the time-travelling TMA pitch deck

is an e-mail Arbetter sent to Segaran on November 15, 2015 in which he complained that the concept

lacked an active role for the brand and did not have some kind of twist or clever wink at the end.

Gregory Dec. Ex. 76.  The ending of the spot (which Segaran did not note in her notes (Gregory Ex.

6)) had supposedly been the factor PepsiCo loved – Arbetter described it as a "really clever and

important device" that "popped" (Gregory Dec. Ex. 76) -- which makes the e-mails of a week later

quite puzzling and raises questions about the authenticity of the original TWA pitch deck.

154.    Since PepsiCo embarked on the new round of collecting creatives, there was anxiety

from its senior marketing management about the status of the commercial development.  As Seth

Kaufman, the person who needed to give sign-off, stated before the presentations that the commercial

represented his "highest level of anxiety."  Gregory Dec. Ex. 42.  That anxiety naturally caused the

need for the concept selection and development to run at an accelerated pace.

155.    E-mails between PepsiCo and TMA and internally within TM indicated that TMA was

having off-line "inside scoop" conversations with Rosen and that Rosen was giving "great" feedback

that would "really elevate the spot."  Gregory Dec. Ex 56.

156.    While he tried to discount his own role, the PepsiCo witnesses credited Rosen (and

his partner Neil Goldberg) with being an important part of the concept selection task.  Gregory Dec.

Ex. 79 [Segaran Tr] 33, 39.

157.     Rosen's daughter works for Quietman, the company that handled production tasks for the creation of the Super Bowl commercial. Gregory Dec. Ex. 81 [Rosen Tr] at 140:11-12, 149:15-17, 152:6-7, 11, 16-17, 20-21.

158.     The improper sharing of information with TMA began even before TMA submitted its initial pitch. During the October 30, 2015 briefing conference call, Segaran indicated that PepsiCo did not know and could not reveal the theme of the halftime show (Gregory Dec. Ex. 77 [Al Pascarelli Tr] at 74:2-76:12; Ex. 79 [Segaran Tr] at 50:11-21; yet, an internal TMA e-mail on November 2, 2015 somehow indicated "[t]he Theme for the Halftime show is the History of Music – a celebration of the past and present in music." Gregory Dec. Ex 53.

159.     The totality of the evidence cited above is certainly sufficient to support the conclusion that PepsiCo and its agents were sharing information with TMA that it should have kept confidential.

160.     Like "All Kinds/Living Jukebox," PepsiCo employs a hero character (Janelle Monáe) in the commercial and, as she moved from room to room, the music genre, fashion, clothes and vibe of the room changed -- with the doorways acting as the agent of change and with all the scenes stitched together to give the appearance of one seamless shot of a changing environment. Samay Ex. 34.

161.     After airing the commercial during the Super Bowl, PepsiCo rebroadcast the Super Bowl commercial (and variations of it) nationally on both television and on the Internet many thousands of times such that it has been viewed literally hundreds of millions of times across numerous platforms.

162.     When PepsiCo produced the Super Bowl commercial, it also created a second commercial which used the well-known "Joy of Cola" song in different musical styles. Gregory Dec. Ex. 79 [Segaran Tr] at 202:16-203:9, 204:10-205:7, 207:8-208:24; Ex. 85 [Meyer Tr] at 91:9-93:1.

163.    The PepsiCo plan was to use the second commercial for the remainder of the year, after the expiration of the short-term music licenses it had secured from Madonna and The Contours. Gregory Dec. Ex. 49; 79 [Segaran Tr] at 200:18-201:23.

164.    The PepsiCo witnesses acknowledged the production of the second commercial and the fact that it aired extensively, but the Company did not provide a copy of it or any details about the number or location of airings of it.    Gregory Dec. Ex. 79 [Segaran Tr] 202:16-203:9, 204:10-205:7, 207:8-208:24; Ex. 85 [Meyer Tr] at 91:9-93:1.

165.    With the two versions of the commercial it produced, PepsiCo copied both the "All Kinds" and the "Living Jukebox" concepts.

166.    What was new and creative about Betty's work is the particular way in which all of the elements (hero character, same secondary characters in each scene, music/genre changes, wardrobe changes and set design changes that reflect those music changes) came together with the doorway being the agent of change and it all stitching together to appear as one continuous shot in one continuing environment. Samay Dec. Ex. 4, 21; Gregory Dec. Ex. 15:3-20:11, 21:13-27:3, 54:21-57:13, 58:16-60:14, 62:3-65:5, 67:19-71:7.

167.    An example of how common elements that have been used before or are not alone protectable can be combined in a new way to create a new, interesting and protectable way is the iconic Budweiser commercial that uses elements of frogs, lily pads and a ribbit sound. Gregory Dec. Ex. 77 [Al Pascarelli Tr] at 90:7-91:  The sum can be greater than the parts and is more important than how they can be broken apart. Gregory Dec. Ex. 77 [Al Pascarelli Tr] at 99:4-100:10.

168.    As soon as Betty reached out to PepsiCo after the Super Bowl to complain about the misappropriation, PepsiCo acted hastily tried to cover its tracks given its lack of ownership of Betty's work.  Gregory Dec. Ex. 10.

169.    On December 28, 2015 at 3:50 pm, Betty submitted its $5000 estimate to PepsiCo for its time for working on the 2016 Super Bowl ad.  Gregory Dec. Ex. 14.

170.    PepsiCo initially requested that Betty invoice Direct Focus (Gregory Dec. Ex. 28) but Betty refused because PepsiCo is its client.  Gregory Dec. Ex. 84 [Al Pascarelli, Jr. Tr] at 95:6-96:15.

171.    Betty reminded PepsiCo as early as December 7, 2015 that the fee it earned for the project was not in exchange for an assignment of ownership rights.  Gregory Dec. Ex. 12.

172.    On December 28, 2015 at 3:52 pm, PepsiCo requested a formal estimate from Betty. Gregory Dec. Ex. 14.

173.    On December 28, 2015 at 4:48 pm, Betty submitted its formal estimate with a cover letter to Segaran stating: "We are happy to submit our estimate for the creative concept development and the requested second round of refinements related to the 2016 Super Bowl Ad. Pursuant to our phone conversation Betty will retain all rights, title and interest in its developed advertising concepts and ideas and in all variations and or derivative of them."  The attached estimate bore a banner at the top of the page indicating "Work Estimate" and "Estimate #1228."  Consistent with the cover letter, the Job Description stated: "Creative concept development and second round refinements relating to the 2016 Pepsi Super Bowl Ad. Estimate includes for time only. Betty will retain all rights title and interest in its developed concepts and ideas in all variations and derivatives of them."  Gregory Dec. Ex 12.

174.    Super Bowl 50 is played on February 7, 2016.

175.    On February 10, 2016, Betty issued a demand letter to PepsiCo.  Gregory Dec. Ex. 10.

176.    On March 1, 2016 at 4:48 pm, Segaran forwarded the Betty estimate to Danzi. Gregory Dec. Ex 13.

177.    On March 1, 2016, Danzi submitted Betty's estimate for payment.  Gregory Dec. Ex. 14.

178.    On March 4, 2016 at 2:01 pm, Danzi learned that Betty was not set up as a PepsiCo vendor and she was requested to obtain tax documentation from Betty.  Gregory Dec. Ex. 16.

179.    On March 4, 2016 at 7:05 pm, Danzi responded "Shoot" because she had been told that Betty was upset, considering litigation and that she could not contact Betty. Gregory Dec. Ex. 16; Gregory Dec. Ex. 80 [Danzi Tr] at 97:11-98:8).

180.    On March 9, 2016 at 9:37 am, Danzi received a follow up request regarding the tax paperwork needed from Betty.  Gregory Dec. Ex. 17.

181.    On April 21, 2016, Segaran was included on privileged communications initiated by Arbetter regarding threatened Betty Litigation.  Gregory Dec. Ex. 87.

182.    In March or April 2016, Segaran instructs Danzi to pay Betty and Danzi thereafter created a phony Betty invoice by doctoring the header banner of the Betty estimate, adding fake purchase order and invoice numbers.  She deleted the statement at the bottom of the Betty estimate that "[a]bove information is not an invoice and only an estimate for the services that have been provided." Gregory Dec. Ex. 18.

183.    On April 25, 2016, PepsiCo initiated $5000 ACH payment to Betty referencing the phony invoice and attaching a purchase order titled "Betty SB Ad Creative Concept" and General Terms and Conditions including a section addressing "Ownership" of all created intellectual property Gregory Dec. Ex. 37.

184.    On April 27, 2016, Betty returned $5000 to PepsiCo to avoid any suggestion that it sold any intellectual property rights to "All Kinds/Living Jukebox" to PepsiCo.  Gregory Dec. Ex. 40.

185.    The Britney Spears "Now and Then" commercial did not employ the device of doorways as the agents of change for stitching together scenes to create the appearance of one continuous shot of a changing environment, used different cast members in each scene; it created a distinct and very different feel. Samay Dec. Ex. 34.

186.    The "Bottle Pass" spot provides a very different feel from the Super Bowl commercial. Among other things, there was no hero character, the cast changes, it does not take place in a singular space, it does not use doorways as the agents of change and there was no change of music genres or wardrobes for each era depicted.  Samay Dec. Ex. 34.

Dated: Stamford, Connecticut
May 1, 2019

Respectfully,

By:/s/Mark S. Gregory
    Mark S. Gregory (MG0914)
    Martin LLP
    262 Harbor Drive
    Stamford, Connecticut 06902
    Tel: (203) 973-5210
    Fax: (203) 973-5250
    E-Mail: mgregory@martinllp.net

    *Attorneys for Plaintiff Betty Inc.*

## <u>CERTIFICATE OF SERVICE</u>

I hereby certify that on May 1, 2019 a copy of the foregoing Plaintiff's Responses to Defendant's Statement of Undisputed Facts is being filed electronically and served by mail on anyone unable to accept electronic filing. Notice of this filing will be sent by e-mail to all parties by operation of the court's electronic filing system or by mail to anyone unable to accept electronic filing as indicated on the Notice of Electronic filing. Parties may access this filing through the Court's CM/ECF System.

By: /s/ Mark S. Gregory
    Mark S. Gregory (MG0914)
    Martin LLP
    262 Harbor Drive
    Stamford, Connecticut 06902
    Tel: (203) 973-5210
    Fax: (203) 973-5250
    E-Mail: mgregory@martinllp.net