UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
--------------------------------------------------------------x
BETTY, INC.,                                        :
                              Plaintiff,            :
                                                    :        **OPINION AND ORDER**
v.                                                  :
                                                    :        16 CV 4215 (VB)
PEPSICO, INC.,                                      :
                              Defendant.            :
--------------------------------------------------------------x

Briccetti, J.:

Plaintiff Betty, Inc. ("Betty"), brings this action asserting copyright infringement and

breach of contract against defendant PepsiCo, Inc. ("Pepsi").

Now pending is Pepsi's motion for summary judgment.  (Doc. #87).

For the reasons set forth below, the motion for summary judgment is GRANTED.

The Court has subject matter jurisdiction under 28 U.S.C. §§ 1331, 1332(a), and 1338.

**BACKGROUND**

The parties have submitted briefs, statements of material facts, declarations, and exhibits,

which together reflect the following factual background.

Betty is an advertising agency based in Connecticut.

Pepsi is a global food and beverage company headquartered in New York that markets

and sells products world-wide.  To promote its products, Pepsi engages advertising agencies to

pitch and develop storylines for its advertising campaigns.

I.       The 2014 Services Agreement and Prior Projects

In 2014, Betty and Pepsi-Cola Advertising & Marketing, Inc. ("PCAM"), on behalf of

Pepsi, entered into a "Creative Agency Services Agreement" (the "2014 Agreement"), with a

three-year term.

1

Pursuant to the 2014 Agreement, Pepsi engaged Betty "on a non-exclusive basis to perform the marketing communication services" as provided in the schedule or "Scope of Work." (Doc. #90 ("Samay Decl.") Ex. 23 ¶ 1). Pepsi had sole discretion to determine whether to do business with Betty under the 2014 Agreement.

The parties negotiated and signed a Scope of Work for projects that Betty had worked on for Pepsi, including with Pepsi brands such as Mountain Dew and Pepsi Max.

II.      Pepsi's 2016 Super Bowl Halftime Commercial

Pepsi has sponsored the Super Bowl Halftime show for many years. Prior Super Bowl commercials have employed a Pepsi "through the ages" structure. For example, in 2001, Pepsi aired, "Now and Then," a commercial in which Britney Spears sang and danced through different eras. Pepsi had also aired "Bottle Pass," featuring performers dancing and moving in different eras, as well as "Diner," opening on a jukebox in a diner.

In 2016, Pepsi was the lead sponsor of the Super Bowl Halftime show. Accordingly, Pepsi had a prime commercial slot that would air before the 2016 Super Bowl Halftime show (the "halftime commercial").

On October 30, 2015, Pepsi hosted a telephone call for advertising agencies pitching Pepsi for the halftime commercial. Pepsi sent the agencies a one-page briefing document outlining what Pepsi was looking for in the commercial. Betty participated in that call and recalled that Pepsi employees encouraged the agencies to use music in their pitches.

On or around November 2, 2015, a Pepsi executive also met with a representative from The Marketing Arm ("TMA"), another advertising agency. Pepsi provided TMA with the same briefing document.

On November 6, 2015, Pepsi heard pitches from fourteen advertising agencies, including Betty and TMA.  At that meeting, Betty presented eight concepts for the halftime commercial. One of the concepts, titled "All Kinds/Living Jukebox," opened outside a "giant Brooklyn(like) warehouse" with a man playing a rendition of "The Joy of Pepsi" on "acoustic guitar."  (Samay Decl. Ex. 4 at ECF 3–4).  In Betty's concept, as the camera moves through the warehouse, "the genres start to change and unfold while the song remains the same."  (Id.).  As the genres change, so do the fashion and vibe of the room.  Betty's concept proposed musical genres such as rock, rap, jazz/swing, classical, and metal music.  Betty's commercial would end on "the other side of the warehouse where a doo wop/acapella crew is standing around a fire lit in a trash can."  (Id.).

Betty also provided alternatives for the concept.  For example, there could be "one stage while making clean cuts from genre to genre," and instead of multiple singers, the commercial could feature a single performer who could play all the renditions of "The Joy of Pepsi."

That same day, TMA presented three proposals for the halftime commercial.  One of the concepts, titled "The Joy of Dance," was built on the foundation of the Britney Spears "Now and Then" commercial, featuring Christopher Walken dancing through a timeline of over fifty years, set in five eras, moving through several rooms.  (Samay Decl. Ex. 5 at ECF 4–6).  The first room would be set in a 1950s diner, the second in 1960s Detroit, the third in a 1970s disco, the fourth in a 1980s Michael Jackson era, and the final in a modern house party.  TMA proposed using a rotation to transition the featured character between sets to reveal a new backdrop.  As the set changed, there would be corresponding changes in wardrobe, dance, and color.  TMA's pitch ended with the camera panning up to reveal that the red, white, and blue sets formed the shape of a Pepsi globe.

Pepsi employees testified Betty's "All Kinds/Living Jukebox" pitch felt dark given the warehouse setting, the heavy metal music, and how it ends on singers standing around a trash can fire.  (Samay Decl. Ex. 60 ("Louis Arbetter Dep.") at 55:19-56:7.)  Accordingly, Pepsi did not request refinements to the "All Kinds/Living Jukebox" concept.  However, at Pepsi's request, Betty did submit refinements to two of its other pitches on November 9, 2015.  Nonetheless, Betty executives acknowledge no material terms for any Scope of Work were discussed related to the halftime commercial.  (Samay Decl. Ex. 62 ("Alphonse Pascarelli Dep.") at 45:2-8 ("Q: Did you ever negotiate with Pepsi a price for use of the All Kinds Living Jukebox concept?  A: No.  Q: Did you ever negotiate what the deliverable would look like if Betty was retained? A: No.")).  And on December 2, 2015, Pepsi told Betty that it would not be using Betty's concepts for the halftime commercial.

Pepsi also asked for refinements to TMA's "The Joy of Dance" pitch by November 9, 2015.  Pepsi employees testified that TMA's pitch was consistent with Pepsi's prior commercials, and that they liked the Pepsi globe concept.  On November 7, 2015, TMA emailed internally about the refinements, stating, "[w]e owe celebrity talent recos for the main dancer (man, woman or possibly combo)" and other revisions including, "[c]hanges from five time periods to three: 50s/80s/present day" and "[s]implified the action/movement across the board; no longer continuous shot or rotating set."  (Doc. #91 ("Gilbar Decl.") Ex. E).  TMA submitted the refined pitch on November 9, 2015, which included a jukebox as a mechanism to display the Pepsi globe.  The revised pitch followed Pharrell Williams through different historical eras.

Ultimately, Pepsi selected TMA's "The Joy of Dance" for its halftime commercial.  On February 7, 2016, the halftime commercial aired.  The final commercial opened on a jukebox selecting a record with the Pepsi logo.  The commercial featured the singer Janelle Monáe

moving from room to room through three different eras.  Monáe entered the frame dancing to

"Do You Love Me" by The Contours in a 1950s-style diner with a red floor.  Monáe exited the

diner through a door into a bright white room where Madonna's "Express Yourself" was playing.

As she entered the white room, Monáe's outfit and the outfits and movements of the dancers

changed to reflect the 1980s.  Seconds later, Monáe ran through another door into a blue room

where "The Joy of Pepsi" played at a dance party.  In the blue room, Monáe and the dancers

donned clothing to reflect the 1990s/2000s.  At the end of the ad, the camera zoomed out from

Monáe and the three rooms combined into the Pepsi globe.

After the commercial aired, Betty applied for and was issued a Certificate of Registration

by the Register of Copyrights for its written pitch materials, including for the "All Kinds/Living

Jukebox" concept.  The May 18, 2016, certificate from the U.S. Copyright Office protects

Betty's November 6 and 9, 2015, pitch decks and the "text of storyline," but excludes from

protection "photograph(s), artwork, Pepsi name and logo."  (Samay Decl. Ex. 33).

## DISCUSSION

I.    <u>Standard of Review</u>

The Court must grant a motion for summary judgment if the pleadings, discovery

materials before the Court, and any affidavits show there is no genuine issue as to any material

fact and it is clear the moving party is entitled to judgment as a matter of law.  Fed. R. Civ. P.

56(a); <u>Celotex Corp. v. Catrett</u>, 477 U.S. 317, 322 (1986).[1]

---

[1]     Unless otherwise indicated, case quotations omit all citations, internal quotation marks, footnotes, and alterations.

A fact is material when it "might affect the outcome of the suit under the governing law. . . . Factual disputes that are irrelevant or unnecessary" are not material and thus cannot preclude summary judgment.  Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 248 (1986).

A dispute about a material fact is genuine if there is sufficient evidence upon which a reasonable jury could return a verdict for the non-moving party.  See Anderson v. Liberty Lobby, Inc., 477 U.S. at 248.  The Court "is not to resolve disputed issues of fact but to assess whether there are any factual issues to be tried."  Wilson v. Nw. Mut. Ins. Co., 625 F.3d 54, 60 (2d Cir. 2010).  It is the moving party's burden to establish the absence of any genuine issue of material fact.  Zalaski v. City of Bridgeport Police Dep't, 613 F.3d 336, 340 (2d Cir. 2010).

If the non-moving party has failed to make a sufficient showing on an essential element of his case on which he has the burden of proof, then summary judgment is appropriate.  Celotex Corp. v. Catrett, 477 U.S. at 323.  If the non-moving party submits "merely colorable" evidence, summary judgment may be granted.  Anderson v. Liberty Lobby, Inc., 477 U.S. at 249–50.  The non-moving party "must do more than simply show that there is some metaphysical doubt as to the material facts, and may not rely on conclusory allegations or unsubstantiated speculation."  Brown v. Eli Lilly & Co., 654 F.3d 347, 358 (2d Cir. 2011).  The mere existence of a scintilla of evidence in support of the non-moving party's position is likewise insufficient; there must be evidence on which the jury could reasonably find for him.  Dawson v. County of Westchester, 373 F.3d 265, 272 (2d Cir. 2004).

On summary judgment, the Court construes the facts, resolves all ambiguities, and draws all permissible factual inferences in favor of the non-moving party.  Dallas Aerospace, Inc. v. CIS Air Corp., 352 F.3d 775, 780 (2d Cir. 2003).  If there is any evidence from which a reasonable inference could be drawn in the non-movant's favor on the issue on which summary

judgment is sought, summary judgment is improper.  Sec. Ins. Co. of Hartford v. Old Dominion

Freight Line, Inc., 391 F.3d 77, 83 (2d Cir. 2004).

In deciding a motion for summary judgment, the Court need consider only evidence that

would be admissible at trial.  Nora Bevs., Inc. v. Perrier Grp. of Am., Inc., 164 F.3d 736, 746 (2d

Cir. 1998).

III.     Copyright Infringement Claim

Pepsi argues Betty's copyright infringement claim fails as a matter of law because the

undisputed facts demonstrate Pepsi did not infringe on Betty's protectible material.

The Court agrees.

A.        Legal Standard

 "To establish copyright infringement, 'two elements must be proven: (1) ownership of a

valid copyright, and (2) copying of constituent elements of the work that are original.'"

Williams v. Crichton, 84 F.3d 581, 587 (2d Cir. 1996) (quoting Feist Publ'ns, Inc. v. Rural Tel.

Serv. Co., 499 U.S. 340, 361 (1991)).

For the first element, the Copyright Act "provides that a 'certificate of a registration

made before or within five years after first publication of the work shall constitute prima facie

evidence of the validity of the copyright and of the facts stated in the certificate.'"  Chic Home

Design, LLC v. New Journey Grp. Ltd., 2017 WL 3738775, at *3 (S.D.N.Y. Aug. 30, 2017)

(citing 17 U.S.C § 410(c)).

For the second element, "[i]n the absence of direct evidence, copying is proven by

showing (a) that the defendant had access to the copyrighted work and (b) the substantial

similarity of protectible material in the two works."  Williams v. Crichton, 84 F.3d at 587.  To

assess substantial similarity, courts "engage in a detailed examination of the works themselves,

to determine whether, in the eyes of the average lay observer, the allegedly infringing work is substantially similar to the protectible expression in the copyrighted work." Lewinson v. Henry Holt & Co., LLC, 659 F. Supp. 2d 547, 564 (S.D.N.Y. 2009) (citing Williams v. Crichton, 84 F.3d at 583, 587).

The Court thus looks to "the total concept and feel, theme, characters, plot, sequence, pace, and setting of the [copyrighted work] and the [allegedly infringing] work[]." Williams v. Crichton, 84 F.3d at 588.  In undertaking this analysis, the Court must distinguish between "a work's non[-]protectible elements and its selection, coordination, arrangement, and expression of those elements—which are protectible." Lewinson v. Henry Holt & Co., LLC, 659 F. Supp. 2d at 565.  The Court must "must take care to inquire only whether the protectible elements, standing alone, are substantially similar." Williams v. Crichton, 84 F.3d at 588.

A "principle fundamental to copyright law" is that "a copyright does not protect an idea, but only the expression of an idea." Williams v. Crichton, 84 F.3d at 587.  "While [t]he distinction between an idea and its expression is an elusive one," id. at 587–88, "the nub is that an author must use creativity to transform facts and ideas into an expression that displays the stamp of the author's originality." Lewinson v. Henry Holt & Co., LLC, 659 F. Supp. 2d at 566. "Similarly, scenes a faire, sequences of events that necessarily result from the choice of a setting or situation, do not enjoy copyright protection." Williams v. Crichton, 84 F.3d at 587.  Scènes à faire are "elements that follow naturally from a work's theme rather than from an author's creativity." MyWebGrocer, LLC v. Hometown Info, Inc., 375 F.3d 190, 194 (2d Cir. 2004). Finally, "where an element occurs both in the defendant's prior work and the plaintiff's prior work, no inference of copying can be drawn." Muller v. Twentieth Century Fox Film Corp., 794

8

F. Supp. 2d 429, 444 (S.D.N.Y. 2011), aff'd sub nom. Muller v. Anderson, 501 F. App'x 81 (2d

Cir. 2012) (summary order).

> B.     Application

The parties do not dispute the first element, that Betty obtained a valid copyright for its

written presentation.  Thus, the dispute centers around the second element—whether Pepsi

copied Betty's protected material.

The Court finds Pepsi did not copy Betty's protected material.

Betty fails to put forward evidence of direct copying.  Rather, it asks the Court to draw an

inference of copying from Pepsi's access to Betty's written pitch material and the supposedly

substantial similarity between Pepsi's halftime commercial and Betty's pitch.

The parties agree Pepsi had access to Betty's written presentation.  Therefore, the

analysis ultimately turns on the second part of the substantial similarity test:  whether, in the eyes

of the average lay observer, Pepsi's halftime commercial was substantially similar to the

protectible expression in Betty's presentation.

Here, undisputed evidence demonstrates that the overall concept, feel, setting, themes,

characters, pace, and sequence of Betty's written presentation are not substantially similar to

Pepsi's halftime commercial.

The concept and feel of Betty's pitch and Pepsi's halftime commercial are not

substantially similar:  Betty's presentation is darker than the actual halftime commercial.

Between the acoustic music, the warehouse, and the ending on a group gathered around a trash

can fire, these images evoke a darker and moodier concept and feel.  Betty's concept is further

darkened by the genres of music Betty selected—acoustic guitar, metal, rock, classical, and doo

9

wop/acapella.  Whereas Pepsi's halftime commercial takes place in three bright rooms featuring

pop music of different eras, and a pop version of "The Joy of Pepsi."

The settings are also meaningfully different.  The setting for Betty's proposed

commercial "takes place in a Brooklyn(like) warehouse" and outside the warehouse with

musicians standing around a trash can fire.  The Pepsi halftime commercial begins set in a

brightly-lit 1950s-era diner with a red dance floor, transitions to a brightly-lit white room with a

Pepsi logo on the floor, and ends in a room with a blue floor, blue walls, and blue lighting.

Likewise, the themes are different.  The theme of Betty's "All Kinds/Living Jukebox"

pitch is different artists or a single artist singing "The Joy of Pepsi" with "fashion, clothes, and

vibe" changes to reflect the changing genres.  The theme of Pepsi's commercial is dance through

three different eras.  Although both Betty's pitch and the Pepsi halftime commercial feature

changes in fashion and vibe connected to the room, these changes arise from different stimuli:

for Betty it's the musical genre; for Pepsi it's the decade.  Moreover, the concept of changing

clothing and dance moves to match the genre or decade employed in both Betty's pitch and

Pepsi's commercial is itself not protectible—it follows naturally from their themes.  Williams v.

Crichton, 84 F.3d at 587.  Thus, Betty's proposed thematic device, of changing wardrobe and

dance moves to reflect the genre, is not protected.

In addition, the characters are different.  The characters identified in Betty's copyrighted

materials are an acoustic guitar singer, a lone singer with an Adele-like quality, and a doo

wop/acapella crew.  In the "considerables" section of its written presentation, Betty suggests,

instead of those characters, either a celebrity or non-celebrity could perform the "The Joy of

Pepsi" in all different genres.  The Pepsi halftime commercial, however, features one

singer/dancer—Janelle Monáe—throughout.  Although Betty's suggestion of a celebrity could

encompass Monáe, that is too broad and too generalized to be substantially similar.  Moreover, the photographs in Betty's pitch—which are excluded from copyright protection—do not include images of Monáe.

The pacing and sequencing of the two works differ meaningfully as well.  Betty's written pitch proposes changing between sets through "clean cuts" and magician-like outfit changes, whereas the Pepsi halftime commercial changes with "clean cuts" through doorways.  As Monáe crosses the threshold, her outfit changes, as do the outfits of the background dancers.  However, Betty does not offer a particularized expression or example of a clean cut in its pitch.  Thus, here, a "clean cut" is an idea rather than an expression of an idea, and ideas are not protected. Lewinson v. Henry Holt & Co., LLC, 659 F. Supp. 2d 547, 566 (S.D.N.Y. 2009).  Based on the protectible elements of Betty's pitch, neither the pacing nor sequencing between the two works is substantially similar.

Betty argues there is substantial similarity because its written materials propose a jukebox and the Pepsi halftime commercial opens on a jukebox.  The Court is not persuaded.  Betty's sole reference to a jukebox in its written materials is the title "Living Jukebox."  But the title is merely an idea, rather than an expression of an idea, and therefore it does not enjoy copyright protection.  Lewinson v. Henry Holt & Co., LLC, 659 F. Supp. 2d at 566.  Moreover, Pepsi's prior ad "Diner" featured a jukebox, and thus no inference of copying can be drawn.  Muller v. Twentieth Century Fox Film Corp., 794 F. Supp. 2d at 444.

In sum, there are few, if any similarities, between Betty's protected pitch materials and Pepsi's halftime commercial.  To the extent there are any similarities, those similarities arise from non-protected elements such as ideas, scènes à faire, and Pepsi's prior work.  Williams v. Crichton, 84 F.3d at 588–89.

Accordingly, Betty's copyright infringement claim fails as a matter of law.[2]

IV.     Breach of Contract Claim

In its prior decision on Pepsi's motion to dismiss the amended complaint, this Court

found that plaintiff had plausibly alleged the "2014 Agreement is a Type II preliminary

agreement that obligated the parties to negotiate in good faith." (Doc. #65 ("June 4, 2018,

Opinion & Order") at 6). However, the Court noted "[t]he question is close . . . , and may be

addressed again on summary judgment." (June 4, 2018, Opinion & Order at 8).

Now, at summary judgment, the Court finds the undisputed evidence demonstrates there

was no Type II preliminary agreement.

A.      Legal Standard

"Under New York law, a breach of contract claim requires proof of (1) an agreement,

(2) adequate performance by the plaintiff, (3) breach by the defendant, and (4) damages."

Fischer & Mandell, LLP v. Citibank, N.A., 632 F.3d 793, 799 (2d Cir. 2011).

"In some circumstances, however, preliminary agreements can create binding

obligations." Adjustrite Sys., Inc. v. GAB Bus. Servs., Inc., 145 F.3d 543, 548 (2d Cir. 1998).

For a so-called Type II preliminary agreement to exist, courts consider the following five factors:

"(1) whether the intent to be bound is revealed by the language of the agreement; (2) the context

of the negotiations; (3) the existence of open terms; (4) partial performance; and (5) the necessity

of putting the agreement in final form, as indicated by the customary form of such transactions."

Brown v. Cara, 420 F.3d 148, 157 (2d Cir. 2005). If the Court concludes there is such an

agreement, the parties are not committed to their ultimate contractual objectives, but they are

---

[2]     Pepsi also argues TMA independently created the halftime commercial. As the Court has
already concluded Betty's copyright infringement claim fails as a matter of law for lack of
substantial similarity, it need not assess whether TMA created the commercial independently.

12

"obligat[ed] to negotiate the open issues in good faith in an attempt to reach the . . . objective

within the agreed framework."  Id.

However, if the contract leaves open material terms, the contract is simply not

enforceable, either as a preliminary agreement or otherwise.  Foros Advisors LLC v. Dig. Globe,

Inc., 333 F. Supp. 3d 354, 361 (S.D.N.Y. 2018) ("Without such critical terms as the type of

financial advisor, the scope of services, and the compensation, there can be no binding

agreement because the Offer Clause is merely an agreement to agree on these material terms at a

later time.").

      B.     Application

The undisputed evidence demonstrates there was no preliminary agreement requiring

Pepsi to negotiate in good faith, and thus, there is no contractual obligation.

First, and most important, the language of the 2014 Agreement does not suggest an intent

to be bound.  To support its argument that the parties intended to be bound, Betty directs the

Court to Section 7 of the 2014 Agreement.  That section provides:

> Ownership/Trademarks/Copyrights.  Subject to PCAM's payment of all amounts
> owed for the Deliverables pursuant to the Scope of Work, PCAM shall own all
> right, title, and interest in and to the Deliverables subject to all third party rights,
> restrictions, limitations, and obligations as disclosed by the Agency in writing to
> PCAM and as approved by PCAM.

(Samay Decl. Ex. 23 ¶ 7.)  Betty argues that if Pepsi wanted to use its creative efforts, pursuant

to Section 7, Pepsi had an obligation to negotiate with Betty in good faith.  The record does not

support a finding that Pepsi used Betty's creative efforts, but even if it did, Betty's own

employees acknowledge there is no provision in the 2014 Agreement requiring Pepsi to negotiate

with Betty over a Scope of Work.  (Alphonse Pascarelli Dep. at 128:8-12 ("Q: Is there any

provision in the contract that requires Pepsi to negotiate with Betty other than when there is a

change in an existing scope of work?  A: Not outside the scope of work.").)  Moreover, the

parties agree no "Deliverables" were discussed in anticipation of a Scope of Work.[3]  Thus, the

language of the 2014 Agreement does not support a finding of the parties' intent to be bound.

Second, the context of the negotiations weighs against finding a Type II preliminary

agreement.  Betty knew it was one of fourteen agencies pitching Pepsi.  Therefore, Betty was

aware it would get a Scope of Work only if Pepsi decided to move forward with its concept or

concepts.

Third, there were several open terms.  The 2014 Agreement contemplates a Scope of

Work with more specific terms, such as an engagement date, deliverables, and fee.  These terms

would be negotiated separately only if Pepsi opted to move forward with Betty.

Fourth, Betty did not partially perform.  Betty knew its efforts developing concepts and

making refinements were towards a Scope of Work, but not by the terms of any such agreement.

Fifth, and finally, based on Betty's prior dealings with Pepsi, Betty should have known a

final form—the Scope of Work—was necessary and customary for Pepsi to move forward with

any one of Betty's pitches.

The Court concludes the undisputed evidence shows there was no preliminary Type II

agreement.  Thus, the Court finds any contractual obligation to negotiate, in good faith or

otherwise, is unenforceable.

Accordingly, Betty's breach of contract claim fails as a matter of law.

---

[3]      Pepsi agreed to compensate Betty, and eventually cut a check for refinements to concepts
not at issue here.  The agreement on those refinements is immaterial to Betty's breach of contact
claim arising from the 2014 Agreement.

**CONCLUSION**

The motion for summary judgment is GRANTED.

The Clerk is instructed to terminate the motion (Doc. #87) and close this case.

Dated: November 12, 2019
      White Plains, NY

SO ORDERED:

_____
Vincent L. Briccetti
United States District Judge